# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 20, 2016

Lyle W. Cayce
Clerk

No. 14-41127

MARC VEASEY; JANE HAMILTON; SERGIO DELEON; FLOYD CARRIER; ANNA BURNS; MICHAEL MONTEZ; PENNY POPE; OSCAR ORTIZ; KOBY OZIAS; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; JOHN MELLOR-CRUMMEY, KEN GANDY; GORDON BENJAMIN, EVELYN BRICKNER,

Plaintiffs – Appellees

TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS,

Intervenor Plaintiffs – Appellees

v.

GREG ABBOTT, in his Official Capacity as Governor of Texas;  CARLOS CASCOS, Texas Secretary of State; STATE OF TEXAS; STEVE MCCRAW, in his Official Capacity as Director of the Texas Department of Public Safety,

Defendants – Appellants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA,

Plaintiff – Appellee

TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND; IMANI CLARK,

Intervenor Plaintiffs – Appellees

v.

No. 14-41127

STATE OF TEXAS;  CARLOS CASCOS, Texas Secretary of State; STEVE MCCRAW, in his Official Capacity as Director of the Texas Department of Public Safety,

Defendants – Appellants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TEXAS STATE CONFERENCE OF NAACP BRANCHES; MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES,

Plaintiffs – Appellees

v.

CARLOS CASCOS, Texas Secretary of State; STEVE MCCRAW, in his Official Capacity as Director of the Texas Department of Public Safety,

Defendants – Appellants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LENARD TAYLOR; EULALIO MENDEZ, JR.; LIONEL ESTRADA; ESTELA GARCIA ESPINOSA;  MARGARITO MARTINEZ LARA; MAXIMINA MARTINEZ LARA; LA UNION DEL PUEBLO ENTERO, INCORPORATED,

Plaintiffs – Appellees

v.

STATE OF TEXAS;  CARLOS CASCOS, Texas Secretary of State; STEVE MCCRAW, in his Official Capacity as Director of the Texas Department of Public Safety,

Defendants – Appellants

2

No. 14-41127

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

Before STEWART, Chief Judge, and JOLLY, DAVIS, JONES, SMITH,
DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES,
GRAVES, HIGGINSON, and COSTA, Circuit Judges.

HAYNES, Circuit Judge, joined by STEWART, Chief Judge, and DAVIS,
PRADO, SOUTHWICK, GRAVES, and HIGGINSON, Circuit Judges, in full;
DENNIS and COSTA, Circuit Judges, joining in all but Part II.A.1 and
concurring in the judgment.[1]

In 2011, Texas ("the State") passed Senate Bill 14 ("SB 14"), which
requires individuals to present one of several forms of photo identification in
order to vote. *See* Act of May 16, 2011, 82d Leg., R.S., ch. 123, 2011 Tex. Gen.
Laws 619. Plaintiffs filed suit challenging the constitutionality and legality of
the law. The district court held that SB 14 was enacted with a racially
discriminatory purpose, has a racially discriminatory effect, is a poll tax, and
unconstitutionally burdens the right to vote. *See Veasey v. Perry*, 71 F. Supp.
3d 627, 633 (S.D. Tex. 2014). The State appealed from that decision, and a
panel of our court affirmed in part, vacated in part, and remanded the case for
further findings. *See Veasey v. Abbott*, 796 F.3d 487, 493 (5th Cir. 2015), *reh'g
en banc granted*, 815 F.3d 958 (5th Cir. 2016). The State filed a petition for
this court to rehear the case en banc, which we granted.

———————————

[1] Part II.A.1 as written represents the opinion of a plurality of the court. However, a
majority of the court agrees that there are infirmities in the district court's opinion regarding
Plaintiffs' discriminatory purpose claim, requiring reversal of the district court's judgment
that SB 14 was passed with a racially discriminatory purpose. A majority of the court also
agrees that, given the court's decision to reverse the district court's judgment as to this claim,
the court should remand to the district court with instructions to reweigh the evidence in
light of this opinion.

No. 14-41127

# I. Background

## A. *Senate Bill 14*

Prior to the implementation of SB 14, a Texas voter could cast a ballot in person by presenting a registration certificate—a document mailed to voters upon registration. TEX. ELEC. CODE §§ 13.142, 63.001(b) (West 2010). Voters appearing without the certificate could cast a ballot by signing an affidavit and presenting one of multiple forms of identification ("ID"), including a current or expired driver's license, a photo ID (including employee or student IDs), a utility bill, a bank statement, a paycheck, a government document showing the voter's name and address, or mail addressed to the voter from a government agency. *Id.* §§ 63.001, 63.0101 (West 2010).

With the implementation of SB 14, Texas began requiring voters to present certain specific forms of identification at the polls. These include: (1) a Texas driver's license or personal identification card issued by the Department of Public Safety ("DPS") that has not been expired for more than 60 days; (2) a U.S. military identification card with a photograph that has not been expired for more than 60 days; (3) a U.S. citizenship certificate with a photo; (4) a U.S. passport that has not been expired for more than 60 days; (5) a license to carry a concealed handgun issued by DPS that has not been expired for more than 60 days; or (6) an Election Identification Certificate ("EIC") issued by DPS that has not been expired for more than 60 days.[2] TEX. ELEC. CODE § 63.0101 (West Supp. 2014).[3]

---

[2] We refer to these required forms of identification under SB 14 as "SB 14 ID."

[3] SB 14 also requires the name on the photo ID to be "substantially similar" to the voter's registered name. TEX. ELEC. CODE § 63.001(c) (West Supp. 2014). If the names are not identical but are substantially similar, the voter must sign an affidavit that the voter and the registered voter are one and the same. *Id.* If the names are not substantially similar, the voter may submit a provisional ballot and within six days must go to the county registrar

No. 14-41127

SB 14 states that DPS "may not collect a fee for an [EIC] or a duplicate [EIC]," TEX. TRANSP. CODE § 521A.001(b) (West 2013), and allows DPS to promulgate rules for obtaining an EIC, *id.* § 521A.001(f); § 521.142. To receive an EIC, DPS rules require a registered voter to present either: (A) one form of primary ID, (B) two forms of secondary ID, or (C) one form of secondary ID and two pieces of supporting identification. 37 TEX. ADMIN. CODE § 15.182(1). Thus, any application for an EIC requires either one Texas driver's license or personal identification card that has been expired for less than two years, or one of the following documents, accompanied by two forms of supporting identification: (1) an original or certified copy of a birth certificate from the appropriate state agency; (2) an original or certified copy of a United States Department of State Certification of Birth for a U.S. citizen born abroad; (3) U.S. citizenship or naturalization papers without a photo; or (4) an original or certified copy of a court order containing the person's name and date of birth and indicating an official change of name and/or gender. *Id.* § 15.182(3).[4]

Before May 27, 2015, a statutory provision distinct from SB 14 imposed a $2 or $3 fee for a certified copy of a birth certificate.[5] TEX. HEALTH & SAFETY

---

with additional ID to verify his or her identity. *Id.* §§ 63.001(g), 63.011, 65.0541(a) (West Supp. 2014).

[4] Among the forms of supporting identification are: voter registration cards, school records, insurance policies that are at least two years old, identification cards or driver's licenses issued by another state that have not been expired for more than two years, Texas vehicle or boat titles or registrations, military records, Social Security cards, W-2 forms, expired Texas driver's licenses, government agency ID cards, unexpired military dependent identification cards, Texas or federal parole or mandatory release forms, federal inmate ID cards, Medicare or Medicaid cards, immunization records, tribal membership cards from federally recognized tribes, and Veteran's Administration cards. 37 TEX. ADMIN. CODE § 15.182(4).

[5] The Department of State Health Services ("DSHS") waived most of the fees for obtaining a birth certificate to get an EIC, but this provision separately required the Bureau of Vital Statistics, local registrars, and county clerks to collect a $2 fee for the issuance of a

No. 14-41127

CODE § 191.0045 (West 2010). As discussed below, after the district court issued its judgment and the panel conducted oral argument in this case, the Texas Legislature passed Senate Bill 983 during the 2015 legislative session and eliminated this fee.

Persons who have a disability are exempt from SB 14's photo ID requirement if they are able to provide the voter registrar with documentation of their disability from the U.S. Social Security Administration or Department of Veterans Affairs. TEX. ELEC. CODE § 13.002(i) (West Supp. 2014). Other persons may vote by provisional ballot without a photo ID if they file affidavits either asserting a religious objection to being photographed or asserting that their SB 14 ID was lost or destroyed as a result of a natural disaster occurring within 45 days of casting a ballot. *Id.* § 65.054. Additionally, voters who will be 65 or older as of the date of the election may vote early by mail. *Id.* § 82.003.

If a voter is unable to provide SB 14 ID at the poll, the voter can cast a provisional ballot after executing an affidavit stating that the voter is registered and eligible to vote. *Id.* § 63.001(a), (g). The vote counts if the voter produces SB 14 ID to the county registrar within six days of the election. *Id.* § 65.0541.

SB 14 requires county registrars to inform applicants of the new voter ID requirements when issuing voter registration certificates, *id.* § 15.005, and requires both the Secretary of State and voter registrar of each county with a website to post SB 14's requirements online. *Id.* § 31.012(a). The requirements must also be placed prominently at polling places. *Id.* § 62.016. Additionally, the Secretary of State must "conduct a statewide effort to educate

---

certified copy of a birth certificate, and permitted local registrars and county clerks to impose an additional $1 fee. TEX. HEALTH & SAFETY CODE § 191.0045(d), (e), (h) (West 2010).

voters regarding the identification requirements for voting." *Id.* § 31.012(b). The district court found that SB 14 allocated a one-time expenditure of $2 million for voter education.[6] *Veasey v. Perry*, 71 F. Supp. 3d at 649.

## B. Procedural History

The State began enforcing SB 14 on June 25, 2013.[7] The plaintiffs and intervenors[8] (collectively, "Plaintiffs") filed suit against Defendants to enjoin enforcement of SB 14, and their suits were consolidated before one federal district court in the Southern District of Texas. *See Veasey v. Perry*, 71 F. Supp. 3d at 632. Plaintiffs claim that SB 14's photo identification requirements violate the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act because SB 14 was enacted with a racially discriminatory purpose and has a racially discriminatory effect. Plaintiffs also claim that SB 14's photo ID requirement places a substantial

---

[6] The district court also found that one-quarter of the $2 million was earmarked to research what type of voter education was needed. *Veasey v. Perry*, 71 F. Supp. 3d at 649.

[7] A three-judge district court declined to grant judicial preclearance to override the United States Attorney General's denial of preclearance. *See Texas v. Holder*, 888 F. Supp. 2d 113, 144–45 (D.D.C. 2012), *vacated and remanded*, 133 S. Ct. 2886 (2013). The Supreme Court vacated and remanded this decision when it issued *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), which held unconstitutional the coverage formula in Section 4(b) used to determine which jurisdictions were subject to the preclearance requirement in Section 5 of the Voting Rights Act. Thereafter, Texas began enforcing SB 14.

[8] Plaintiff-Intervenor Texas League of Young Voters Education Fund (the "Texas League") was non-operational when the panel opinion was issued and remained so at least at the time the supplemental en banc briefs were filed in this case. "A claim becomes moot when 'the parties lack a legally cognizable interest in the outcome.'" *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). The Texas League argues that it nonetheless has standing because many of the Texas voters whose inability to obtain SB 14 ID gave rise to the Texas League's standing remain disenfranchised by SB 14. Because other Plaintiffs have standing to challenge SB 14 and because the court's remedy will reach all voters who do not have or cannot reasonably obtain SB 14 ID (regardless of their membership in the Texas League), we need not separately address the Texas League's standing. *See Nat'l Rifle Ass'n*, 719 F.3d at 344 n.3 ("Only one of the petitioners needs to have standing to permit us to consider the petition for review.").

No. 14-41127

burden on the fundamental right to vote under the First and Fourteenth Amendments, and constitutes a poll tax under the Fourteenth and Twenty-Fourth Amendments.  The State defends SB 14 as a constitutional requirement imposed to prevent in-person voter fraud and increase voter confidence and turnout.

The district court conducted a nine-day bench trial at which dozens of expert and lay witnesses testified by deposition or in person.  Following that bench trial, the district court issued a lengthy and comprehensive opinion holding:

> SB 14 creates an unconstitutional burden on the right to vote [under the First and Fourteenth Amendments], has an impermissible discriminatory effect against Hispanics and African–Americans [under Section 2 of the Voting Rights Act], and was imposed with an unconstitutional discriminatory purpose [in violation of the Fourteenth and Fifteenth Amendments and Section 2]. [Furthermore,] SB 14 constitutes an unconstitutional poll tax [under the Fourteenth and Twenty-Fourth Amendments].

*Veasey v. Perry*, 71 F. Supp. 3d at 633.  Shortly before in-person early voting was scheduled to begin for the November 2014 elections, the district court "enter[ed] a permanent and final injunction against enforcement of the voter identification provisions [of SB 14], Sections 1 through 15 and 17 through 22."[9] *Id.* at 707 & n.583.  Since it struck the State's voter ID law so close to the impending November 2014 election, the district court ordered the State to "return to enforcing the voter identification requirements for in-person voting

---

[9] The district court did not enjoin enforcement of sections 16, 23, and 24 in accordance with SB 14's severability clause.  Sections 16 and 23 relate to increasing the penalties and offense levels for election code violations.  *See* Tex. Elec. Code § 64.012 historical note (West 2010 & Supp. 2014) [Act of May 16, 2011, 82d Leg., R.S., ch. 123, §§ 16, 23, 2011 Tex. Gen. Laws 619, 623, 625].  Section 24 has expired, but once related to the purposes for which the voter registrars could use certain funds disbursed under the election code.  *See* Act of May 16, 2011, 82d Leg., R.S., ch. 123, § 24, 2011 Tex. Gen. Laws 619.

in effect immediately prior to the enactment and implementation of SB 14." *Id.* at 707. The district court retained jurisdiction to review any remedial legislation and to pre-approve any administrative remedial measures. *Id.* at 707–08.

In October 2014, the State appealed the district court's final judgment, and a panel of this court granted the State's emergency motion for stay pending appeal, grounding its decision primarily in "the importance of maintaining the status quo on the eve of an election." *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014). Plaintiffs filed emergency motions before the Supreme Court, seeking to have this court's stay vacated. The Supreme Court denied these motions to vacate the stay of the district court's judgment. *See Veasey v. Perry*, 135 S. Ct. 9 (2014). Therefore, this court's stay of the district court's injunction remained in place, and SB 14 continues to be enforced.

On May 27, 2015, after oral argument was heard by the panel that initially considered this appeal, Senate Bill 983 ("SB 983") was signed into law, eliminating the fee "associated with searching for or providing a record, including a certified copy of a birth record, if the applicant [for the record] states that the applicant is requesting the record for the purpose of obtaining an election identification certificate." Act of May 25, 2015, 84th Leg., R.S., ch. 130, 2015 Tex. Sess. Laws Serv. Ch. 130 (codified as an amendment to TEX. HEALTH & SAFETY CODE § 191.0046(e)) (hereinafter "SB 983"). SB 983 became effective immediately. *Id.* §§ 2–3 (codified as note to TEX. HEALTH & SAFETY CODE § 191.0046); *see also* S.J. of Tex., 84th Leg., R.S., 1449–50 (2015) (reporting unanimous passage out of the Texas Senate); H.J. of Tex., 84th Leg., R.S., 4478–79 (2015) (reporting passage by 142 to 0, with one member absent, in the Texas House). SB 983 provides that "a local registrar or county clerk who issues a birth record" required for an EIC that would otherwise be entitled

No. 14-41127

to collect a fee for that record "is entitled to payment of the amount from the [D]epartment [of State Health Services]." Act of May 25, 2015, 84th Leg., R.S., ch. 130 (codified as an amendment to TEX. HEALTH & SAFETY CODE § 191.0046(f)). SB 983 did not appropriate funds to spread public awareness about the free birth records. The parties addressed the potential effect of SB 983 on their claims before both the panel and our full court, and we have accounted for its passage.[10]

Considering the State's appeal from the district court's judgment, the panel opinion held that the district court committed legal errors in conducting its discriminatory purpose analysis; therefore, it vacated that portion of the district court's opinion and remanded the case for further proceedings. *See Veasey*, 796 F.3d at 493, 498. Noting that the finding on remand might be different, the panel opinion addressed the Plaintiffs' other claims. *Id.* at 493. It affirmed the district court's finding that SB 14 has a discriminatory effect in violation of Section 2 of the Voting Rights Act and remanded for consideration of the proper remedy. *Id.* It vacated the district court's holding that SB 14 constitutes a poll tax and rendered judgment on that claim for the State. *Id.* Finally, the panel opinion vacated the district court's determination that SB

---

[10] The parties also filed Rule 28(j) letters before the panel that initially heard this case. The parties noted the passage of SB 1934, effective on September 1, 2015, which provides that state-issued identification cards issued to individuals age 60 and older expire on a date to be specified by DPS. Act of May 29, 2015, 84th Leg., R.S., S.B. 1934 (codified as an amendment to TEX. TRANSP. CODE § 521.101(f)(1)). Before this new law, ID cards for those 60 and older did not expire. 37 TEX. ADMIN. CODE § 15.30. While Plaintiffs contended before the panel initially considering this case that SB 1934 will exacerbate the discriminatory effect of SB 14, the State insisted SB 1934 was passed merely to comply with the federal REAL ID Act. *See* 6 C.F.R. § 37.5(a). The panel opinion concluded that this issue is not yet ripe for our review. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation omitted)). The parties have not raised this issue again before our full court.

No. 14-41127

14 violates the First and Fourteenth Amendments of the U.S. Constitution, pursuant to the doctrine of constitutional avoidance, and dismissed those claims. *Id.*

While this case was awaiting oral argument before our full court, in light of the upcoming elections in November 2016, the parties applied to the Supreme Court to vacate the stay of the district court's injunction that a panel of this court originally entered in October 2014. The Supreme Court denied the motion to vacate the stay but noted that if, by July 20, 2016, this court had "neither issued an opinion on the merits of the case nor issued an order vacating or modifying the current stay order, an aggrieved party [could] seek interim relief from th[e Supreme] Court by filing an appropriate application." *Veasey v. Abbott*, 136 S. Ct. 1823 (2016).

## II. Section 2 of the Voting Rights Act

### A. Discriminatory Purpose

The State appeals the district court's holding that SB 14 was passed with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act. We review this determination for clear error. "If the district court's findings are plausible in light of the record viewed in its entirety, we must accept them, even though we might have weighed the evidence differently if we had been sitting as a trier of fact." *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1312 (5th Cir. 1991) (citation omitted). However, when the district court's "findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue," *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982), in which case reversing and rendering is the proper course, *Meche v. Doucet*, 777 F.3d 237, 246–47 (5th Cir.), *cert. denied*, 136 S. Ct. 111 (2015).

11

No. 14-41127

We apply the framework articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–68 (1977), to determine whether SB 14 was passed with a discriminatory purpose. Although the district court properly cited the *Arlington Heights* framework, we conclude that some "findings are infirm," necessitating a remand on this point. *Pullman-Standard*, 456 U.S. at 292. Since the record does not "permit[] only one resolution of the factual issue," and there is evidence that could support the district court's finding of discriminatory purpose, we must remand for a re-weighing of the evidence.[11] *See id.*

### 1. Legal Errors in the District Court's Analysis

"Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 265. However, "[r]acial discrimination need only be one purpose, and not even a primary purpose," of an official action for a violation to occur. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citation omitted). "Legislative motivation or intent is a paradigmatic fact question." *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)). "Proving the motivation behind official action is often a problematic undertaking." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

---

[11] One of the dissenting opinions suggests that the majority opinion flouts the canon of constitutional avoidance by reaching the discriminatory purpose claim. We recognize the canon of constitutional avoidance, and where possible, we have avoided reaching constitutional claims unnecessarily, *see infra* Parts III and IV. However, we cannot avoid ruling on the discriminatory intent claim here, where the remedy to which Plaintiffs would be entitled for a discriminatory intent violation is potentially broader than the remedy the district court may fashion for the discriminatory impact violation. *See City of Richmond v. United States*, 422 U.S. 358, 378 (1975) (holding, in the discriminatory purpose context, that "[a]n official action . . . taken for the purpose of discriminating . . . on account of . . . race has no legitimacy at all").

No. 14-41127

In *Arlington Heights*, the Supreme Court set out five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose,[12] and courts must perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[13] *See* 429 U.S. at 266–68. "Those factors include: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton*

---

[12] The State argues that, instead of applying the *Arlington Heights* standard, we should apply a "clearest proof" standard grafted from cases involving the determination of whether a legislature meant to impose criminal punishment through a civil law when the law faces an *ex post facto* challenge. *See, e.g.*, *Smith v. Doe*, 538 U.S. 84, 92–93 (2003); *Kansas v. Hendricks*, 521 U.S. 346, 360–61 (1997); *Flemming v. Nestor*, 363 U.S. 603, 613, 617–20 (1960). In those cases, courts deferred to legislatures' categorizations of laws as "civil" except upon "the clearest proof" that the laws were "so punitive either in purpose or effect as to negate" the "civil" label. *Hendricks*, 521 U.S. at 361 (citation omitted). The Supreme Court has not applied this standard in the voting rights context. *See generally Arlington Heights*, 429 U.S. 252; *Hunter*, 471 U.S. 222; *cf. Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979); *Lodge v. Buxton*, 639 F.2d 1358 (5th Cir. Unit B Mar. 1981). Instead, we have noted that discriminatory intent in this context may be shown through circumstantial evidence, as discriminatory motives are often "cleverly cloaked in the guise of propriety." *Lodge*, 639 F.2d at 1363. We decline to apply the State's proposed standard in this context.

[13] Neither *Arlington Heights* nor our decision in *Price*, 945 F.2d 1307, requires direct evidence. The district court here allowed extensive discovery of legislative materials which did not yield a "smoking gun." The district court could have found, but was not required to find, that this lack of a smoking gun supports the State's position here. That was the situation that we addressed in *Price*, and in that case we found no clear error in the district court's decisions about what evidence to credit. As the district court explained here, SB 14's proponents knew at the time that SB 14 would be subject to the preclearance requirement, *Veasey v. Perry*, 71 F. Supp. 3d at 658, 701, so the lack of a smoking gun is not surprising. The latter point makes it even more important that *Price* noted direct evidence would be stronger than circumstantial evidence, but only "[t]o the extent that the justifications advanced in [legislators'] testimon[ies] do not demonstrate a pretext for intentionally discriminatory actions." *Price*, 945 F.2d at 1318. As we note herein, we conclude there is evidence that could support a finding that the Legislature's justification of ballot integrity was pretextual in relation to the specific, stringent provisions of SB 14.

No. 14-41127

*v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267–68). Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that disparate impact. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The challengers bear the burden to show that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law"; if they meet that burden, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228 (citation omitted).

The State's stated purpose in passing SB 14 centered on protection of the sanctity of voting, avoiding voter fraud, and promoting public confidence in the voting process. No one questions the legitimacy of these concerns as motives. The disagreement centers on whether SB 14 was passed with impermissible motives as well. We recognize that evaluating motive, particularly the motive of dozens of people, is a difficult enterprise. We acknowledge the charged nature of accusations of racism, particularly against a legislative body, but we must also face the sad truth that racism continues to exist in our modern American society despite years of laws designed to eradicate it. We appreciate the district court's efforts to address this difficult inquiry. Nonetheless, we hold that much of the evidence upon which the district court relied was "infirm." *See Pullman-Standard*, 456 U.S. at 292.

One type of evidence on which the district court relied in seeking to discern the Legislature's intent was Texas's history of enacting racially discriminatory voting measures. *See Veasey v. Perry*, 71 F. Supp. 3d at 633–36. It noted, for instance, Texas's use of all-white primaries from 1895–1944, literacy tests and secret ballots from 1905–1970, and poll taxes from 1902–1966. *Id.* at 634–35. While the record also contains more contemporary

14

No. 14-41127

examples, s*ee id.* at 635, 636 & n.23, the district court relied too heavily on the evidence of State-sponsored discrimination dating back hundreds of years, *cf. Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2628 (2013) (noting that "history did not end in 1965").

"The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," *Arlington Heights*, 429 U.S. at 267, but the Supreme Court has cautioned that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value," *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (resolving that laws in force during and just after the Civil War were not probative of the legislature's intent many years later). More recently, the Court in *Shelby County* also counseled against undue reliance on noncontemporary evidence of discrimination in the voting rights context. 133 S. Ct. at 2618–19, 2631 (striking down Section 4(b) of the Voting Rights Act because "the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions"). In light of these cases, the most relevant "historical" evidence is relatively recent history, not long-past history.[14] We recognize that history provides context and that historical discrimination (for example, in education) can have effects for many years. But, given the case law we describe above and the specific issue in this case, we conclude that the district court's disproportionate reliance on long-ago history was error.

---

[14] "Relatively recent" does not mean immediately contemporaneous. *Shelby County* emphasized that "things have changed" since the 1965 passage of the Voting Rights Act, 133 S. Ct. at 2625, but it did not articulate a particular time limit, *see id.* at 2625–27. Nor do we. Suffice it to say the closer in time, the greater the relevance, while always recognizing that history (even "long-ago history") provides context to modern-day events.

No. 14-41127

We also recognize that not all "history" was "long ago" and that there were some more contemporary examples of discrimination identified by the Plaintiffs in the district court. The evidence of relatively recent discrimination cited by the district court is more probative of discriminatory intent. *See, e.g.*, *Veasey v. Perry*, 71 F. Supp. 3d at 635, 636 & n.23. Nonetheless, several of the relatively contemporary examples of discrimination identified by the district court are limited in their probative value in connection with discerning the Texas Legislature's intent. For example, in a state with 254 counties, we do not find the reprehensible actions of county officials in one county (Waller County) to make voting more difficult for minorities to be probative of the intent of legislators in the Texas Legislature, which consists of representatives and senators from across a geographically vast, highly populous, and very diverse state. *See Miss. State Chapter, Operation Push, Inc. v. Mabus* (*Operation Push*), 932 F.2d 400, 409–10 (5th Cir. 1991) (stating that "[e]vidence of disparate registration rates or similar registration rates in *individual counties* could not provide dispositive support" for the claim that plaintiffs could not participate in the political process at the *state* level (emphasis added)).

Additionally, the district court relied on contemporary examples of statewide discrimination evidenced by two redistricting cases that, taken alone, form a thin basis for drawing conclusions regarding contemporary State-sponsored discrimination. The first, *Bush v. Vera*, 517 U.S. 952, 976 (1996), found that a Texas redistricting plan to create three majority-minority districts violated the Equal Protection Clause of the Fourteenth Amendment because race was the predominant factor, the plans ignored traditional redistricting criteria, and their shapes could only be explained as the product of unconstitutional racial gerrymandering. The second case found voter dilution

16

affecting Hispanics in the redrawing of one congressional district. *See League of Latin Am. Citizens v. Perry* (*LULAC*), 548 U.S. 399, 439–40 (2006). Although citing discussions of the historic discrimination against Hispanics in Texas, the Court did not base its decision on a conclusion that the legislature intentionally discriminated based upon ethnicity. *Id.* at 440–42. Instead, it looked at history as a context for the disenfranchisement of voters who had grown disaffected with the Hispanic Congressman the legislature sought to protect by its redrawing of the district. *Id.* at 438–41. The Court did not find any vote dilution as to African Americans in the drawing of a different district. *Id.* at 444. Thus, these cases do not lend support for a finding of "relatively recent" discrimination.[15]

The district court's reliance on post-enactment speculation by opponents of SB 14 was also misplaced. Discerning the intent of a decisionmaking body is difficult and problematic. *Hunter*, 471 U.S. at 228. To aid in this task, courts may evaluate "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action . . . ." *Arlington Heights*, 429 U.S. at 268. Where the court is asked to identify the intent of an entire state legislature, as opposed to a smaller body, the charge becomes proportionately more challenging. *Hunter*, 471 U.S. at 228. As *United States v. O'Brien* explains:

---

[15] Nonetheless, as discussed *infra* note 28, the Court's conclusion in *LULAC* that Texas's 2003 redistricting plan violated the Voting Rights Act does evidence a history of discrimination that is relevant to our discriminatory effect analysis, because historical instances of discrimination continue to produce socioeconomic conditions that the district court found contributed to the racial disparities in ID possession.

Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

391 U.S. 367, 383–84 (1968) (footnote omitted).

To ascertain the Texas Legislature's purpose in passing SB 14, the district court mistakenly relied in part on speculation by the bill's opponents about proponents' motives (rather than evidence of their statements and actions). For instance, it credited the following: Representative Hernandez-Luna's simple assertion that two city council seats in Pasadena, Texas were made into at-large seats "in order to dilute the Hispanic vote and representation"; repeated testimony that the 2011 session was imbued with anti-immigrant sentiment;[16] and testimony by the bill's opponents that they believed the law was passed with a discriminatory purpose. *Veasey v. Perry*, 71 F. Supp. 3d at 637, 655–57.

"The Supreme Court has . . . repeatedly cautioned—in the analogous context of statutory construction—against placing too much emphasis on the contemporaneous views of a bill's opponents."[17] *Butts v. City of New York*, 779

---

[16] The relevance of this evidence apparently rests partially upon the unsupported premise that a legislator concerned about border security or opposed to the entry into Texas of undocumented immigrants is also necessarily in favor of suppressing voting by American citizens of color.

[17] Here, the problematic evidence is the speculation and conclusions of the opposing legislators. We are not suggesting that the bill opponents lack credibility because they are

No. 14-41127

F.2d 141, 147 (2d Cir. 1985) (citing, inter alia, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 204 n.24 (1976)).  We too have held that such statements are entitled to "little weight."  *Mercantile Tex. Corp. v. Bd. of Governors of Fed. Reserve Sys.*, 638 F.2d 1255, 1263 (5th Cir. Unit A Feb. 1981).  The Second Circuit considered such speculation in *Butts* and held that "the speculations and accusations of . . . [a] few opponents simply do not support an inference of the kind of racial animus discussed in, for example, *Arlington Heights*."  779 F.2d at 147 (citation omitted).  We agree and conclude that the district court erred in relying on conjecture by the opponents of SB 14 as to the motivations of those legislators supporting the law.[18]

The district court also placed inappropriate reliance upon the type of post-enactment testimony which courts routinely disregard as unreliable.  *See Barber v. Thomas*, 560 U.S. 474, 486 (2010) ("And whatever interpretive force one attaches to legislative history, the Court normally gives little weight to statements, such as those of the individual legislators, made *after* the bill in question has become law."); *see also Edwards v. Aguillard*, 482 U.S. 578, 596 n.19 (1987) ("The Court has previously found the post-enactment elucidation of the meaning of a statute to be of little relevance in determining the intent of the legislature contemporaneous to the passage of the statute.").  While probative in theory, even those (after-the-fact) stray statements made by a few

---

opposing legislators, as credibility is a question for the trier of fact. Testimony found to be credible from opponents of the bill about conduct and statements by proponents would be highly probative.  Our point is simply that speculation and conclusory accusations by opposing legislators are not an appropriate foundation for a finding of purposeful discrimination.

[18]  In the different but somewhat analogous realm of employment discrimination, we have similarly rejected the plaintiff's testimony that he or she believed that the motivation of his or her employer was racial or other discrimination.  *See Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 426–27 (5th Cir. 2000).

individual legislators voting for SB 14 may not be the best indicia of the Texas Legislature's intent. *See Operation Push*, 932 F.2d at 408 (finding "isolated and ambiguous statements made by . . . legislators" were not compelling evidence of that law's discriminatory purpose); *Jones v. City of Lubbock*, 727 F.2d 364, 371 n.3 (5th Cir. 1984) (refusing to "judge intent from the statements [made by] . . . a single member" of the legislative body).

Because the district court relied upon evidence we conclude is infirm, the district court's opinion cannot stand as written. The next question, then, is whether we reverse and render judgment for the State or remand to the district court with instructions.

## 2. *Remand for Re-Weighing of the Evidence*

While the district court's analysis contained some legal infirmities, the record also contained evidence that could support a finding of discriminatory intent. *See Meche*, 777 F.3d at 246–47 (noting in review of a district court's findings following a bench trial that "[w]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue"). Therefore, under *Pullman-Standard*, 456 U.S. at 292, we must remand the discriminatory intent issue to the district court to reweigh the factors in light of this opinion.

In *Pullman-Standard*, the Supreme Court reversed a panel of this court after the panel weighed the facts and rendered judgment, rather than remanding for further proceedings. *Id.* at 292–93. The *Pullman-Standard* panel of this court had concluded that the district court erred by not considering all relevant evidence and suggested that the district court might have reached a different conclusion had it properly considered the evidence. *Id.* at 284–85, 292. The Supreme Court admonished that "discriminatory intent . . . is a factual matter subject to the clearly-erroneous standard . . .

No. 14-41127

[and] when a district court's finding on such an ultimate fact is set aside for an error of law, the court of appeals is not relieved of the usual requirement of remanding for further proceedings to the tribunal charged with the task of factfinding in the first instance." *Id.* at 293. The Court expressed concern that this court would ignore such an "elementary" principle and instructed that it is not the purview of this court to produce an "independent consideration of the totality of the circumstances." *Id.* at 291–92.

Pursuant to this clear guidance, our inquiry is whether "the record permits of only one resolution of the factual issue." *Id.* at 292. We conclude that it does not.

First, although the record does not contain *direct* evidence that the Texas Legislature passed SB 14 with a racially invidious purpose, this does not mean there is no evidence that supports a finding of discriminatory intent. "[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982); *Brown*, 561 F.3d at 433 ("To find discriminatory intent, direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered." (citation omitted)). Instead, courts may consider both circumstantial and direct evidence of intent as may be available. *Arlington Heights*, 429 U.S. at 266.

In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence.[19] To require direct evidence of intent would essentially give

---

[19] In fact, in this case, there is evidence that the proponents of SB 14 were careful about what they said and wrote about the purposes of SB 14, knowing it would be challenged during the preclearance process under the Voting Rights Act. Senator Fraser, one of the authors of SB 14, admitted during his deposition that he believed "that the public legislative record would either go to the Department of Justice or a three-judge panel as part of the

legislatures free reign to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

For example, in employment discrimination cases, we do not automatically find for an employer who proffers a race-neutral reason for terminating an employee; instead, the employee can show that this reason is pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973) (establishing that where an employer has offered a race-neutral reason for an adverse employment action, the employee is entitled to show that the employer's stated reason is in fact pretext); *see, e.g.*, *Evans v. City of Houston*, 246 F.3d 344, 354–56 (5th Cir. 2001) (holding that a plaintiff had provided sufficient circumstantial evidence that an employer's reasons for demoting her were pretextual to create a genuine dispute of material fact regarding whether she was wrongfully demoted and reversing the district court's grant of summary judgment for the employer). As we were recently reminded in *Foster v. Chatman*, 136 S. Ct. 1737, 1751–52, 1754–55 (2016), people hide discriminatory intent behind seemingly legitimate reasons. If Jane were fired from an at-will job for being late once, we might conclude that firing was legitimate, until we learned that Joe, who has the very same job as Jane, was late numerous times with no penalty. *Cf. Evans*, 246 F.3d at 354–56. Context

---

[Voting Rights Act] Section 5 review process," and that he was therefore "aware that everything that [he] was saying was part of a public record." The Deputy General Counsel to the Lieutenant Governor, Bryan Hebert, testified that he sent an email "urg[ing] senators to emphasize the detection and deterrence of fraud and protect[ing] public confidence in elections" as "the goal" of SB 14, "to remind people what the point of the bill was" for their speeches on the floor of the Texas Senate.

matters.[20]  With this in mind, we now address the circumstantial evidence that could support a finding of discriminatory purpose such that the record does not permit of only one resolution of the factual issue of intent.  *Pullman-Standard*, 456 U.S. at 292.

The record shows that drafters and proponents of SB 14 were aware of the likely disproportionate effect of the law on minorities, and that they nonetheless passed the bill without adopting a number of proposed ameliorative measures that might have lessened this impact.  For instance, the Legislature was advised of the likely discriminatory impact by the Deputy General Counsel to the Lieutenant Governor and by many legislators, and such impact was acknowledged to be "common sense" by one of the chief proponents of the legislation.[21]  *See Veasey v. Perry*, 71 F. Supp. 3d at 657–58.

Additionally, although he was careful with his comments about the legislation, one of the authors of SB 14, Senator Fraser, testified that he "believe[s] today the Voting Rights Act has outlived its useful life."  When other legislators asked Senator Fraser questions about the possible disparate impact of SB 14, he simply replied "I am not advised."  *Id.* at 646–47.  Another senator admitted at his deposition that he and other proponents of SB 14 voted to table

---

[20]  Of course, employment discrimination cases are not directly supportive, but they are analogous.  One of the dissenting opinions points out that the intent of the Legislature differs from that of an employer because a legislature's intent is "a pastiche of each individual representative's views, mixed policies and motives."  Jones Dissenting Op. at 5 n.5.  But while each legislator casts his or her own vote, these votes are often cast in blocs and along party lines.  Recognition that legislatures, just as employers, may articulate pretextual reasons for discriminatory actions is not a superficial equation, but rather a realistic acknowledgment.

[21]  Representative Todd Smith, a proponent of the legislation, stated that it was "common sense" the law would have a disproportionate effect on minorities.  *Veasey v. Perry*, 71 F. Supp. 3d at 657.  Similarly, Bryan Hebert, Deputy General Counsel in the Office of the Lieutenant Governor, acknowledged that the poor and minorities were most likely to be affected by SB 14.  *Id.*  Without additional forms of identification, Hebert warned that SB 14 was unlikely to obtain (the now-defunct) preclearance under Section 5 of the Voting Rights Act.  *Id.* at 658.

No. 14-41127

numerous amendments meant to expand the types of accepted IDs, expand the operating hours of DPS stations issuing voter IDs, delay implementation of SB 14 until an impact study had been completed, and other ameliorative measures.  He and other proponents of SB 14 have largely refused to explain the rejection of those amendments, both at the time and in subsequent litigation.  *Id.*  The district court noted that this attitude "was out of character for sponsors of major bills."  *Id.* at 647.

The district court also heard evidence that SB 14 is only tenuously related to the legislature's stated purpose of preventing voter fraud.  For example, the record shows that Texas has a history of justifying voter suppression efforts such as the poll tax and literacy tests with the race-neutral reason of promoting ballot integrity.  *See id.* at 636 & n.24.  Dr. Vernon Burton, an expert in race relations, testified about the "history of official discrimination in Texas voting."  He identified some devices Texas has used to deny minorities the vote, including "the all[-]White primary, the secret ballot and the use of illiteracy[,] . . . poll tax, re-registration and purging."  He testified as follows regarding "the stated rationale" for each of these devices:

> Q     What, in your opinion, was the stated rationale for the enactment of all[-]White primaries in Texas?
>
> A     The stated rationale was voter fraud.
>
> Q     What was the stated rationale, in your opinion, for the use of secret ballot provisions in Texas?
>
> A     The stated rationale was to prevent voter fraud.
>
> Q     And what was the stated rationale, in your opinion, for the use of the poll tax in Texas?
>
> A     The stated rationale by the State was to prevent voter fraud.
>
> Q     And how about the stated rationale for the use in Texas of re-registration requirements and voter purges?
>
> A     The stated rationale was voter fraud.

24

> Q    Dr. Burton, in your expert opinion, did these devices actually respond to sincere concerns or incidents – incidences of voter fraud?
>
> A    No.

Here, too, there is evidence that could support a finding that the Legislature's race-neutral reason of ballot integrity offered by the State is pretextual.   This bill was subjected to radical departures from normal procedures.   Consideration of procedural departures is a difficult inquiry, because on the one hand, "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267.   On the other hand, "objection[s] to typical aspects of the legislative process in developing legislation," such as increasing the number of votes a law requires for passage, may not demonstrate an invidious intent, standing alone.   *Cf. Operation Push*, 932 F.2d at 408–09, 408 n.6. Yet, context matters, and evidence of procedural departures provides one potential link in the circumstantial totality of evidence the district court must consider.

In this case, for example, the procedural maneuvers employed by the Texas Legislature and the State occurred, as the district court notes, only after repeated attempts to pass voter identification bills were blocked through countervailing procedural maneuvers.   *See Veasey v. Perry*, 71 F. Supp. 3d at 645–46.   At the same time, SB 14 was subject to numerous and radical procedural departures that may lend credence to an inference of discriminatory intent.   *See id.* at 647–51.   These included: (1) getting special permission to file the bill under a low number reserved for the Lieutenant Governor's legislative priorities; (2)  Governor Perry's decision to designate the bill as emergency legislation so that it could be considered during the first sixty days  of the legislative session; (3) suspending the two-thirds rule regarding the number of

No. 14-41127

votes required to make SB 14 a "special order"; (4) allowing the bill to bypass the ordinary committee process in the Texas House and Senate; (5) passing SB 14 with an unverified $2 million fiscal note despite the prohibition on doing so in the 2011 legislative session due to a $27 million budget shortfall; (6) cutting debate short to enable a three-day passage through the Senate; and (7) passing resolutions to allow the conference committee to add provisions to SB 14, contrary to the Legislature's rules and normal practice. *See id.* at 647–53. Such treatment was virtually unprecedented.[22]

Texas is a huge state in land mass and population and the Legislature faces great challenges in governing. The Texas Legislature meets for regular sessions for less than five months out of every two years. TEX. CONST. art. III, § 24; TEX. GOV'T CODE § 301.001 (West 2013).[23] During the session, it must pass a balanced budget that will govern until the next session, based on projected revenue for the next two years. TEX. CONST. art. VIII, § 22; *id.* art. III, § 49a. In recent years, the Legislature has faced many complex and controversial issues. The district court noted that the 2011 legislative session itself involved "critically important issues such as the $27 million budget

---

[22] One of the dissenting opinions calls into question the rationale behind these maneuvers and draws different interpretations and inferences from the evidence. However, it is the exclusive province of the district court to engage in this fact finding. *Pullman-Standard*, 456 U.S. at 291–92. We acknowledge that multiple inferences could reasonably be drawn from the record evidence, but we must leave the drawing of those inferences to the district court. Additionally, one of the dissenting opinions disagrees with reliance on opposing legislators' factual testimony about the unusual nature of the procedural maneuvers utilized to pass SB 14. There is a clear difference between opposing legislators testifying about their personal knowledge regarding the normal procedural sequence of passing legislation and opposing legislators merely speculating about the motives of SB 14's proponents.

[23] The Texas Governor also has the power to call special sessions of the Legislature, which are topically limited to the confines of the proclamation summoning the Legislature. TEX. CONST. art. IV, § 8.

shortfall and transportation funding," none of which received "a select committee or an exception from the two-thirds rule," as did SB 14. *Veasey v. Perry*, 71 F. Supp. 3d at 657.

The Legislature is entitled to set whatever priorities it wishes. Yet, one might expect that when the Legislature places a bill on an expedited schedule and subjects it to such an extraordinary degree of procedural irregularities, as was the case with SB 14, such a bill would address a problem of great magnitude. Ballot integrity is undoubtedly a worthy goal. But the evidence before the Legislature was that in-person voting, the only concern addressed by SB 14, yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB 14's passage.[24] *See id.* at 639. The bill did nothing to combat mail-in ballot fraud, although record evidence shows that the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting.[25] *Id.* at 641, 653.

In the context of the many pressing matters of great importance to Texas that did not result in these legislative irregularities, we cannot say that the record leads to only one factual conclusion in this case. *Pullman-Standard*, 456 U.S. at 292. We cannot say that district court had to simply accept that legislators were really so concerned with this almost nonexistent problem. Against a backdrop of warnings that SB 14 would have a disparate impact on

---

[24] Representative Fischer testified that the Legislature had access to data from the 2008 and 2010 elections when considering SB 14, which showed that "of the millions of votes cast in both of those elections, there were perhaps four referrals for in person voter impersonation" and that "one, if not two individuals . . . had been officially charged and may have accepted responsibility for impersonation."

[25] This statement is not intended as a criticism of allowing mail-in ballots, which are a vital means of enabling voting when it would otherwise be difficult or impossible for some people to exercise their right to vote in person. It is simply an acknowledgement that the evidence supporting the need for reform was minimal on the in-person voting side.

No. 14-41127

minorities and would likely fail the (then extant) preclearance requirement, amendment after amendment was rejected. *Veasey v. Perry*, 71 F. Supp. 3d at 650–52, 698, 701–02, 708–10. While cloaking themselves in the mantle of following Indiana's voter ID law, which had been upheld against a (different) challenge in *Crawford*, the proponents of SB 14 took out all the ameliorative provisions of the Indiana law. *See, e.g., id.* at 651–52 (noting the Texas House stripped an indigency exception that had been added to SB 14 in the Texas Senate); *cf. Frank v. Walker (Frank II)*, 819 F.3d 384, 386–87 (7th Cir. 2016) (noting that an indigency exception may be necessary for voters who face "high hurdles" to obtaining required photo identification and that the Indiana law the Court considered in *Crawford* contained such an indigency exception).[26]

This circumstantial evidence of discriminatory intent is augmented by contemporary examples of State-sponsored discrimination in the record. For

---

[26] One of the dissenting opinions claims that "the Indiana and Texas laws are not meaningfully different." Jones Dissenting Op. at 28 n.26. This ignores the district court's findings and the obvious differences between the two laws that affect the discriminatory impact analysis. The district court explained the differences well:

> Notably, while Defendants claim that SB 14 was modeled after the Indiana law, the Indiana law is more generous to voters. Unlike SB 14, it permits the use of any Indiana state-issued or federal ID and contains a nursing home resident exemption. Furthermore, Indiana is more generous in its acceptance of certain expired ID. Of particular relevance here, Indiana's accommodation of indigents, while requiring an additional trip to the county election office to claim an exemption, does not require an indigent to actually obtain, or pay any fees associated with, a qualified photo ID. This is significant, as demonstrated in this case. There was also a reference in *Crawford* to a "greater public awareness" of the law, which would prompt voters to secure qualified ID, as opposed to a relative dearth of publicity and instruction in Texas.

*Veasey v. Perry*, 71 F. Supp. 3d at 679 (footnotes omitted) (citing IND. CODE § 3-5-2-40.5(a)(3) (2014), IND. CODE § 3-11.7-5-2.5 (2011), and *Crawford*, 553 U.S. at 187–88 & n.6). The district court specifically found that the Texas Legislature stripped an indigency exception from SB 14, *id.* at 652, and that "[w]hen the legislature rejected student IDs, state government employee IDs, and federal IDs, they rejected IDs that are disproportionately held by African–Americans and Hispanics," *id.* at 658. These differences are highly salient to the discriminatory impact analysis.

No. 14-41127

example, the record shows that as late as 1975, Texas attempted to suppress minority voting through purging the voter rolls, after its former poll tax and re-registration requirements were ruled unconstitutional.  *See Veasey v. Perry*, 71 F. Supp. 3d at 635.[27]  It is notable as well that "[i]n every redistricting cycle since 1970, Texas has been found to have violated the [Voting rights Act] with racially gerrymandered districts."  *Id.* at 636 & n.23 (collecting cases).[28]  Furthermore, record evidence establishes that the Department of Justice objected to at least one of Texas's statewide redistricting plans for each period between 1980 and the present, while Texas was covered by Section 5 of the

---

[27]  The law in question was enacted in 1975, after a previous re-registration requirement was struck down as unconstitutional in the early 1970s.  A three-judge court eventually struck down this attempt at purging and re-registration after the Department of Justice objected to the law when Texas became subject to preclearance.  *See generally Veasey v. Perry*, 71 F. Supp. 3d at 635 & n.18.

[28]  In *LULAC*, the Supreme Court also noted Texas's "long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process."  *LULAC*, 548 U.S. at 439 (quoting *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994)).  The Court found that Texas's 2003 redistricting plan diluted the Hispanic vote in one district such that it violated the Voting Rights Act.  Although the Court did not find that Texas had acted with discriminatory intent, it noted:

> The changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive. . . .  In essence the State took away the Latinos' opportunity because Latinos were about to exercise it. This bears the mark of intentional discrimination that could give rise to an equal protection violation.  Even if we accept the District Court's finding that the State's action was taken primarily for political, not racial, reasons, the redrawing of the district lines was damaging to the Latinos in District 23.  The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active, dividing them with a district line through the middle of Laredo.

*Id.* at 439–40 (citations omitted).

No. 14-41127

Voting Rights Act. Texas "is the only state with this consistent record of objections to such statewide plans."[29]   Finally, the same Legislature that passed SB 14 also passed two laws found to be passed with discriminatory purpose. *See Texas v. United States*, 887 F. Supp. 2d 133, 159–66 (D.D.C. 2012) (utilizing the *Arlington Heights* analysis and concluding the 2011 Texas Legislature created two redistricting plans with a discriminatory purpose), *vacated and remanded on other grounds*, 133 S. Ct. 2885 (2013).

It is also probative that many rationales were given for a voter identification law, which shifted as they were challenged or disproven by opponents. *Veasey v. Perry*, 71 F. Supp. 3d at 653–59; *see generally Foster*, 136 S. Ct. at 1751–52, 1754–55 (reasoning that the fact that the government's "principal reasons" for its action "shifted over time . . . suggest[ed] that those reasons may [have been] pretextual").   One of those rationales included preventing noncitizens from voting, even though two forms of identification

---

[29] One of the dissenting opinions quarrels with the district court's findings on this issue, but a three-judge panel reviewing Texas's 1981 redistricting plan reached the same conclusion:

> In 1975, Congress extended the special pre-clearance provisions of the Voting Rights Act of 1965 to Texas.  This decision was made on the basis of extensive hearings into the history of voting discrimination in the state.  Since the pre-clearance provisions were extended to Texas in August of 1975, the Department of Justice has lodged far more objections to governmental actions affecting voting rights in Texas than any other covered state. Between August 15, 1975, and September 18, 1981, the State and its various political sub-divisions received 91 letters of objection.  In this same period, no other covered state had more than 50 objections, and only three had more than thirty.  The election changes objected to by the Department of Justice include the movement of polling places, proposed annexations, alteration of district lines, and a state-wide purge of voter registration lists.

*Seamon v. Upham*, 536 F. Supp. 931, 989 (E.D. Tex.) (citations omitted), *vacated on other grounds*, 456 U.S. 37 (1982).

No. 14-41127

approved under SB 14 are available to noncitizens. *Veasey v. Perry*, 71 F. Supp. 3d at 654. It is likewise relevant that SB 14's proponents refused to answer why they would not allow amendments to ameliorate the expected disparate impact of SB 14. *Id.* at 646–47, 650–51.

Further supporting the district court's finding is the fact that the extraordinary measures accompanying the passage of SB 14 occurred in the wake of a "seismic demographic shift," as minority populations rapidly increased in Texas, such that the district court found that the party currently in power is "facing a declining voter base and can gain partisan advantage" through a strict voter ID law.[30]  *Id.* at 700.

In sum, although some of the evidence on which the district court relied was infirm, there remains evidence to support a finding that the cloak of ballot integrity could be hiding a more invidious purpose. As we have explained, the

---

[30] This partisan motive to suppress votes is not based on which party is in the majority. When asked about the fact that most redistricting and discriminatory laws were enacted under legislatures with a majority who were members of a different party than the current majority, the Plaintiffs' expert, Dr. Burton, agreed. He testified that this fact made his analysis "stronger because it does not matter who is in charge of State politics or the political parties in power in Texas, whether they're Republicans, Democrats[,] or Martians, every time that African–Americans have, in fact, been perceived to be increasing their ability to vote and participate in the process there has been State legislation to either deny them the vote or at least dilute the vote or make it much more difficult for them to participate on an equal basis as Whites in the State of Texas."

One of the dissenting opinions claims that we confuse partisanship for racism in our analysis of whether the Legislature acted with a discriminatory intent. Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive. As another of the dissenting opinions points out, acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory. *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) (noting that "racial discrimination [may be and has been a] necessary accompaniment of [an] action taken to protect incumbencies"). In this case, the district court found that the party in power in the Texas Legislature faced "a declining voter base and [stood to] gain partisan advantage by suppressing the . . . votes of African-Americans and Latinos." *See Veasey v. Perry*, 71 F. Supp. 3d at 700. Once again, the disagreement centers in part on the fact that some of the dissenting opinions would re-weigh the evidence and disregard the district court's fact findings, which we are not entitled to do. *See Pullman-Standard*, 456 U.S. at 292.

No. 14-41127

absence of direct evidence such as a "let's discriminate" email cannot be and is not dispositive. Because we do not know how much the evidence found infirm weighed in the district court's calculus, we cannot simply affirm the decision. However, it is not an appellate court's place to weigh evidence. *See Price*, 945 F.2d at 1317 ("[T]he appellate court may not substitute its judgment for the district court's."). Thus, since there is more than one way to decide this case, and the right court to make those findings is the district court, we must remand.[31]

We therefore remand this claim to the district court to "reexamin[e] . . . the probative evidence underlying Plaintiffs' discriminatory purpose claims weighed against the contrary evidence, in accord with" the appropriate legal standards we have described. *Veasey*, 796 F.3d at 503–04; *cf. City of Richmond*

---

[31] Two of the dissenting opinions take issue with our decision on discriminatory intent, in part because this issue can be fraught and divisive. One of the dissenting opinions claims that Congress intended to prevent such divisiveness by ensuring that plaintiffs could sue for discriminatory impact. Congress amended the Voting Rights Act in 1982 to make it clear that plaintiffs could sue for discriminatory impact after Supreme Court precedent had required the showing of a discriminatory purpose under Section 2. *See* S. Rep. No. 97-417, at 15–16 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 192–93. Congress acted in the face of this precedent to make it *easier* for minority plaintiffs to combat discriminatory laws—not to make it more difficult. Congress did not eliminate plaintiffs' ability to sue for purposeful discrimination, so it remains our duty to consider these claims. *See* S. Rep. No. 97-417, at 17 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 194 & n.50 (emphasis in original) (citation omitted) (noting that Section 2 was originally understood by Congress to prohibit "any kind of practice . . . if its *purpose or effect* was to deny or abridge the right to vote on account of race or color"). In this case, although we must tread carefully in assessing the motives of the Legislature and the district court may very well agree with some of the points made by the dissenting opinions, we must be mindful of our role in this process. We are not the court to make factual findings in the first instance, and the record evidence could support more than one conclusion. We must therefore remand for reweighing of the evidence, rather than conducting that reweighing ourselves. *See Pullman-Standard*, 456 U.S. at 291 ("When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law . . . there should be a remand for further proceedings to permit the *trial court* to make the missing findings . . . ." (emphasis added)); *N. Miss. Commc'ns, Inc. v. Jones*, 951 F.2d 652, 656–57 (5th Cir. 1992) (citing *Pullman-Standard*, 456 U.S. at 291) (remanding a case, for the fourth time, for factual findings under the proper standard).

No. 14-41127

*v. United States*, 422 U.S. 358, 378 (1975) ("[W]e should be confident of the evidentiary record and the adequacy of the lower court's consideration of it."). The parties have not asked to offer additional evidence, and we conclude that, as to this issue, the district court should not take additional evidence. The district court may, but is not required to, entertain additional oral argument prior to issuing its new findings. The district court on remand should make its discriminatory purpose findings based on the record we have, guided by this opinion and the instructions we have given the district court about the legal infirmities in its initial findings.

Time is short, though. The Supreme Court has, in effect, set a July 20 deadline for this court to act, after which it will entertain motions for relief. *Veasey v. Abbott*, 136 S. Ct. at 1823. Time is also needed to communicate those modifications to the wider public so as not to disrupt the election process. Indeed, among the findings made by the district court was that the public education campaign for SB 14 at the time of trial was "grossly insufficient." *Veasey v. Perry*, 71 F. Supp. 3d at 649. Equally necessary in the time left before early voting begins in late October is an adequate campaign to explain not only SB 14 but also court-ordered amendments to voter identification rules. We are mindful that future litigation and appeals to this court are also distinct possibilities.

Additionally, we recognize the burden our majority opinion places on the district court to implement a remedy for the discriminatory effect violation with so little time, *see infra* Part II.B. Therefore, to avoid disruption of the upcoming election, we rely on equitable principles in concluding that the district court should first focus on fashioning interim relief for the discriminatory effect violation in the months leading up to the November 2016 general election. The primary concern of this court and the district court

No. 14-41127

should be to ensure that SB 14's discriminatory effect is ameliorated as Section 2 requires in time for the November 2016 election, while respecting the policy choices made by the Legislature in passing SB 14. *See Perry v. Perez*, 132 S. Ct. 934, 940–41 (2012) (per curiam).

We instruct the district court to take the requisite time to reevaluate the evidence and determine anew whether the Legislature acted with a discriminatory intent in enacting SB 14. But it is unnecessary for the district court to undertake this task until after the November 2016 election. *See Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (election permitted to continue despite unresolved issues related to disenfranchisement); *see also Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (noting that a court may withhold immediate relief so as not to disturb a forthcoming election). If the district court concludes that SB 14 was passed with a discriminatory intent, the district court should fashion an appropriate remedy in accord with its findings; provided, however, that any remedy will not be made effective until after the November 2016 election.

## B. *Discriminatory Effect*

Plaintiffs allege that SB 14 has a discriminatory effect in violation of Section 2 of the Voting Rights Act, which proscribes any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301(a). Unlike discrimination claims brought pursuant to the Fourteenth Amendment, Congress has clarified that violations of Section 2(a) can "be proved by showing discriminatory effect alone." *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986); *see also* 52 U.S.C. § 10301(b).[32]

---

[32] Section 2 provides in full:

In proscribing laws that have a discriminatory effect, Congress exercised its authority pursuant to the Fifteenth Amendment, which states that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude," and gives Congress the "power to enforce this article by appropriate legislation." U.S. CONST. amend. XV.

### 1. The Gingles Factors and Two-Part Framework

To prove that a law has a discriminatory effect under Section 2, Plaintiffs must show not only that the challenged law imposes a burden on minorities, but also that "a certain electoral law, practice, or structure interacts with social and historical conditions *to cause* an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47 (emphasis added). While courts regularly utilize statistical analyses to discern whether a law has a discriminatory impact, *see, e.g.*, *Operation Push*,

---

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301. We address more fully below how the factors adopted by the Supreme Court in *Gingles* and the other standards we apply effectuate the language of Section 2.

No. 14-41127

932 F.2d at 410–11, the Supreme Court has also endorsed factors ("the *Gingles* factors") enunciated by Congress to determine whether such an impact is a product of current or historical conditions of discrimination such that it violates Section 2,[33] *Gingles*, 478 U.S. at 44–45.

Although courts have often applied the *Gingles* factors to analyze claims of vote dilution,[34] perhaps because of past preclearance requirements, there is little authority on the proper test to determine whether the right to vote has been *denied* or *abridged* on account of race. *See Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014) ("Unsurprisingly, then, the case law has developed to suit the particular challenges of vote dilution claims. A clear test for Section 2 vote denial claims—generally used to refer to any claim that is not a vote dilution claim—has yet to emerge."), *vacated on other grounds by* No. 14-3877, 2014 WL 10384647, at *1 (6th Cir. Oct. 1, 2014). However, the Fourth and Sixth Circuits have adopted a two-part framework that draws on the text of Section 2 and the Supreme Court's guidance in *Gingles* to analyze Section 2 claims.

### (a) The Two-Part Framework

We now adopt the two-part framework employed by the Fourth and Sixth Circuits to evaluate Section 2 "results" claims. The framework has two elements:

> [1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than

---

[33] These are sometimes also called the "Senate Factors," as they derive from the Senate Report accompanying the 1982 amendments to the Voting Rights Act. *See Gingles*, 478 U.S. at 43–45.

[34] *See, e.g.*, *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850–51 (5th Cir. 1993) (en banc); *Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542, 1543, 1546, 1551–56 (5th Cir. 1992).

No. 14-41127

other members of the electorate to participate in the political process and to elect representatives of their choice, [and]

[2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (citations and internal quotation marks omitted), *cert. denied*, 135 S. Ct. 1735 (2015); *see also Husted*, 768 F.3d at 554.

The first part of this two-part framework inquires about the nature of the burden imposed and whether it creates a disparate effect in that "members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice"—this encompasses Section 2's definition of what kinds of burdens deny or abridge the right to vote.  *Compare* 52 U.S.C. § 10301 (proscribing denial or abridgement of the right to vote and defining how a violation of Section 2 may be established)*, with League of Women Voters*, 769 F.3d at 240 (outlining the two-part test, using almost identical language to describe an impermissible burden on the right to vote).

The second part of the two-part framework draws on the Supreme Court's guidance in *Gingles*.  *See League of Women Voters*, 769 F.3d at 240 (quoting *Gingles*, 478 U.S. at 47); *Husted*, 768 F.3d at 554 (quoting *Gingles*, 478 U.S. at 47).  This second part of the framework provides the requisite causal link between the burden on voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both.  *See Gingles*, 478 U.S. at 47 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and

No. 14-41127

historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.").

### (b) The *Gingles* Factors

As did the Fourth and Sixth Circuits, we conclude that the *Gingles* factors should be used to help determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination.[35] In other words, the *Gingles* factors may be used to examine causality under the second part of the two-part analysis.

These factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;

---

[35] *See League of Women Voters*, 769 F.3d at 240, 245 (noting the *Gingles* factors are useful in examining both elements of the two-part test, especially the causal linkage between disparate impacts and conditions of discrimination); *Husted*, 768 F.3d at 554 (noting the *Gingles* factors form part of the totality of the circumstances analysis in examining a claim of vote denial, "particularly with regard to the second element" of the two-part test).

No. 14-41127

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* at 36–37 (quoting S. Rep. No. 97-417, at 28–29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206–07). Two additional considerations are:

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]
[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.*

These factors are not exclusive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45 (quoting S. Rep. No. 97-417, at 29). Not every factor will be relevant in every case. These factors provide salient guidance from Congress and the Supreme Court on how to examine the current effects of past and current discrimination and how those effects interact with a challenged law. *Id.*; *League of Women Voters*, 769 F.3d at 240, 245; *Husted*, 768 F.3d at 554.

### (c)  This Analysis is Appropriate for Section 2 Effect Challenges

The State argues that the *Gingles* factors are inapposite in this context, and that we should apply the two-part test as it was applied in the Seventh Circuit in *Frank v. Walker*, 768 F.3d 744, 754–55 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1551 (2015). The State also argues that if we apply the *Gingles* factors and two-part test and find a Section 2 violation in this case, all manner of neutral election laws may be struck down. We disagree that the *Gingles* factors are inapposite here, and we have good reasons to believe that the State's gloomy forecast is unsound.

No. 14-41127

Use of the two-factor test and the *Gingles* factors limits Section 2 challenges to those that properly link the effects of past and current discrimination with the racially disparate effects of the challenged law. Applying the *Gingles* factors involves engaging in a multi-factor analysis, under which no one factor has determinative weight. *Gingles*, 478 U.S. at 45. Certainly, this analysis is fact dependent. Yet, in many similar contexts, we frequently employ multi-factor, totality-of-the-circumstances analyses that are highly fact bound. *See, e.g.*, *United States v. Batamula*, ___ F.3d ___, No. 12-20630, 2016 WL 2342943, at *3–4 (5th Cir. May 3, 2016) (en banc) (analyzing the totality of the circumstances to determine whether a defendant was prejudiced by a lack of competent advice during the guilty plea process); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 175–76 (5th Cir. 2012) (adopting a "totality-of-the-circumstances" analysis to determine whether an employee is a minister for purposes of the ministerial exception and abrogating the three-part test previously employed by this court, because the Supreme Court specifically rejected the use of a rigid, bright-line test for this issue); *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 330–31 (5th Cir. 2009) (applying multi-factor tests to analyze whether a supervisor created a hostile work environment or retaliated against an employee for reporting sexual harassment, and in analyzing the last factor of the hostile work environment test, looking to the totality of the circumstances to determine whether the harassment was sufficiently severe and pervasive to alter employment conditions).[36]

---

[36] *See also In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 462 (5th Cir. 2012) (rejecting a per se approach in favor of a "totality of the circumstances approach for deciding whether third-party payment of a retainer creates a disqualifying interest" in a bankruptcy case); *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006) (employing a multi-factor test to determine whether consent to search was voluntary); *Cleveland v. City of Elmendorf*, 388

No. 14-41127

We conclude that the two-part framework and *Gingles* factors together serve as a sufficient and familiar way to limit courts' interference with "neutral" election laws to those that truly have a discriminatory impact under Section 2 of the Voting Rights Act. Just because a test is fact driven and multi-factored does not make it dangerously limitless in application.

The State argues that we should instead adopt a bright-line test as our limiting principle. As the State would have it, so long as the State can articulate a legitimate justification for its election law and some voters are able to meet the requirements, there is no Section 2 violation. This argument effectively nullifies the protections of the Voting Rights Act by giving states a free pass to enact needlessly burdensome laws with impermissible racially discriminatory impacts. The Voting Rights Act was enacted to prevent just such invidious, subtle forms of discrimination. *See Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *Allen v. State Bd. of Elections*, 393 U.S. 544, 565–66 (1969). We think the factors applied to the facts are a proper limiting principle, and find this analysis faithful to the purposes of the Voting Rights Act.[37]

---

F.3d 522, 528 (5th Cir. 2004) (employing a totality-of-the-circumstances analysis to determine whether workers were volunteers for the purposes of the Fair Labor Standards Act); *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 (5th Cir. 2003) (applying a totality-of-the-circumstances analysis to determine whether an employer made an unlawful threat related to union activity); *United States v. Rodriguez-Rivas*, 151 F.3d 377, 380–81 (5th Cir. 1998) (employing a totality-of-the-circumstances analysis to determine whether a Border Patrol agent had reasonable suspicion to stop a vehicle); *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 694 (5th Cir. 1985) (looking "to the totality of the circumstances" in a "heavily fact-specific" inquiry regarding whether a subsidiary was the alter ego of its parent); *Gonzales v. Beto*, 460 F.2d 314, 315 (5th Cir. 1972) (judging a lineup by the totality of the circumstances to determine whether it violated due process).

[37] These arguments also address the discomfort expressed by some of the dissenting opinions with how the *Gingles* factors are applied differently in different cases. As we have noted, the factors are highly fact dependent, as they must be to address different laws, different states with varying histories of official discrimination, and different populations of

No. 14-41127

In addition, two district courts have now applied the same analysis we apply here to two different states' laws and have found no discriminatory results under Section 2. *See, e.g.*, *Lee v. Va. State Bd. of Elections*, ___ F. Supp. 3d ____, No. 3:15CV357-HEH, 2016 WL 2946181, at \*5, \*21–24 (E.D. Va. May 19, 2016); *N.C. State Conference of the NAACP v. McCrory*, ___ F. Supp. 3d ____, No. 1:13CV658, 2016 WL 1650774, at \*73–76, \*117, \*122 (M.D.N.C. Apr. 25, 2016). These district court cases illustrate three principles that the State ignores in its arguments before us: (1) the analysis we employ effectively allows examination of differing fact patterns; (2) the State's prediction of vast judicial interference with election laws is unfounded; and (3) district courts are well suited to conduct this fact-intensive analysis in the first instance, as the institutions we rely on for fact finding day in and day out.

---

minority voters. Such has also been the case with the variances in decisions among the circuit courts to consider challenges to voter ID laws—our decision differs from those of other circuits in part because we are considering "the [s]trictest [l]aw in the [c]ountry" in a State with a fairly extensive history of official discrimination. *See Veasey v. Perry*, 71 F. Supp. 3d at 642; *cf. Frank*, 768 F.3d at 746 (noting that Wisconsin's law allowed the use of state ID cards, recent naturalization papers, tribal IDs, and signed college or university photo IDs); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1346 (11th Cir. 2009) (noting that Georgia's law allowed the use of "a government employee identification card, a U.S. military identification card, or a tribal identification card"); *Gonzalez v. Arizona*, No. CV 06-1268-PHX, 2006 WL 3627297, at \*6 (D. Ariz. Sept. 11, 2006) (describing a wide variety of acceptable forms of identification accepted at Arizona polls), *aff'd*, 485 F.3d 1041 (9th Cir. 2007).

Even so, the fact-dependent nature of the *Gingles* factors does not mean that "[v]irtually any voter regulation" may be struck down under our analysis. *See* Jones Dissenting Op. at 52. Undoubtedly, challenges to election laws under Section 2 have increased since *Shelby County* as states have enacted new laws and regulations that must be challenged under Section 2, if at all, because these laws no longer face preclearance. That does not mean that our analysis endangers neutral, nondiscriminatory election laws. As we explain *infra*, district courts considering these challenges have come to different conclusions based on varying fact patterns and election laws, not always with the result of striking down election laws. Indeed, the United States abandoned its Section 2 discriminatory-effect challenge to a voter ID law after the North Carolina legislature added a reasonable impediment exception to the law. *See N.C. State Conference of the NAACP v. McCrory*, ___ F. Supp. 3d ____, No. 1:13CV658, 2016 WL 1650774, at \*16 (M.D.N.C. Apr. 25, 2016).

No. 14-41127

Furthermore, the Seventh Circuit's approach in *Frank* is not inconsistent with our own. The Seventh Circuit applied the two-part framework only "[f]or the sake of argument," did not apply the *Gingles* factors, and expressed skepticism about the second step of the two-part analysis "because it does not distinguish discrimination by the [government] defendants from other persons' discrimination." *Frank*, 768 F.3d at 754–55. The Seventh Circuit ultimately did not apply the second step of the two-part analysis because it concluded that the plaintiffs failed to show that Wisconsin's law imposed a discriminatory burden that gave minority voters less opportunity to participate in the political process at the first step of the analysis. *Id.* at 753, 755. Our record contains more particularized evidence of the discriminatory burden imposed by SB 14 than did the record in *Frank*.[38]

To the extent that the State argues causality may be established only where there is a finding that state action caused the social and historical conditions begetting discrimination, *see Frank*, 768 F.3d at 755, we need not and do not decide that issue. Unlike in *Frank*, the district court in this case found both historical and contemporary examples of discrimination in both employment and education by the State of Texas, and it attributed SB 14's disparate impact, in part, to the lasting effects of that State-sponsored discrimination. *See Veasey v. Perry*, 71 F. Supp. 3d at 636, 666–67. Thus, even assuming this limitation from *Frank* applied, the evidence here meets that test.

---

[38] Furthermore, Wisconsin's law, considered in *Frank*, allows for more forms of identification than does SB 14. The district court found SB 14 to be the "[s]trictest [l]aw in the [c]ountry" based on comparisons to other states' voter ID laws and on the characterization of SB 14 by one of its drafters. *Veasey v. Perry*, 71 F. Supp. 3d at 642–43, 701 & n.542.

No. 14-41127

Finally, we reject the argument that *Crawford* mandates upholding SB 14 simply because the State expressed legitimate justifications for passing the law.[39]  *Crawford* contains no mention of Section 2 or the Voting Rights Act— in that case, the Court only considered a First and Fourteenth Amendment challenge, which involves a different analytical framework than what we use for Section 2 claims. *See generally* 553 U.S. 181.  Additionally, the Court in *Crawford* analyzed only a facial challenge that had been adjudicated in the district court on summary judgment. *Crawford*, 553 U.S. at 187–88, 202–03. Here, we have a multitude of factual findings about Plaintiffs' combined challenges, based on copious evidence from a bench trial and a record that spans more than one hundred thousand pages. *See generally Veasey v. Perry*, 71 F. Supp. 3d 627.  Nevertheless, the State argues that *Frank* drew on *Crawford* to conclude Wisconsin's law did not impose a discriminatory burden on voters because it appeared to be a generally-applicable election law.

*Crawford* clearly established that states have strong interests in preventing voter fraud and increasing voter confidence by safeguarding the integrity of elections. 553 U.S. at 191, 194–97.  We do not deny that the State in this case may pursue those interests, nor that they are strong and valid interests.  However, that acknowledgement does not address the additional as-

---

[39]  One of the dissenting opinions relies heavily on *Crawford* in discussing both discriminatory purpose and impact, essentially using *Crawford*'s endorsement of "preventing voter fraud" as a talisman against objections that SB 14 does not appear even remotely well tailored to suit its stated purposes.  While we acknowledge the State's legitimate interests in this case, *Crawford* did not deal with either discriminatory intent or effect under Section 2. In *Crawford*, the Court simply noted the weight of the State's interests in the First and Fourteenth Amendment balancing analysis, which differs from Section 2's inquiries into discriminatory motive and impact.  As noted *infra*, even Judge Easterbrook and the Seventh Circuit do not subscribe to the dissenting opinions' views of *Crawford*'s or *Frank*'s holdings. We likewise decline to read into *Crawford* the inapposite principle that the State may invidiously discriminate or impermissibly disparately burden minorities so long as it articulates "preventing voter fraud" as one purpose of a restrictive law.

No. 14-41127

applied challenges Plaintiffs make in this case. *See id.* at 199–202. Even the Seventh Circuit has acknowledged that *Crawford* does not extend as far as the State argues, holding that *Frank* "did not decide that persons unable to get a photo ID with reasonable effort lack a serious grievance." *Frank II*, 819 F.3d at 386. The Seventh Circuit in this later iteration of *Frank* did not consider a Section 2 challenge. *Id.* at 385–86; *see also Frank v. Walker*, 141 F. Supp. 3d 932, 934–36 (E.D. Wis. 2015), *vacated in part by Frank II*, 819 F.3d 384. But the court noted that neither *Crawford* nor *Frank* foreclose the argument that an indigency exception may be necessary to prevent an unconstitutional burden on plaintiffs hindered from voting and obtaining photo IDs due to financial hardship and other factors like those exhibited by the Plaintiffs in this case.[40] *Frank II*, 819 F.3d at 386–87. The Seventh Circuit remanded the plaintiffs' constitutional claims to the district court for further consideration of an as-applied challenge factually similar to the one Plaintiffs make in this case. *Id.* at 385–86, 388.

---

[40] Specifically, the Seventh Circuit noted the distinction between the general facial challenge in *Frank* and the more particular as-applied challenge in *Frank II*:

> The argument plaintiffs now present is different. Instead of saying that inconvenience for some voters means that no one needs photo ID, plaintiffs contend that high hurdles for some persons eligible to vote entitle those particular persons to relief. *Plaintiffs' approach is potentially sound if even a single person eligible to vote is unable to get acceptable photo ID with reasonable effort.* The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily. Plaintiffs now accept the propriety of requiring photo ID from persons who already have or can get it with reasonable effort, while endeavoring to protect the voting rights of those who encounter high hurdles. This is compatible with our opinion and mandate, just as it is compatible with *Crawford.*

*Frank II*, 819 F.3d at 386–87 (emphasis added).

No. 14-41127

Having established that the two-part analysis and *Gingles* factors are appropriate standards for examining Plaintiffs' Section 2 claim,[41] we evaluate the district court's discriminatory effect finding for clear error. *See Operation Push*, 932 F.2d at 410.

### 2. *SB 14's Disparate Impact*

The district court found that 608,470 registered voters, or 4.5% of all registered voters in Texas, lack SB 14 ID. *Veasey v. Perry*, 71 F. Supp. 3d at 659. Of those, 534,512 voters did not qualify for a disability exemption from SB 14's requirements. *Id.* The latter figure, which was derived by comparing the Texas Election Management System with databases containing evidence of who possesses SB 14 ID, is known as the "No-Match List."[42] *Id.* The district court credited expert analysis and testimony by the individual Plaintiffs, finding that SB 14 imposed excessive and disparate burdens on minority voters

---

[41] One of the dissenting opinions proposes a different analysis to apply in Section 2 "results" cases. This opinion asserts that the test should be "simple and consistent," meaning that we should ignore the Supreme Court's guidance in *Gingles*, Congress's intention as expressed in the Senate Factors, and, in practice, that we should require outright denial of the right to vote to show a Section 2 violation. Jones Dissenting Op. at 53. Unfortunately, assessing whether a law has a discriminatory impact is no simple matter and does not lend itself to simple formulations. As we have shown, neither do many other fact-dependent tests that we routinely apply in other contexts. We must undertake this difficult work, even if the analytical frameworks best suited to the task are not as neat and tidy as we would prefer. *See Clements*, 999 F.2d at 860 (noting that standards in Section 2 cases "must reflect the central purpose of the Voting Rights Act and its intended liberality as well as the practical difficulties of proof in the real world of trial," especially since "greater certitude frequently may be purchased only at the expense of other values").

[42] While the State's expert criticized this calculation, he conceded that the methodology used to derive this figure was well accepted. Nonetheless, he attempted to challenge the No-Match List because 21,731 people on the No-Match List later voted in the spring 2014 election. We accept the well-reasoned logic of the district court, which noted that some of those 21,731 who voted may have done so by mail, which does not require SB 14 ID, while others may have obtained SB 14 ID between the calculation of the No-Match List and the spring 2014 election. *Veasey v. Perry*, 71 F. Supp. 3d at 660.

No. 14-41127

who lack SB 14 ID, including many Plaintiffs.  *Id.* at 664–77.  This evidence supports the district court's findings regarding SB 14's disparate impact.

### (a)  Expert Analyses of SB 14's Impact

Plaintiffs' experts relied on four distinct methods of analysis to determine the races of those on the No-Match List.[43]  *Id.* at 660–62.  Those included: (1) ecological regression analysis, (2) homogenous block group analysis, (3) comparing the No-Match List to a Spanish Surname Voter Registration list, and (4) reliance on data provided by Catalist LLC, a company that compiles election data.  *Id.* at 661.  The ecological regression analysis performed by Dr. Stephen Ansolabehere, an expert in American electoral politics and statistical methods in political science, which compared the No-Match List with census data, revealed that Hispanic registered voters and Black registered voters were respectively 195% and 305% more likely than their Anglo peers to lack SB 14 ID.  *Id.*  According to Dr. Ansolabehere, this disparity is "statistically significant and 'highly unlikely to have arisen by chance.'"  *Id.*  The homogenous block group analysis yielded similar results, and other experts arrived at similar conclusions.  *Id.* at 661–62.  These statistical analyses of the No-Match List were corroborated by a survey of over 2,300 eligible Texas voters, which concluded that Blacks were 1.78 times more likely than Whites, and Latinos 2.42 times more likely, to lack SB 14 ID.  *Id.*

---

[43] We recognize that the terms used to describe different racial or ethnic groups inoffensively can themselves be the subject of dispute.  Where we quote a witness or the district court or where we discuss a witness's testimony, we use their terms.  For our part, because we are a reviewing court, while recognizing the imperfections of these terms, we use the terms used by the district court and the parties to refer to the three groups that were the subject of the evidence in this case:  Anglos (used to describe non-Hispanic Caucasians), Hispanics, and African Americans.  We also recognize that many Texans identify with more than one racial or ethnic group and some Texans do not fall into any of these three groups; we address the evidence and arguments as they were presented by the parties.

No. 14-41127

at 662–63.  Even the study performed by the State's expert, which the district court found suffered from "significant methodological oversights," found that 4% of eligible White voters lacked SB 14 ID, compared to 5.3% of eligible Black voters and 6.9% of eligible Hispanic voters.  *Id.* at 663 & n.239.  The district court thus credited the testimony and analyses of Plaintiffs' three experts, each of which found that SB 14 disparately impacts African-American and Hispanic registered voters in Texas.  *Id.* at 663.

The district court likewise concluded that SB 14 disproportionately impacts the poor, who are disproportionately minorities.  *Id.* at 664–65.  It credited expert testimony that 21.4% of eligible voters earning less than $20,000 per year lack SB 14 ID, compared to only 2.6% of voters earning between $100,000 and $150,000 per year.  *Id.* at 664.  Lower income respondents were also more likely to lack the underlying documents to get an EIC.  *Id.*  Dr. Jane Henrici, an anthropologist and professorial lecturer at George Washington University, explained that:

> [U]nreliable and irregular wage work and other income . . . affect the cost of taking the time to locate and bring the requisite papers and identity cards, travel to a processing site, wait through the assessment, and get photo identifications.  This is because most job opportunities do not include paid sick or other paid leave; taking off from work means lost income.  Employed low-income Texans not already in possession of such documents will struggle to afford income loss from the unpaid time needed to get photo identification.

*Id.* (alteration in original).

Furthermore, the court found that the poor are less likely to avail themselves of services that require ID, such as obtaining credit and other financial services.  *Id.*  They are also less likely to own vehicles and are therefore more likely to rely on public transportation.  *Id.* at 665, 672–73.  As a result, the poor are less likely to have a driver's license and face greater

48

No. 14-41127

obstacles in obtaining photo identification. *Id.* Even obtaining an EIC poses an obstacle—the district court credited evidence that hundreds of thousands of voters face round-trip travel times of 90 minutes or more to the nearest location issuing EICs. *Id.* at 672. Of eligible voters without access to a vehicle, a large percentage faced trips of three hours or more to obtain an EIC.[44] *Id.*

### (b)  The State's Challenges to the District Court's Analysis

Although the State does not dispute the underlying factual findings, it identifies several purported legal errors in the district court's decision. We address only the most relevant challenges at length herein.[45] We conclude that

---

[44] Before the panel, the State attacked the entirety of the district court's findings on the grounds that the lower court did not distinguish between SB 14's statutory provisions and the Department of Public Safety's implementing regulations. Although an issue raised for the first time on appeal, like this one, is waived, *Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 747 (5th Cir. 2011), this argument likewise fails on the merits. The State's proposed rule of law would contradict both *Gingles*'s demand that courts take a "functional view of the political process" in assessing Section 2 claims, 478 U.S. at 45, 48 n.15, and Section 2's language itself, which proscribes voting practices "imposed or applied" such that they produce a discriminatory result, 52 U.S.C. § 10301(a). Moreover, we have previously affirmed a district court's finding of discriminatory impact where the district court found the law delegated too much discretion to local officials. *See Operation Push*, 932 F.2d at 404.

[45] Other challenges brought by the State include its argument that that the analyses relied upon by the district court are unreliable because one source of data—the State's voter registration database—does not list the race or ethnicity of voters. The State contends that Plaintiffs' expert should have relied instead on data provided by the Department of Public Safety ("DPS"). The district court rightly rejected this argument. The DPS database did not allow registrants to identify themselves as "Hispanic" until May 2010. As the Texas Director of Elections conceded, the number of Hispanic registered voters is "exponentially higher" than the DPS records would suggest. We cannot fault the district court for refusing to rely on inaccurate data, particularly in light of the State's failure to maintain accurate data.

Additionally, the State suggests that conveying the disparity in ID possession in comparative percentages is misleading. *See Frank*, 768 F.3d at 755 n.3 (stating that purveying data as a comparative percentage is a "misuse" that "produces a number of little relevance to the problem"). Instead, the State believes a less deceptive method is to state that 2% of Anglo, 5.9% of Hispanic, and 8.1% of African-American registered voters lack SB 14 ID. Even assuming the State is correct, conveying the disparities in the way the State suggests does not change the analysis. The district court did not err in concluding that SB 14 disproportionately impacts Hispanic and African-American voters.

No. 14-41127

the district court did not reversibly err in determining that SB 14 violates Section 2 by disparately impacting minority voters.

First, the State disputes the propriety of using statistical analyses to determine the racial composition of the No-Match List. Relying on *Bartlett v. Strickland*, 556 U.S. 1, 17–18 (2009), the State argues that the Supreme Court foreclosed using statistical analysis to determine the racial composition of a group of voters. That is a mischaracterization. *Strickland* cautions against adopting standards that require judges to make complicated, race-based predictions in redistricting cases, a concern that is not implicated here. *Id.* It is well within the district court's purview to assess whether minorities are disproportionately affected by a change in the law based on statistical analyses. *See, e.g.*, *Operation Push*, 932 F.2d at 410–11. Using accepted statistical methodologies to estimate the racial composition of Texas voters does not require the type of race-based predictions that the Court referenced in *Strickland*.[46] Instead, this case is more akin to *Operation Push*, in which this court approved using surveys and "independent statistical tests" to project the impact on minorities of newly enacted voter registration procedures. *Id.*

---

Finally, the State argues for the first time on appeal that there is no disparate impact where, as here, the gross number of Anglos without SB 14 ID—296,156 people—almost totals the number of African-American, Hispanic, and "other" voters without SB 14 ID—312,314 people. Courts have never required the gross number of affected minority voters to exceed the gross number of affected Anglo voters. *See, e.g.*, *League of Women Voters*, 769 F.3d at 233; *see also Frank*, 768 F.3d at 753–54 (comparing the percentage of minority voters without qualifying ID to the percentage of Anglos without such ID). We decline to address this argument raised for the first time on appeal. *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341–42 (5th Cir. 1999).

[46] These problematic predictions included inquiries like: "What types of candidates have white and minority voters supported together in the past and will those trends continue?" *Strickland*, 556 U.S. at 17.

No. 14-41127

Second, the State relies on *Strickland* to argue that the canon of constitutional avoidance militates against requiring the State to ensure that voters of various races possess voter ID in equal measure. *See* 556 U.S. at 18. The district court's discriminatory effect finding, if affirmed, would do no such thing, nor does Section 2 mandate the sort of remedy to which the State objects. Section 2 merely prohibits the State from imposing burdens on minority voters that would disproportionately abridge their ability to participate in the political process. *Cf. Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.* ("*Inclusive Communities*"*)*, 135 S. Ct. 2507, 2524 (2015) ("Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice . . . . If additional measures are adopted, courts should strive to design them to eliminate racial disparities through race-neutral means. Remedial orders that impose racial targets or quotas might raise more difficult constitutional questions." (citation omitted)).

Finally, before our full court, the State refined its argument that our holding that SB 14 violates Section 2 would make Section 2 "invalid as no longer congruent and proportional to the Fifteenth Amendment." Relatedly, the State and dissenting opinions characterize the district court's findings as resting solely on a statistical disparity in SB 14 ID rates, rather than any concrete proof that voters were denied the right to vote. These arguments miss the mark. In particular, the constitutionality argument by the State is short sighted and ignores the history and text of the Fifteenth Amendment. If the State had its way, the Fifteenth Amendment and Section 2 would only prohibit outright *denial* of the right to vote and overtly purposeful discrimination. Yet, both the Fifteenth Amendment and Section 2 also explicitly prohibit *abridgement* of the right to vote. U.S. CONST. amend. XV; 52 U.S.C. § 10301(a). Application of the *Gingles* factors then determines whether any such

No. 14-41127

abridgement is linked to social and historical conditions of discrimination such that the abridgement has occurred "on account of race."  U.S. CONST. amend. XV; 52 U.S.C. § 10301(a).  The standards we apply here, and our manner of applying them, show that Section 2's protections remain closely tied to the power granted Congress by the Fifteenth Amendment.[47]

Regarding the district court's findings, they rest on far more than a statistical disparity.  The district court's lengthy opinion goes through the evidence supporting its findings in great detail, and we will not repeat all of that evidence here for the sake of clarity and brevity.  *See Veasey v. Perry*, 71 F. Supp. 3d at 665, 667–77.  However, a few examples show that the district court relied on concrete evidence regarding the excessive burdens faced by Plaintiffs in making its findings.  This evidence personified the expert analysis credited by the district court regarding SB 14's discriminatory effect.

---

[47] Additionally, we note that this court and many others have upheld the constitutional validity of the Section 2 results test.  *See, e.g.*, *Bush v. Vera*, 517 U.S. at 990–91 (O'Connor, J., concurring) (collecting cases assuming Section 2's constitutionality); *Jones*, 727 F.2d at 373–74; *United States v. Blaine Cty.*, 363 F.3d 897, 904–05 (9th Cir. 2004) (holding that the court remains bound to the Supreme Court's prior affirmance of Section 2's constitutionality and noting that "when the Supreme Court first announced the congruence-and-proportionality doctrine in *City of Boerne v. Flores,* 521 U.S. 507 (1997), it twice pointed to the [Voting Rights Act] as the model for appropriate prophylactic legislation" and that the Supreme Court continues to rely on the Voting Rights Act as the baseline for congruent and proportional legislation); *Johnson v. Hamrick*, 196 F.3d 1216, 1219 n.3 (11th Cir. 1999) (reaffirming the constitutionality of Section 2).  We previously held that "[c]ongressional power to adopt prophylactic measures to vindicate the purposes of the fourteenth and fifteenth Amendments is unquestioned" and "[o]n those occasions when the Court has stricken enactments as exceeding congressional power under the enforcement clauses of the fourteenth or fifteenth amendments, the congressional objective has usually deviated from the central purposes of those amendments—to ensure black equality." *Jones*, 727 F.2d at 373–74 (citations omitted).  Section 2, as applied here, does not deviate from that purpose, and *Jones* still binds us.  *Cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

No. 14-41127

## (c)  Evidence of the Burdens Imposed on Plaintiffs by SB 14

The individual Plaintiffs testified that they faced many specific burdens in attempting to obtain SB 14 ID or vote.  The district court found that "[t]he Plaintiffs [d]emonstrate[d] the [i]mpact" of SB 14 along several axes, including: (1) the difficulty of obtaining an EIC and voting with the proper ID because of Texas's poor implementation of this program; (2) the cost of underlying documents necessary to obtain an EIC or other SB 14 ID; (3) difficulties with delayed, nonexistent, out-of-state, or amended birth certificates due to nontraditional births and errors on birth certificates; (4) long distances and other travel issues that made getting to a registrar and DPS office problematic for many Plaintiffs; (5) a strict disability exemption[48]; and (6) a burdensome alternative of voting absentee.  *See id*.  Some of the Plaintiffs faced difficulties along multiple axes in attempting to get SB 14 ID and vote in person.

---

[48]  SB 14 exempts certain disabled persons from its photo ID requirements, if they submit an application to be exempted with written documentation, including: (1) "a statement in a form prescribed by the secretary of state that the applicant does not have a form of identification acceptable" under SB 14's codified provision, TEX. ELEC. CODE § 63.0101, and (2) documentation from either "the United States Social Security Administration evidencing the applicant has been determined to have a disability," or documentation "from the United States Department of Veterans Affairs evidencing the applicant has a disability rating of at least 50 percent."  TEX. ELEC. CODE § 13.002(i).  The district court found that Plaintiffs Carrier, Espinoza, Mendez, and Taylor "may qualify for SB 14's disability exemption," but that "[t]hese Plaintiffs were not made aware of this exemption when they went to DPS or other relevant offices" and that "[a]s of January 15, 2014, only 18 voters were granted a disability exemption in Texas."  *Veasey v. Perry*, 71 F. Supp. 3d at 674 (citing TEX. ELEC. CODE § 13.002(i)).  This fact evidences the increased burden SB 14 places on Plaintiffs and others on the No-Match List because of the lack of funding devoted to educating voters.  Although this is not an overwhelming burden in and of itself, the requirement and poor implementation provide one more obstacle for disabled plaintiffs to clear in attempting to vote in person without SB 14 ID.  In this case, some of the Plaintiffs who could have used this exception were turned away at the polls and were never made aware of it.

No. 14-41127

First, the record evidence disproves the State's claim that "the plaintiffs have failed to identify a single individual who faces a substantial obstacle to voting because of SB 14."[49] For one thing, the district court found that multiple Plaintiffs were turned away when they attempted to vote, and some of those Plaintiffs were not offered provisional ballots to attempt to resolve the issue. *Id.* at 668. One of those Plaintiffs, Floyd Carrier, "was well-known to the election workers at his polling place, but was not offered a provisional ballot and was not permitted to cast a vote." *Id.* Floyd Carrier had the help of his son in attempting to obtain SB 14 ID, but they faced an almost impossible bureaucratic morass when they tried to get the required underlying documentation. Due to these obstacles and the lack of training and education about SB 14's requirements, Floyd Carrier was completely prevented from voting. *See id.* at 668 & n.268 (noting that throughout their efforts to obtain underlying documentation and qualifying ID for Floyd Carrier, no one informed the Carriers about the EIC).

Plaintiff Bates faced a similar problem when she reported to the polls, as she was unaware that her existing ID was insufficient until she attempted to vote in person. At that point, it was too late to cast an absentee ballot, and she was not able to obtain SB 14 ID in time to cure her provisional ballot because she could not afford to purchase her Mississippi birth certificate at its $42 cost on her $321 fixed monthly income. *Id.* at 649 & n.115, 665. Plaintiff Gordon Benjamin was not able to obtain an EIC at the DPS because he was unable to get his Louisiana birth certificate for the hefty $81 fee online. Eventually, his

---

[49] Before the panel that initially heard this case, the State made an even bolder claim—that the Plaintiffs "failed to show that SB 14 prevented a single person from voting." This claim is demonstrably false, as the experiences of Plaintiffs Floyd Carrier and Sammie Louise Bates show, *see infra*.

No. 14-41127

sister was able to get his birth certificate in person on a trip through Louisiana, but he was unable to make that trip before the 2013 elections. *Id.* at 671, 673. Benjamin cast a provisional ballot that went uncured. Many more stories like these proliferate in the pages of the district court's opinion. *Id.* at 667–77.

Traveling to DPS offices to obtain EICs posed an additional obstacle for many Plaintiffs. The district court found that four Plaintiffs rely almost exclusively on public transportation. One of these Plaintiffs, Ken Gandy, faces an hour-long, one-way trip to reach the nearest DPS office. *See id.* at 673. Plaintiffs Estrada and Espinoza use family and friends for transportation, but they each face "a 60-mile roundtrip ride to the nearest DPS station." *Id.*

The State failed to contest any of this evidence, except to suggest that these Plaintiffs could vote by mail. The district court did not clearly err in finding that mail-in voting is not an acceptable substitute for in-person voting in the circumstances presented by this case.[50] We are by no means criticizing Texas for making mail-in voting available, as it represents an important bridge for many who would otherwise have difficulty appearing in person. Instead, we conclude that it is not the equivalent of in-person voting for those who are able and want to vote in person. Mail-in voting involves a complex procedure that cannot be done at the last minute. *See id.* at 688–90 (describing the complex process of obtaining and submitting a mail-in ballot).[51] It also deprives voters of the help they would normally receive in filling out ballots at

---

[50] We do not opine on the effect, under Section 2, of other possible absentee balloting arrangements, only on the inadequacy of mail-in voting in these circumstances to mitigate or eliminate the discriminatory impact of SB 14.

[51] For example, mail-in voting requires obtaining and submitting a correctly filled-out and signed application to the early voting clerk in the voter's county "on or before the 18th day before election day," TEX. ELEC. CODE § 86.008(a), *plus* receiving an absentee ballot by mail, filling out the ballot correctly, and ensuring the proper state party *receives* the ballot on or before election day, *id.* §§ 86.004–.007, 86.008(b).

No. 14-41127

the polls, which Plaintiff Naomi Eagleton cited as a reason why she prefers to vote in person. *Id.* at 689.

Elderly plaintiffs may also face difficulties getting to their mailboxes, like Plaintiff Carrier, who has to be driven to his mailbox because it is at the local post office. *Id.* at 673. Seven of the Plaintiffs further testified they are reluctant to vote by mail due to the increased risk of fraud because of people who harvest mail-in ballots from the elderly. *Id.* at 676–77. The district court credited expert testimony showing mail-in ballot fraud is a significant threat— unlike in-person voter fraud. *Id.* at 639–41, 676. Finally, with mail-in voting, voters lose the ability to account for last-minute developments, like candidates dropping out of a primary race, or targeted mailers and other information disseminated right before the election. *Id.* at 689. We discern no clear error in the district court's finding that mail-in voting for specific subsets of Texas voters does not sufficiently mitigate the burdens imposed by SB 14.

The State further claims SB 14 has no disparate impact because the State offers "free" EICs, and after SB 983, free underlying documentation to Texas voters who were born in Texas. Yet, the record is replete with evidence that the State devoted little funding or attention to educating voters about the new voter ID requirements, resulting in many Plaintiffs lacking information about these supposed accommodations until they were informed about them during the course of this lawsuit. *See, e.g.*, *id.* at 667–69, 676 (describing the "insufficient" implementation of the EIC program, the fact that many Plaintiffs did not know about the EIC or required voter ID until being turned away at the polls, that one Plaintiff paid $22 for his birth certificate because he was not told about the reduced-cost alternative then available, and other issues with the implementation of SB 14). We find no clear error in the district court's

No. 14-41127

finding that the State's lackluster educational efforts resulted in additional burdens on Texas voters.[52] *See, e.g.*, *id.* at 668.

We conclude that the district court did not clearly err in finding that SB 14 imposes significant and disparate burdens on the right to vote.

### 3. The Gingles Factors

We next consider the district court's finding that SB 14 "produces a discriminatory result that is actionable because [it] . . . interact[s] with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African–Americans and Hispanic voters." *Id.* at 698. The district court found *Gingles* factors 1, 2, 5, 6, 7, 8, and 9 probative. *Id.* at 697. Again, we conclude it was proper to utilize the *Gingles* factors to determine whether conditions engendered by current and former state-sponsored discrimination are sufficiently linked to the racial disparity in ID possession under SB 14.

---

[52] These lackluster efforts stand in stark contrast to those of other states whose voter ID laws have thus far passed Section 2 scrutiny. *See, e.g.*, *N.C. State Conference of the NAACP v. McCrory*, ___ F. 3d ___, No. 1:13CV658, 2016 WL 1650774, at *19–20 (M.D.N.C. Apr. 25, 2016) (cataloging the myriad educational efforts of North Carolina, including: education at three elections before the law went into effect; having voters sign a ledger if they lacked required ID; targeted mailings and outreach to those voters and over 200,000 others on North Carolina's no-match list; pre-paid return mailers to obtain assistance for voters lacking required ID; and further updated advertisement, targeted mailing, and outreach after a reasonable impediment exception was enacted); *Common Cause/Ga. v. Billups*, 504 F. Supp. 2d 1333, 1378–79 (N.D. Ga. 2007) (holding that the state of Georgia's educational efforts were crucial to whether Georgia's voter ID law unduly burdened voters, that the court initially granted a preliminary injunction in part due to lack of notice and education, and finding that voters had since been educated after Georgia ran advertisements and directly contacted voters who potentially lacked valid IDs to inform them about how to get valid ID or vote absentee), *vacated in part on other grounds*, 554 F.3d 1340 (11th Cir. 2009). Contrary to the State's hyperbolic predictions, these different outcomes show the importance of the fact-bound Section 2 analysis we employ here. It has resulted in the approval of laws less burdensome and less discriminatory in effect than SB 14, while it holds the State of Texas accountable for the strictest and perhaps most poorly implemented voter ID law in the country. *See, e.g.*, *Veasey v. Perry*, 71 F. Supp. 3d at 667–69, 676 (noting the many problems with the implementation of SB 14).

No. 14-41127

## (a) *Gingles* Factor 1: History of Official Discrimination

As part of this "searching practical evaluation of the past and present reality," *Gingles*, 478 U.S. at 45 (citation omitted), the district court found that Texas's history of discrimination in voting acted in concert with SB 14 to limit minorities' ability to participate in the political process. We repeat *Shelby County*'s admonishment that "history did not end in 1965," 133 S. Ct. at 2628, and emphasize that contemporary examples of discrimination are more probative than historical examples. However, even long-ago acts of official discrimination give context to the analysis,[53] and the district court credited more contemporary examples of state-sponsored discrimination. *Veasey v. Perry*, 71 F. Supp. 3d at 635–36, 700. One contemporary example is the district court's finding that "[i]n every redistricting cycle since 1970, Texas has been found to have violated the VRA with racially gerrymandered districts." *Id.* at 636 & n.23 (collecting cases). The district court further noted that, before it was vacated along with preclearance by *Shelby County*, "a three-judge court

---

[53] The district court cited many examples of Texas's long history of state-sponsored discrimination. *See Veasey v. Perry*, 71 F. Supp. 3d at 633–36. Less recent examples include all-white primary elections that persisted from 1895 to 1944 despite the Supreme Court attempting to curb the practice in 1927, literacy and secret ballot restrictions that persisted until struck down in 1970, and poll taxes that were eventually struck down in 1966. *Id.* at 633–35. When the poll tax was made unconstitutional in 1964 by the Twenty-Fourth Amendment, Texas attempted to separate federal and state ballots, so that the State could still impose a poll tax for state ballots. That effort never succeeded because it was struck down as unconstitutional after the Voting Rights Act was passed and applied to Texas. Eventually, Texas ratified the Twenty-Fourth Amendment in 2009. In the wake of Texas's inability to retain poll taxes, the district court found that Texas passed a voter re-registration requirement in 1966 that persisted in the form of purging the voter rolls after re-registration was ruled unconstitutional in the early 1970s. *Id.* at 635. Ultimately, the purging practice was enjoined under the preclearance portions of the Voting Rights Act. *Id.* While long-ago history of discrimination is of limited probative value when considering whether the Legislature acted with discriminatory intent, it cannot be ignored in the discriminatory effect analysis, because even these seemingly remote instances of State-sponsored discrimination continue to produce socioeconomic conditions that the district court found caused the racial disparities in possession of SB 14 ID.

58

No. 14-41127

had found that two of Texas's 2011 redistricting plans violated the VRA." *Id.* at 636 n.23. In other words, the 2011 Texas Legislature was found to have violated the Voting Rights Act by passing two redistricting plans that were found to have a retrogressive or racially discriminatory impact in the same legislative session that resulted in SB 14.[54]

The district court found that these past instances of discrimination, all the way through the 2011 legislative session that produced SB 14, were relevant in part because each time, "the Texas Legislature relied on the justification that its discriminatory measures were necessary to combat voter fraud." *Id.* at 636. The Texas Legislature relied on that same justification in passing SB 14, even though the evidence showed that in-person voter fraud "is very rare." *Id.*

Even acknowledging that long-ago evidence of discrimination has less force than more contemporary evidence under *Shelby County*, this factor and other factors support the district court's finding that SB 14 has a discriminatory effect.

### (b) *Gingles* Factor 2: Racially Polarized Voting

The district court relied primarily on the testimony of Dr. Barry Burden, a political science professor, and Mr. George Korbel, an expert on voting rights,

---

[54] Of course, the preclearance analysis differs from the Section 2 discriminatory effect analysis. The State had the burden to show it should receive preclearance in *Texas v. Holder*, whereas the Plaintiffs have the burden to show a discriminatory effect in the analysis we employ here. *Cf. Texas v. Holder*, 888 F. Supp. 2d 113, 117 (D.D.C. 2012) (noting that the preclearance analysis places the burden on the State to prove that a law does *not* have "'the effect of denying or abridging the right to vote on account of race'—i.e. . . . a retrogressive effect"), *vacated and remanded on other grounds*, 133 S. Ct. 2886 (2013). One of the dissenting opinions seeks to discredit this case because it was vacated after *Shelby County* was decided. However, the opinion was not vacated on the merits and remains factually relevant as a contemporary example of State-sponsored discrimination based on the finding of a three-judge federal court.

No. 14-41127

in concluding that racially polarized voting exists throughout Texas. The court stated that "[r]acially polarized voting exists when the race or ethnicity of a voter correlates with the voter's candidate preference." *Id.* at 637 (citing *Gingles*, 478 U.S. at 53 n.21). For support, the district court noted that the gap between Anglo and Latino Republican support is between 30 and 40 percentage points, the Supreme Court has previously acknowledged the existence of racially polarized voting in Texas, and that in other litigation, Texas has conceded that racially polarized voting exists in 252 of its 254 counties. *Id.* at 637–38. The State did not contest these findings before the district court.[55]

### (c) *Gingles* Factor 5: Effects of Past Discrimination

Next, the district court appraised "[t]he extent to which members of the minority group . . . bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." *Veasey v. Perry*, 71 F. Supp. 3d at 696 (citing *Gingles*, 478 U.S. at 45). The disparity in education, employment, and health outcomes between Anglos, African Americans, and Hispanics is manifest by the fact that the 29% of African Americans and 33% of Hispanics in Texas live below the poverty line compared to 12% of Anglos. *Id.* at 665. The unemployment rate for Anglos is also significantly lower. At trial, the court found that 6.1% of Anglos were unemployed compared to 8.5% of Hispanics and 12.8% of African Americans. *Id.* at 666. Furthermore, 91.7% of Anglo 25-year-olds in Texas have graduated from high school, compared to

---

[55] For the first time in its reply brief before the panel that initially heard this case, the State argued that the district court erred by examining whether race and voting patterns exhibited a correlated, rather than causal, link. We generally do not consider arguments raised for the first time in a reply brief. *See Baris v. Sulpicio Lines*, 932 F.2d 1540, 1546 n.9 (5th Cir. 1991). The State has not renewed this argument before our full court and we will not consider it.

No. 14-41127

85.4% of African Americans, and only 58.6% of Hispanics. *Id.* Anglos are also significantly more likely to have completed college—33.7% of Anglos hold a bachelor's degree, compared to 19.2% of African Americans and 11.4% of Hispanics. *Id.* Finally, the district court credited testimony that African Americans and Hispanics are more likely than Anglos to report being in poor health, and to lack health insurance. *Id.* at 666–67.

The district court found that the history of State-sponsored discrimination led to these disparities in education, employment, housing, and transportation. *See id.* at 636. For example, according to Dr. Vernon Burton, a professor with an expertise in race relations, past State-sponsored employment discrimination and Texas's maintenance of a "separate but equal" education system both contributed to the unequal outcomes that presently exist. *Id.* Although *Brown v. Board of Education*, 347 U.S. 483 (1954), mandated desegregated schools in 1954, Dr. Burton testified that Texas maintained segregated schools until roughly 1970. *Veasey v. Perry*, 71 F. Supp. 3d at 666 & n.258. "As a result" of systemic discrimination and the disparities in education, employment, housing, and transportation, the district court found that "Hispanics and African–Americans make up a disproportionate number of people living in poverty, and thus have little real choice when it comes to spending money on anything that is not a necessity." *Id.* at 636 (footnote omitted).

Importantly, the district court also found that "[t]hese socioeconomic disparities have hindered the ability of African–Americans and Hispanics to effectively participate in the political process. Dr. Ansolabehere testified that these minorities register and turn[ ]out for elections at rates that lag far behind

No. 14-41127

Anglo voters."[56]  *Id.* at 697.  This is significant because the inquiry in Section 2 cases is whether the vestiges of discrimination act in concert with the challenged law to impede minority participation in the political process.  *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 866–67 (5th Cir. 1993) (en banc).  The district court concluded in the affirmative, and the State does not contest these underlying factual findings on appeal.

The district court ultimately found:

> SB 14's voter ID requirements interact with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African–Americans and Hispanic voters as compared to Anglo voters. *In other words, SB 14 does not disproportionately impact African–Americans and Hispanics by mere chance.* Rather, it does so by its interaction with the vestiges of past and current racial discrimination.

*Veasey v. Perry*, 71 F. Supp. 3d at 698 (emphasis added).

Again, the State does not dispute the underlying data or methodologies. Instead, the State objects that the district court must have found some evidence that SB 14 directly caused a reduction in turnout.  The State insists that the district court erred by failing to ask whether SB 14 causes a racial *voting* disparity, rather than a disparity in voter ID possession.  We have never required such a showing.  Section 2 asks whether a standard, practice, or procedure results in "a denial *or abridgement* of the right . . . to vote."  52 U.S.C. § 10301(a).  Abridgement is defined as "[t]he reduction or diminution of

---

[56] According to Dr. Ansolabehere's expert report, 83 to 87% of Anglos of voting age and 84 to 88% of Anglo citizens of voting age in Texas are registered to vote, compared to 65 to 77% of Blacks of voting age and 75 to 80% of Black citizens of voting age, and 50 to 55% of Hispanics of voting age and 75 to 80% of Hispanic citizens of voting age.  Likewise, 41.8% of Anglos voted in 2010 compared to 31.3% of Blacks and 22% of Hispanics.  In 2012, 64.3% of registered Anglos voted, compared to 45% of registered Blacks and 59.8% of registered Hispanics.

something," *Abridgement*, BLACK'S LAW DICTIONARY (10th ed. 2014), while the Voting Rights Act defines "vote" to include "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(e). The district court's finding that SB 14 abridges the right to vote by causing a racial disparity in voter ID possession falls comfortably within this definition. Our case law dictates the same outcome. *See Operation Push*, 932 F.2d at 409, 413 (affirming the district court's finding that a voter registration law violated Section 2 when it resulted in a 25% difference in the registration rates between eligible black and white voters); *see also Chisom*, 501 U.S. at 408 (Scalia, J., dissenting) ("If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, blacks would have less opportunity 'to participate in the political process' than whites, and [Section] 2 would therefore be violated . . . .").

For the same reason, we decline to require a showing of lower turnout to prove a Section 2 violation. An election law may keep some voters from going to the polls, but in the same election, turnout by different voters might increase for some other reason. *See Veasey v. Perry*, 71 F. Supp. 3d at 655 (discussing the effect of President Obama's candidacy on voter turnout). That does not mean the voters kept away were any less disenfranchised. Requiring a showing of lower turnout also presents problems for pre-election challenges to voting laws, when no such data is yet available. More fundamentally, no authority supports requiring a showing of lower turnout, since *abridgement* of the right to vote is prohibited along with denial. U.S. CONST. amend. XV; 52 U.S.C. § 10301(a). Illuminating this last point is the State's answer at oral argument to a question about whether its proposed Section 2 effects test would

No. 14-41127

prohibit literacy tests (if they were not otherwise specifically prohibited) from being imposed as a condition for voting.[57]  The State contended that literacy tests "would almost certainly" be struck down under its proposed Section 2 effects test—but only if plaintiffs could show a resulting "denial of equal opportunity," i.e., a "voter turnout disparity."[58]

We decline to cripple the Voting Rights Act by using the State's proposed analysis.  Doing so would unmoor the Voting Rights Act from its history and decades of well-established interpretations about its protections.  *See Allen*, 393 U.S. at 565 ("The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right

---

[57] In full, the exchange between a member of our court at the en banc oral argument and the State's counsel follows:

> JUDGE:  "[I]f literacy tests weren't separately prohibited, would a literacy test be invalidated by your proposed equal treatment test?"

> STATE'S COUNSEL:  "Insofar as literacy tests, you know, first of all, that would obviously be separately banned under —"

> JUDGE:  "Beside[s] the separate ban."

> STATE'S COUNSEL:  "I–I believe insofar as you're putting aside the separate banning, and insofar as you're putting aside a purpose claim, I think you would still ask, 'is this a denial of equal opportunity?'  And in that scenario you'd have to show a prima facie case, and it would almost certainly, in the relevant jurisdictions that we're talking about, have been able to show a voter turnout disparity, ah, particularly, you know, *Operation Push v. Mabus* would have been another case like this where you had legacy systems in place, and under those legacy systems, there would have been liability."

[58] One of the dissenting opinions would require a showing of decreased turnout to prevail on a discriminatory effect claim.  This argument is unsupported by case law and ignores the following points.  First, such an approach would foreclose the ability to file pre-enforcement challenges, which are particularly important now that preclearance is not required.  As the concurring opinion acknowledges, the Supreme Court suggested in *Shelby County* that courts could "block voting laws from going into effect" through injunctive relief under Section 2.  *See Shelby Cty.*, 133 S. Ct. at 2619.  Second, turnout itself does not answer the question of a particular voter being denied access: turnout of certain people might increase while turnout of others decreases, leaving overall turnout the same; yet, those denied the right to vote are still disenfranchised.  Third, this argument also conflates abridgement and denial: in previous times, some people paid the poll tax or passed the literacy test and therefore voted, but their rights were still abridged.

No. 14-41127

to vote because of their race.”); *Chisom*, 501 U.S. at 406 (Scalia, J., dissenting) (“This new ‘results’ criterion [from the 1982 amendments to the Voting Rights Act] provides a powerful, albeit sometimes blunt, weapon with which to attack even the most subtle forms of discrimination.”).  Instead, we will adhere to the Supreme Court’s instruction to examine challenged laws and practices in an intensely fact-based and local totality-of-the-circumstances analysis.  *See Gingles*, 478 U.S. at 36–38, 79.

Thus, while evidence of decreased turnout is relevant, it is not required to prove a Section 2 claim of vote denial or abridgement.  In this case, the record contains evidence that minority voters generally turn out in lower numbers than non-minority voters and that State-sponsored discrimination created socioeconomic disparities, which hinder minority voters’ general participation in the political process.  Accordingly, the district court did not clearly err in determining that the impact of past and current discrimination on minorities in Texas favors finding that SB 14 has a discriminatory effect under Section 2.

### (d) *Gingles* Factor 6: Racial Appeals in Political Campaigns

While the existence of racial appeals in political campaigns is a factor that may be indicative of a law’s disparate impact, *see Gingles*, 478 U.S. at 40, it is not highly probative here (and racial appeals seem to have been used by both minorities and non-minorities).  The district court found that such appeals still exist in Texas and cited anecdotal evidence to support its finding.  *See Veasey v. Perry*, 71 F. Supp. 3d at 638–39.  While we do not overturn the underlying factual finding, we do not agree that such anecdotal evidence of racial campaign appeals shows that SB 14 denies or abridges the right to vote.

No. 14-41127

### (e) *Gingles* Factor 7 and Factor 8: Minority Public Officials and Responsiveness to Minority Needs

The extent to which minority candidates are elected to public office also contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process. *See Gingles*, 478 U.S. at 45. The district court found that African Americans comprise 13.3% of the population in Texas, but only 1.7% of all Texas elected officials are African American. *Veasey v. Perry*, 71 F. Supp. 3d at 638. Similarly, Hispanics comprise 30.3% of the population but hold only 7.1% of all elected positions. *Id.* Within the Texas Legislature, however, both groups fare better—African Americans hold 11.1% of seats in the Legislature while Hispanics hold 21.1% of seats. *Id.* Again, the State does not contest these findings. *Id.*

The district court also found that Texas's history of discrimination, coupled with SB 14's effect on minorities in Texas and the Legislature's response to ameliorative amendments, demonstrated a lack of responsiveness to minority needs by elected officials. *See Gingles*, 478 U.S. at 45. The evidence supports the district court's finding that "the legislature knew that minorities would be most affected by the voter ID law." *Veasey v. Perry*, 71 F. Supp. 3d at 657–58. For instance, Representative Todd Smith, a proponent of the legislation, stated that it was "common sense" the law would have a disproportionate effect on minorities. *See id.* at 657. Similarly, Bryan Hebert, Deputy General Counsel in the Office of the Lieutenant Governor and author of some of the provisions of SB 14, warned that SB 14 was unlikely to obtain (the now-defunct) preclearance under the Voting Rights Act without further forms of permissible ID. *Id.* at 658.

The district court noted that minority legislators and constituents testified about the likely disparate impact of SB 14, yet their amendments to

No. 14-41127

ameliorate that impact were rejected without explanation. *See id.* at 651, 658, 669, 698, 702. These included amendments to expand the forms of acceptable ID to include student IDs, federal IDs, state-government employee IDs, measures to fund education and training related to the law, and indigency exceptions.[59] *Id.* at 658, 708–10. While this does not necessarily prove improper intent on the part of those legislators, it nonetheless supports a conclusion of lack of responsiveness.[60]

### (f) *Gingles* Factor 9: Tenuousness of Policies Underlying the Law

The district court concluded that the policies underlying SB 14's passage were only tenuously related to the State's interests in preventing fraud and increasing voter confidence in elections. We do not deny that the State's articulated objectives are legitimate state interests, as the Supreme Court has made clear. *See Crawford*, 553 U.S. at 191. Yet, the articulation of a legitimate interest is not a magic incantation a state can utter to avoid a finding of disparate impact. Even under the least searching standard of review we employ for these types of challenges, there cannot be a total disconnect between the State's announced interests and the statute enacted. *See St. Joseph Abbey v. Castille*, 712 F.3d 215, 225–26 (5th Cir. 2013) (holding there was an impermissible "disconnect" between the state's expressed interests and the challenged regulations and noting that "[t]he great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption[,] nor does it require courts to accept nonsensical explanations [from the state]"); *cf. Inclusive Cmtys. Project,*

---

[59] The indigency exception was part of SB 14 when it passed the Senate, but was stripped from the bill in the Texas House. *Veasey v. Perry*, 71 F. Supp. 3d at 652.

[60] This distinction is akin to the difference between negligence and intent.

No. 14-41127

*Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 282 (5th Cir. 2014) (permitting a plaintiff to prevail on disparate impact claim under the Fair Housing Act where he "prov[es] that the [state's] substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect"), *aff'd*, 135 S. Ct. 2507 (2015).   The Court in *Gingles* and the Senate that passed the 1982 Amendments to the Voting Rights Act acknowledged as much by including tenuousness among the factors to be considered.  *See Gingles*, 478 U.S. at 45. Along with elected officials' lack of responsiveness to minority needs, a tenuous fit between the expressed policy and the provisions of the law bolsters the conclusion that minorities are not able to equally participate in the political process.  Otherwise, elected officials would be more responsive regarding the disparate impact of a law, and a law not meaningfully related to its expressed purpose would be abandoned or ameliorated to avoid imposing a disparate impact, given the preexisting socioeconomic and political disadvantages caused by past and present discrimination.

The district court found that "the stated policies behind SB 14 are only tenuously related to its provisions." *Veasey v. Perry*, 71 F. Supp. 3d at 698. The State is entitled to make policy choices about when and how it will address various priorities.  But in this case, the provisions of SB 14 fail to correspond in any meaningful way to the legitimate interests the State claims to have been advancing through SB 14.  For example, the Legislature claimed to model its law after those from Indiana, Georgia, Wisconsin, and other states that included many more forms of acceptable identification, plus indigency exceptions and far more extensive educational campaigns. Yet, the Legislature rejected many ameliorative amendments that would have brought SB 14 in line with those states' voter ID laws.  *See id.* at 643, 658.  The option of mail-

68

in voting also showcases the dubious connection between the State's interests and SB 14's provisions. In order to prevent voter fraud, the State has pushed more vulnerable elderly voters away from in-person voting—a form of voting with little proven incidence of fraud—and toward mail-in voting, which the record shows is far more vulnerable to fraud, particularly among the elderly. *Id.* at 639–41, 653. In fact, SB 14 does nothing to address the far more prevalent issue of fraudulent absentee ballots. *Id.* at 641.

The district court likewise found that the Legislature's expressed concerns about undocumented immigrants and noncitizens voting were misplaced. It credited testimony that undocumented immigrants are unlikely to vote as they try to avoid contact with government agents for fear of being deported. *Id.* at 654. At least one Representative who voted for SB 14 conceded that he had no evidence to substantiate his fear of undocumented immigrants voting. *Id.* Additionally, the district court found that SB 14 would not prevent noncitizens from voting, since noncitizens can legally obtain a Texas driver's license or concealed handgun license, two forms of SB 14 ID. *Id.* at 654–55.

The district court also found "no credible evidence" to support assertions that voter turnout was low due to a lack of confidence in elections, that SB 14 would increase public confidence in elections, or that increased confidence would boost voter turnout. *Id.* at 655. Two State Senators and the Director of the Elections Division at the Texas Secretary of State's office were all unaware of anyone abstaining from voting out of concern for voter fraud, and the Director testified that implementing SB 14's provisional ballot process might actually undermine voter confidence. *Id.*

Rather, the district court credited testimony that SB 14 would decrease voter turnout. *Id.* at 655–56. According to a well-established formula employed by political scientists to assess individuals' likelihood of voting in an

No. 14-41127

election, increasing the cost of voting decreases voter turnout—particularly among low-income individuals, as they are most cost sensitive. *Id.* at 656. Further, the district court dismissed the argument that increased turnout during the 2008 presidential election was demonstrative of increased voter confidence in two states that had recently passed voter ID laws. *Id.* at 655. Instead, it found that the increased turnout, which occurred nationwide, was due to President Obama's candidacy. *Id.* Finally, the court also found that public opinion polls—which found high levels of support for photo ID requirements—were not demonstrative that SB 14 itself would promote voter confidence. *Id.* at 656. The district court discounted the polls because they did not evaluate whether voters supported SB 14 itself rather than some other form of voter ID law when weighed against SB 14's exceedingly burdensome requirements and attendant effect on minority voters. *Id.*

### (g) Discriminatory Effect Conclusion

In light of its findings regarding SB 14's disparate impact and its application of the *Gingles* factors, the district court held that SB 14 acted in concert with current and historical conditions of discrimination to diminish African Americans' and Hispanics' ability to participate in the political process. *Id.* at 695–98. We conclude that the district court performed the "intensely local appraisal" required by *Gingles.* 478 U.S. at 79. The district court clearly delineated each step of its analysis, finding that:

> (1) SB 14 specifically burdens Texans living in poverty, who are less likely to possess qualified photo ID, are less able to get it, and may not otherwise need it; (2) a disproportionate number of Texans living in poverty are African–Americans and Hispanics; and (3) African–Americans and Hispanics are more likely than Anglos to be living in poverty because they continue to bear the socioeconomic effects caused by decades of racial discrimination.

*Veasey v. Perry*, 71 F. Supp. 3d at 664.

No. 14-41127

The district court thoroughly evaluated the "totality of the circumstances," each finding was well-supported, and the State has failed to contest many of the underlying factual findings. Furthermore, the district court's analysis comports with the Supreme Court's recent instruction that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."[61] *Inclusive Communities*, 135 S. Ct. at 2523. The district court here acknowledged this principle and tethered its holding to two findings. First, the court found a stark, racial disparity between those who possess or have access to SB 14 ID, and those who do not. Second, it applied the *Gingles* factors to conclude that SB 14 worked in concert with Texas's legacy of state-sponsored discrimination to bring about this disproportionate result.

We note that, because the district court's findings link Texas's state-sponsored history of discrimination to the conditions affecting minority voters

---

[61] Some of the dissenting opinions argue that the majority opinion holds the Legislature "liable for racial disparities [it] did not create" by failing to show that the statistical disparity in ID possession among different races is caused by a State policy, as opposed to socioeconomic and historical conditions. In fact, as discussed above, the district court found that SB 14 creates a racial disparity by requiring the use of certain IDs to vote that minorities disproportionately lack. Certainly the passage of SB 14 did not cause fewer minorities to possess certain IDs (like driver's licenses or concealed handgun licenses). Rather, the district court found that socioeconomic and historical conditions contributed to this disparity in ID possession, which demonstrates why historical evidence of racism is relevant to the Section 2 analysis. But SB 14 *itself* caused minorities to disproportionately lack the documentation that is required to vote by dictating that the documents and IDs required would be those that minorities disproportionately lack. We cannot ignore that in passing SB 14, the Legislature carefully selected the types of IDs that would be required to vote. In doing so, the Legislature selected IDs that minorities disproportionately do not possess and excluded IDs that minorities possess in greater numbers, without providing sufficient justification for those choices. The fact that this occurred on a landscape where minorities are less likely to possess certain forms of ID or be able to obtain those IDs, at least in part as a result of past instances of State-sponsored discrimination, does not absolve the Legislature of responsibility. Accordingly, the district court's conclusion that SB 14 created racial disparities in the possession of IDs required to vote is supported by the record.

No. 14-41127

in Texas today, we need not and do not decide whether proof of such *state-sponsored* discrimination is required under the second part of this analysis.  *Cf. Frank*, 768 F.3d at 755 (reasoning that the discrimination affecting minorities should be linked to the state under the second part of the two-part analysis). The evidence in this record suffices to meet even this higher standard as enunciated in *Frank.  Id.*

We conclude that the district court did not clearly err in determining that SB 14 has a discriminatory effect on minorities' voting rights in violation of Section 2 of the Voting Rights Act.  As discussed below, we remand for a consideration of the appropriate remedy in light of the impending general election.

## III.  First and Fourteenth Amendment Burden on the Right to Vote

Plaintiffs argue that SB 14 also unconstitutionally burdens their right to vote, as forbidden by the First and Fourteenth Amendments.  We decline to decide this question, under the "well established principle governing the prudent exercise of this [c]ourt's jurisdiction that normally th[is c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia Cty. v. McMillan*, 466 U.S. 48, 51 (1984).  Since the majority of the court affirms the district court's determination that SB 14 has a discriminatory effect under Section 2 of the Voting Rights Act, Plaintiffs will be entitled to the same relief they could access if they prevailed on these First and Fourteenth Amendment claims.  *See Ketchum v. Byrne*, 740 F.2d 1398, 1409–10 (7th Cir. 1984) ("There appears to be no difference in the practical result or in the available remedy regardless of how the resulting discrimination is characterized. We therefore shall not explicitly decide the issue of a fourteenth amendment violation . . . ."); *cf. Nw. Austin Mun. Util.*

No. 14-41127

*Dist. No. One v. Holder*, 557 U.S. 193, 205–06 (2009). Put another way, the rights and remedies are intertwined.

Accordingly, it is unnecessary for the en banc court to address this issue, and we need not and do not decide whether SB 14 violates the First and Fourteenth Amendments by placing an unconstitutional burden on the right to vote. *See Merced v. Kasson*, 577 F.3d 578, 586–87 (5th Cir. 2009); *Jordan v. City of Greenwood*, 711 F.2d 667, 668–70 (5th Cir. 1983) (quoting *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105 (1944)). We therefore vacate the district court's determination on this issue and dismiss Plaintiffs' First and Fourteenth Amendment claims.

## IV.  Poll Tax

The Veasey Plaintiffs[62] originally alleged that SB 14 imposed a poll tax in violation of the Fourteenth and Twenty-Fourth Amendments. After the passage of SB 983, the Veasey Plaintiffs filed a Rule 28(j) Letter with this court, stating that "SB14, as amended by SB983, is no longer a poll tax." The Veasey Plaintiffs nevertheless contend that "the poll tax issue is still alive" because SB 14 operated as a poll tax for nearly two years, preventing Plaintiffs and others from voting, and because it will take a "long time" for Texas voters to "learn about and acquire free birth certificates." Additionally, even without the $2 to $3 fee, the Veasey Plaintiffs argue that the process of obtaining a free birth certificate and a free EIC constitutes the kind of "burdensome alternative process" that was struck down in *Harman v. Forssenius*, 380 U.S. 528 (1965). Before our full court, the Veasey Plaintiffs continue to argue that we should

---

[62] The Veasey Plaintiffs include: Marc Veasey, Jane Hamilton, Sergio Deleon, Floyd Carrier, Anna Burns, Michael Montez Penny Pope, Oscar Ortiz, Koby Ozias, League of United Latin American Citizens, John Mellor-Crummey, Ken Gandy, Gordon Benjamin, and Evelyn Brickner. No other plaintiff joined in making this allegation.

No. 14-41127

affirm the district court's poll tax ruling.

To the extent that the Veasey Plaintiffs have not abandoned or conceded this claim,[63] we conclude that SB 14, as amended by SB 983, does not impose a poll tax. Although SB 983 was passed when this case was already on appeal, we do not need to remand this issue to the district court for two reasons: (1) we conclude that even before SB 983, SB 14 did not create a facial poll tax; and (2) the issue of SB 983's impact on the poll tax issue is a pure question of law (at least as far as this facial challenge) that does not necessitate any reweighing of evidence or consideration of new evidence.

The Veasey Plaintiffs previously facially challenged SB 14 with respect to Texas voters born out of state (who are unaffected by SB 983's passage). Those voters could face fees in their state of birth to obtain documentation required for an EIC. We conclude that SB 14 does not facially impose a poll tax on those voters. Rather, SB 14 requires *all* Texas voters to present valid identification at the polls, exercising the State's "legitimate interest in assessing the eligibility and qualifications of voters." *Gonzalez v. Arizona*, 677 F.3d 383, 408–10 (9th Cir. 2012) (en banc); *see also Harper v. Va. Bd. of Elections*, 383 U.S. 663, 668 (1966) ("But we must remember that the interest of the State, when it comes to voting, is limited to the power to fix qualifications."). The indirect cost on voters born out of state does not constitute a poll tax.[64] *Cf. Harman*, 380 U.S. at 541 ("Thus, in order

---

[63] *Cf. Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014) (noting plaintiff "affirmatively abandoned [his Title VII] claim on appeal by conceding" that he had not established pretext for racial discrimination).

[64] Only one plaintiff, Ken Gandy, showed that he was unable to obtain an out-of-state birth certificate due to its cost, s*ee Veasey v. Perry*, 71 F. Supp. 3d at 671, but he was able to vote by mail, *id.* at 677. Accordingly, Ken Gandy has suffered no injury that we must address under the poll tax rubric, and we conclude that SB 14 is not a poll tax as applied to him.

to demonstrate the invalidity of [the challenged law], it need only be shown that it imposes a material requirement *solely* upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." (emphasis added)).

Likewise, SB 14 did not impose a poll tax on voters before the passage of SB 983. It did not "impose[] a material requirement solely upon those who refuse[d]" to pay a poll tax, as proscribed by the Twenty-Fourth Amendment. *Id.* at 541–42. Rather, it drew from the State's power to set voter qualifications by requiring all voters to present a valid form of photo identification at the polls. *See Gonzalez*, 677 F.3d at 408. Under the Fourteenth Amendment, as the Supreme Court interpreted it in *Harper*, the Court has observed that a state invidiously discriminates when it imposes a cost to vote with a justification that is "irrelevant to the voter's qualifications." *Crawford*, 553 U.S. at 189. Although the questions presented to the Supreme Court in *Crawford* did not include whether Indiana's voter ID law imposed a poll tax, the Court observed that a statute would be invalid under *Harper*'s Fourteenth-Amendment poll tax analysis "if the State *required* voters to pay a tax or a fee to obtain a *new* photo identification." 553 U.S. at 198 (emphasis added). The Court implied that requiring voters to obtain photo identification and charging a fee for the required underlying documentation would not qualify as a poll tax, and we similarly conclude that SB 14's similar requirements did not operate as a poll tax. *See id.* at 198 & n.17; *see also Gonzalez*, 677 F.3d at 407–10.

As amended by SB 983, Texas law no longer imposes any direct fee for the underlying documentation required to obtain a qualifying voter ID. What remain are the requirements that such voters travel to the local registrar or county clerk's office, gather and present certain forms of documentation to receive the certified record, travel to the DPS office with that record, and

No. 14-41127

present the certified record, along with two forms of supporting identification, to receive an EIC. *See* 37 TEX. ADMIN. CODE § 15.182(3)–(4). The Veasey Plaintiffs appear to argue in their Rule 28(j) Letter that these obligations make SB 14 unconstitutional under *Harman* because they "requir[e] voters to follow a burdensome alternative process to avoid paying a . . . poll tax."[65]

To the extent the Veasey Plaintiffs now attempt to analogize SB 14 and SB 983 to the scheme in *Harman*, we reject that analogy. In *Harman*, the state of Virginia forced those who would vote in federal elections to choose between paying a poll tax and meeting a registration requirement before each election year. 380 U.S. at 531–32. The Virginia constitution mandated that federal voters file a certificate of residence within a specific date range, beginning on October 1 of the year before the federal election at issue and ending on a date six months before the date of the federal election. *Id.* at 532. On a notarized, witnessed certificate, the federal voter had to submit a current address and attest to: (1) being a resident of Virginia, both at the time of submission and since the date of voter registration, and (2) an intent not to move from the city or county of residence before the next general election. *Id.* Those voters who chose to pay federal and state poll taxes were only required to file the certificate of residence one time; those who did not pay the federal poll tax had to file a new certificate of residence in the designated time frame before each election year. *Id.*

Here, the State does not offer Texas voters a choice between paying a fee and undergoing an onerous procedural process. *Cf. id.* at 540–41. All voters

---

[65] This is somewhat in tension with the Veasey Plaintiffs' initial briefing before the panel, which claimed SB 14 was a poll tax based on the fee involved and conceded that "incidental burdens on voters are not taxes," including "[i]ncidental costs such as paying for gas to drive to the polls."

must make a trip to the DPS, local registrar, county clerk, or other government agency at some point to receive qualifying photo identification. This record reveals that Plaintiffs and those who lack both SB 14 ID and underlying documentation face more difficulty than many Texas voters in obtaining SB 14 ID. Undoubtedly, those who own vehicles, have flexible work schedules, and already possess the required documentation can more easily meet these procedural requirements than some of the Plaintiffs and others who lack these resources. Plaintiffs and others similarly situated often struggle to gather the required documentation, make travel arrangements and obtain time off from work to travel to the county clerk or local registrar, and then to the DPS, all to receive an EIC. These greater difficulties receive consideration in the Section 2 discriminatory effect analysis, but Supreme Court jurisprudence has not equated these difficulties, standing alone, to a poll tax. *See, e.g.*, *Harper*, 383 U.S. at 666. In *Harman*, the Court specifically noted:

> [I]t is important to emphasize that the question presented is not whether it would be within a State's power to abolish entirely the poll tax and require all voters—state and federal—to file annually a certificate of residence. Rather, the issue here is whether the State of Virginia may constitutionally confront the federal voter with a requirement that he either pay the customary poll taxes as required for state elections or file a certificate of residence.

380 U.S. at 538; *see also Crawford*, 553 U.S. at 198–99 (contrasting the unconstitutionality of a requirement that voters "pay a tax or a fee to obtain a new photo identification" with a requirement that voters without ID "travel to the circuit court clerk's office within 10 days [of the election] to execute the required affidavit"). Additionally, whether the qualifying identification is a driver's license, passport, or EIC, voters need not undergo this process every election year during a specific time frame six months prior to the election, as was the case in *Harman*. Instead, the record indicates that an EIC remains

No. 14-41127

valid for six years and must only be obtained sometime before an election.

In light of the recently-enacted SB 983, SB 14 does not impose an unconstitutional poll tax under the Fourteenth or Twenty-Fourth Amendments, nor did it impose a poll tax before SB 983's enactment. Accordingly, we vacate the district court's judgment for the Veasey Plaintiffs on their poll tax claim and render judgment in the State's favor.

## V.  Remedy

After finding that SB 14 was enacted with a racially discriminatory purpose, the district court fully enjoined SB 14's implementation, with the exception of several sections of the law that do not relate to photo identification. *See Veasey v. Perry*, 71 F. Supp. 3d at 707 & n.583. That remedy is potentially broader than the one to which Plaintiffs would be entitled if only the discriminatory effect claim were considered. *Compare Crawford*, 553 U.S. at 200, 203 (noting, in the Section 2 context, that "petitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute"), *with City of Richmond*, 422 U.S. at 378 (holding, in the discriminatory purpose context, that "[a]n official action . . . taken for the purpose of discriminating . . . on account of . . . race has no legitimacy at all"), *and Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 465–66, 471, 487 (1982) (affirming the permanent injunction of a statewide initiative because its provisions were "effectively drawn for racial purposes" in violation of the Fourteenth Amendment).[66]

As discussed above, we (and, correspondingly, the district court) are

---

[66] We do not mean to suggest that a full injunction is *never* available as a remedy for a discriminatory effect finding. However, given the severability clause in this statute and the Supreme Court's cautions to give deference to legislative determinations even when some violation is found, the district court must examine a full range of potential remedies. *Perez*, 132 S. Ct. at 941.

No. 14-41127

acting within a short timeframe during which the district court will have to fashion at least an interim remedy relevant to the November 2016 election. Thus, we consider it prudent to provide some guidance regarding what would constitute a properly tailored remedy.

"When devising a remedy to a [Section] 2 violation, the district court's 'first and foremost obligation . . . is to correct the Section 2 violation.'" *Brown*, 561 F.3d at 435 (quoting *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006)). Yet, any remedy "should be sufficiently tailored to the circumstances giving rise to the [Section] 2 violation," *id.*, and to the extent possible, courts should respect a legislature's policy objectives when crafting a remedy, *see Perez*, 132 S. Ct. at 940–44; *see also Inclusive Communities*, 135 S. Ct. at 2524 ("Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice that 'arbitrar[ily] . . . operate[s] invidiously to discriminate on the basis of rac[e].'" (citation omitted)). In the context of redistricting,[67] the Supreme Court has instructed that a legislature's policy objectives may be discerned from the challenged legislation, and those policy choices should be respected, even when some aspect of the underlying law is unenforceable. *Perez*, 132 S. Ct. at 941.

When a statute contains a severability clause, courts must take special care to attempt to honor a legislature's policy choice to leave the statute intact. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330–31 (2006) (holding that lower courts should not have invalidated the entire statute, but should have accounted for the legislature's policy choices and the

---

[67] We have held that Section 2 redistricting cases provide an appropriate source of guidance for district courts attempting to craft remedies for Section 2 voter registration violations. *See Operation Push*, 932 F.2d at 406. Likewise, we take guidance here from precedent regarding the proper remedies for Voting Rights Act violations.

No. 14-41127

statute's severability clause).  In this case, SB 14's severability clause makes clear that the Legislature intended the photo identification system to be left intact for all valid applications.[68]  Also clearly underlying SB 14 is the concern that a voter present proper identification that cannot easily be counterfeited or used by another.

There are times when a court might give a state legislature an opportunity to cure the infirmities in the statute before permitting the district court to fashion a remedy.  *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, *whenever practicable*, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." (emphasis added)); *Operation Push*, 932 F.2d at 404–06 (affirming the district court after it initially issued orders requiring legislative action and then deferred to the Mississippi legislature's crafted remedy in accordance with those orders); *Westwego Citizens for Better*

---

[68]  The severability clause reads:

> Every provision in this Act and every application of the provisions in this Act are severable from each other. If any application of any provision in this Act to any person or group of persons or circumstances is found by a court to be invalid, the remainder of this Act and the application of the Act's provisions to all other persons and circumstances may not be affected. All constitutionally valid applications of this Act shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the legislature's intent and priority that the valid applications be allowed to stand alone. Even if a reviewing court finds a provision of this Act invalid in a large or substantial fraction of relevant cases, the remaining valid applications shall be severed and allowed to remain in force.

TEX. ELEC. CODE § 64.012 historical note (West Supp. 2014) [Act of May 16, 2011, 82d Leg., R.S., ch. 123, § 25, 2011 Tex. Gen. Laws 619, 625].

No. 14-41127

*Gov't v. City of Westwego*, 946 F.2d 1109, 1124 (5th Cir. 1991). Indeed, when feasible, our practice has been to "offer governing bodies the first pass at devising" remedies for Voting Rights Act violations. *Brown*, 561 F.3d at 435. Based on suggestions in oral argument, appropriate amendments might include a reasonable impediment or indigency exception similar to those adopted, respectively, in North Carolina[69] or Indiana.[70] There may also be some portion of prior state law that can reduce the discriminatory effect SB 14 has on minority voters without proper identification.

However, the Supreme Court and our court have acknowledged that when it is *not* practicable to permit a legislative body this opportunity because of an impending election, "it becomes the 'unwelcome obligation' of the federal court to devise and impose a [remedy] pending later legislative action." *Wise*, 437 U.S. at 540 (quoting *Connor v. Finch*, 431 U.S. 407, 415 (1977)); *see also Perez*, 132 S. Ct. at 939–41 (implicitly approving of a district court's decision to devise an interim redistricting plan rather than permit the legislature to impose a new plan in light of the fast-approaching election, but remanding to the district court to alter the plan to reflect the State's policy judgments); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan."); *cf. Planned Parenthood Cincinatti Region v. Taft*, 444 F.3d 502, 517 (6th Cir. 2006) (remanding to the district court to fashion an appropriate injunction and instructing the district court to account for legislative intent).

---

[69] *See* N.C. GEN. STAT. §§ 163-82.8(e), 163-166.13(c)(2), 163-166.15, 163-182.1B (2015).

[70] *See* IND. CODE § 3-11.7-5-2.5 (2015).

No. 14-41127

Such circumstances are present here: the Texas Legislature is not scheduled to be in session again until January 2017, and the November 2016 general election is fast approaching. It would be untenable to permit a law with a discriminatory effect to remain in operation for that election.[71] In fact, the State has not asked us to permit the Legislature to reconsider SB 14 before the courts fashion a remedy and, despite filing multiple briefs with this court in this case before and after the panel opinion, the State has never argued that we must defer to the Legislature in the first instance. When counsel for the State was asked about this issue during oral argument before our full court, counsel responded that so long as it was a "tailored, specific remedy," he "believe[s] this court could fashion the remedy itself." Upon further pressing by a member of the court, the State noted it also would be proper for the state legislature to act first, but repeated that this court could enact a tailored remedy and did not advocate that this court could or should order the Texas Governor to call a special session of the Legislature to craft a remedy to any Section 2 violation.

Because of the Supreme Court's order and the impending election, we would necessarily have to give only limited time for any legislative fix. Since the legislature is not scheduled to be in session this year, doing so would require that the Texas Governor call a special session of the Legislature. Accordingly, although legislative intercession may occur, it may not be feasible, and we follow the Supreme Court's guidance and permit the district court to enter an order that remedies SB 14's discriminatory effects. *See Wise*, 437 U.S. at 540; *see also Perez*, 132 S. Ct. at 939–41.

---

[71] As discussed above, the Supreme Court has also noted the time constraints of this case in light of the scheduled elections in November of 2016. *See Veasey v. Abbott,* 136 S. Ct. at 1823.

No. 14-41127

In the event that the Governor calls a special session to address this issue or should a later Legislature again address the issue of voter identification, any new law would present a new circumstance not addressed here. Such a new law may cure the deficiencies addressed in this opinion. Neither our ruling here nor any ruling of the district court on remand should prevent the Legislature from acting to ameliorate the issues raised in this opinion. Any concerns about a new bill would be the subject of a new appeal for another day.

On remand, the district court should refer to the policies underlying SB 14 in fashioning a remedy. We acknowledge that the record establishes that the vast majority of eligible voters possess SB 14 ID, and we do not disturb SB 14's effect on those voters—those who have SB 14 ID must show it to vote. The remedy must be tailored to rectify only the discriminatory effect on those voters who do not have SB 14 ID or are unable to reasonably obtain such identification. *See Frank II*, 819 F.3d at 386 (rejecting that "because *some* voters face undue difficulties in obtaining acceptable photo IDs, Wisconsin could not require *any* voter to present a photo ID," but accepting that "high hurdles for some persons" might "entitle those particular persons to relief"). Because the parties had an opportunity to present the evidence they desired during the initial district court proceedings, the district court's determinations should be based on the current record, supplemented only by legislative action, if any, that occurs after this remand and any oral argument permitted by the district court.

Clearly, the Legislature wished to reduce the risk of in-person voter fraud by strengthening the forms of identification presented for voting. Simply reverting to the system in place before SB 14's passage would not fully respect these policy choices—it would allow voters to cast ballots after presenting less

secure forms of identification like utility bills, bank statements, or paychecks. *See* TEX. ELEC. CODE § 63.001(b) (West 2010). The panel opinion noted that one possibility would be to reinstate voter registration cards as documents that qualify as acceptable identification under the Texas Election Code for those individuals who do not have and cannot reasonably obtain SB 14 ID.[72] During oral argument, counsel for the State suggested that an indigency exception, modeled after the exception in Indiana's voter ID law, would be sufficient to cure the discriminatory effect of SB 14. These are solutions the district court may consider. Further, in fashioning a remedy, the district court should also consider the necessity of educational and training efforts to ensure that both voters and workers at polling places are capable of making use of whatever remedy the district court selects.

In light of the impending election, we order the district court to file its order regarding the proper discriminatory effect remedy as soon as possible. The parties have expressed a willingness to work cooperatively with the district court to provide a prompt resolution of this matter, and we urge them to do so to avoid election eve uncertainties and emergencies.

## VI. Conclusion

### A. Discriminatory Purpose Claim

For the reasons stated above, we REVERSE the district court's judgment that SB 14 was passed with a racially discriminatory purpose and REMAND for the district court to consider this claim in light of the guidance we have provided in this opinion. As we have discussed, to avoid disruption of the

---

[72] While the registration card does not contain a photo, it is a more secure document than a bank statement or electric bill and, presumably, one not as easily obtained by another person. It is sent in a nondiscriminatory fashion, free of charge, to each registered voter and therefore avoids any cost issues.

No. 14-41127

upcoming election, the district court should first focus on fashioning interim relief for the discriminatory effect violation in the months leading up to the November general election. The district court should then reevaluate the evidence relevant to discriminatory intent and determine anew whether the Legislature acted with a discriminatory intent in enacting SB 14. We encourage the district court to wait until after the November 2016 election to make this new determination. However, whether the district court waits to make its findings until after the November election or does so sooner, we instruct that, in light of the limited time prior to the November 2016 election, the district court shall not implement any remedy arising from such reevaluation before this November's election.

## B. Discriminatory Effect Claim

We AFFIRM the district court's finding that SB 14 violates Section 2 of the Voting Rights Act through its discriminatory effects and REMAND for consideration of the appropriate remedy consistent with this opinion as soon as possible. The district court must ensure that any remedy enacted ameliorates SB 14's discriminatory effect, while respecting the Legislature's stated objective to safeguard the integrity of elections by requiring more secure forms of voter identification.

## C. Other Claims

We VACATE the district court's holding that SB 14 is a poll tax under the Fourteenth and Twenty-Fourth Amendments and RENDER judgment for the State on this issue. We need not and do not address whether SB 14 unconstitutionally burdens the right to vote under the First and Fourteenth Amendments; therefore, we VACATE the district court's judgment on that issue and DISMISS those claims.

No. 14-41127

### D. Interim Relief

In sum, the district court's immediate responsibility is to ensure the implementation of an interim remedy for SB 14's discriminatory effect that disrupts voter identification rules for the 2016 election season as little as possible, yet eliminates the Section 2 discriminatory effect violation. The district court will need to reexamine the discriminatory purpose claim in accordance with the proper legal standards we have described, bearing in mind the effect any interim legislative action taken with respect to SB 14 may have. The district court's task in this respect may await the November 8, 2016 general election.

No. 14-41127

STEPHEN A. HIGGINSON, Circuit Judge, joined by GREGG COSTA, Circuit Judge, concurring:

As the Supreme Court has reminded, though great progress has been made, "voting discrimination still exists; no one doubts that," and Section 2 of the Voting Rights Act operates as a crucial "permanent, nationwide ban," *Shelby County v. Holder*, 133 S. Ct. 2612, 2619, 2631 (2013), on "even the most subtle forms of discrimination," *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting). The courts, therefore, have a vital role in protecting the right "to participate equally in the political process." *Thornburg v. Gingles*, 478 U.S. 30, 80 (1986). Indeed, the Supreme Court has long cautioned that alleged discrimination against minorities calls for a "searching judicial inquiry," *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938), and with regard to Section 2, which mandates consideration of "the totality of circumstances," 52 U.S.C. § 10301(b), Congress has made clear that, again in the Court's words, "whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality'" and "on a 'functional' view of the political process," *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 30 (1982)).

After a nine-day trial that saw the testimony of over forty witnesses, half of them experts, the district court concluded in a nearly one-hundred-and-fifty-page opinion that SB 14—stricter than other voter ID laws that courts have upheld, including those after which Texas's law was ostensibly modeled[1]— violates Section 2 because it abridges minorities' ability to participate equally

---

[1] *See Texas v. Holder*, 888 F. Supp. 2d 113, 128 (D.D.C. 2012) ("SB 14 is far stricter than either Indiana's or Georgia's voter ID laws."), *vacated on other grounds*, 133 S. Ct. 2886 (2013); *see also N. Car. State Conference of the NAACP v. McCrory*, --- F. Supp. 3d ---, 2016 WL 1650774, at *156 (M.D.N.C. Apr. 25, 2016) ("[North Carolina's voter ID law] is also less burdensome than the Texas ID requirement . . . .").

No. 14-41127

in the political process. As the majority opinion shows, the district court's Section 2 finding is a permissible view of a voluminous record informed by extensive testimony. I join the majority opinion and write separately to respond to arguments in the principal dissenting opinion because, contrary to those arguments, I perceive that the majority opinion's Section 2 analysis fits comfortably with decisions of the Supreme Court, our court, and other circuits.

I.

As the majority opinion explains, our adoption of the Fourth and Sixth Circuits' two-part test places Section 2's totality-of-circumstances inquiry in a vote-denial framework that adheres to the text of Section 2, 52 U.S.C. § 10301, and the Supreme Court's guidance in *Gingles,* 478 U.S. at 47 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."). Use of the *Gingles* (or Senate) factors as nonexhaustive tools fleshing out this framework ensures the requisite causal linkage between past discrimination and a challenged voting practice's disparate impact. Though some of the factors may have less relevance in vote-denial cases, others, particularly "Senate factors one, three, five, and nine," aid in applying the Supreme Court's admonition to discern the relevant social and historical effects of discrimination, and their interaction with a challenged law. *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 555 (6th Cir. 2014), *vacated on other grounds*, 2014 WL 10384647 (6th Cir. 2014); *see also* Daniel P. Tokaji, *Applying Section 2 to the New Vote Denial*, 50 HARV. C.R.-C.L. L. REV. 439, 481–82 (2015) (concluding that most of the Senate factors are relevant to vote-denial claims, the fifth factor especially so). And case law belies the argument that the Senate factors have no place outside the vote-dilution context.

No. 14-41127

The Senate factors have roots in this court, *see Zimmer v. McKeithen*, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc), and we have not limited them to vote-dilution cases. To the contrary, in a vote-denial case in which we affirmed a finding that Mississippi's voter registration process violated Section 2's results test, we noted that the trial court applied those "'objective factors' to aid the courts in evaluating a § 2 claim." *Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 405 (5th Cir. 1991), *aff'g Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987) (applying all nine factors).[2] And among our sister circuits, it is not just the Fourth and Sixth that have found the Senate factors significant in vote-denial cases. *See Gonzalez v. Arizona*, 677 F.3d 383, 405–06 (9th Cir. 2012) (en banc) (explaining that "courts should consider" the Senate factors in vote-denial cases); *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1227 n.26 (11th Cir. 2005) (en banc) (stating in dictum that the factors apply to denial cases); *Smith v. Salt River Proj. Agr. Improvement & Power Dist.*, 109 F.3d 586, 596 n.8 (9th Cir. 1997) (rejecting the argument that the Senate factors "apply only to 'vote dilution' claims"). We do well to join this near-consensus of circuits in recognizing that the Senate Report and *Gingles* provide guidance in the vote-denial context.

## II.

Today's outcome is also not inconsistent with *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). *Crawford* did not even discuss the Voting

---

[2] The *Operation Push* plaintiffs' arguments mirror some in this case. *Compare Operation Push*, 932 F.2d at 403 (citing the argument that African-Americans' lack of access to transportation and less flexible work schedules made it more difficult for them to comply with the restrictive registration system), *with Veasey v. Perry*, 71 F. Supp. 3d 627, 664–65 (S.D. Tex. 2014) (citing evidence that low-income Texans, who are disproportionately African-American or Hispanic, not only disproportionately lack qualifying ID, but also have more difficulty taking time off from work to secure ID and "live without vehicles for their own transportation to get to ID-issuing offices").

No. 14-41127

Rights Act, and held only that the lower courts "correctly concluded that the evidence in the record [was] not sufficient to support a facial attack on the validity of the entire statute" under the constitutional *Anderson-Burdick* framework. *Id.* at 189. Furthermore, as Justice Stevens took care to note, the record there, unlike here, (1) did not quantify the voters without qualifying ID, (2) provided no "concrete evidence of the burden imposed on voters who currently lack photo identification," and (3) said "virtually nothing about the difficulties faced by . . . indigent voters." *Id.* at 200–01. To be sure, *Crawford* established that preventing voter fraud and safeguarding voter confidence are legitimate and important state interests. *Id.* at 194–97. But it does not follow that assertion of those interests immunizes a voter ID law from all challenges, or that courts should be deterred from examining, as part of the Section 2 totality-of-circumstances inquiry, the tenuousness of the reasons given for the law. *See League of Women Voters of N. Car. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014); *cf. Husted*, 768 F.3d at 547 ("[*Crawford*] does not mean, however, that the State can, by merely asserting an interest in preventing voter fraud, establish that that interest outweighs a significant burden on voters.").[3]

Nor does our decision contravene *League of United Latin American Citizens v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc). Texas highlights our statements in that dilution case that socioeconomic disparities alone do not

---

[3] To the extent the dissent argues that *League of United Latin American Citizens v. Clements* forecloses consideration of the "tenuousness" factor, that case distinguished the "weight" of the state's interest "from the conventional *Zimmer* [Senate] factor of tenuousness." 999 F.2d 831, 871 (5th Cir. 1993) (en banc). And as the Supreme Court recently reminded, that a state interest is legitimate does not necessarily mean courts should ignore evidence of whether a specific law advances that interest or imposes needless burdens. *See Whole Women's Health v. Hellerstedt*, --- S. Ct. ---, 2016 WL 3461560, at *16 (2016).

show "that minorities do not enjoy equal access to the political process," and that the Senate Report "did not dispense with proof that participation in the political process is in fact depressed among minority citizens." *Id.* at 866, 867. From this, Texas reasons that the district court erred by finding a Section 2 violation without "proof that the challenged law affects voting behavior." The cited language in *Clements*, however, discussed Senate factors one and five: "the extent of any history of official discrimination" affecting political participation, and "the extent to which members of the minority group . . . bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Id.* at 866 & n.30. In that context, we noted that the plaintiffs "offered no evidence of reduced levels of black voter registration, lower turnout among black voters, or any other factor tending to show that past discrimination"—not the challenged law by itself—"ha[d] affected their ability to participate in the political process" as required by "these *Zimmer* [Senate] factors." *Id.* at 867. Here, in sharp contrast, the district court heard such evidence and found, in its discussion of factor five, that the effects of past discrimination "have hindered the ability of African-Americans and Hispanics to effectively participate in the political process"; indeed, one expert "testified that these minorities register and turnout for elections at rates that lag far behind Anglo voters." *Veasey v. Perry*, 71 F. Supp. 3d 627, 697 (S.D. Tex. 2014).

The district court also heard from witnesses who were unable to vote because they lacked the required forms of ID, from some who struggled to obtain the required forms of ID or documents needed to obtain them, and from others who help disadvantaged individuals obtain photo IDs and attested to the difficulties those individuals face in doing so. *See id.* at 667–76. The court further credited expert testimony that SB 14 "would almost certainly decrease

No. 14-41127

voter turnout, particularly among minorities," by imposing burdens that fall more heavily on African-Americans and Hispanics. *Id.* at 655–56; *see also id.* at 664–65.[4]  The majority opinion rightly rejects Texas's attempt to stretch *Clements* to require that plaintiffs wait until elections have occurred under the challenged law and then prove a direct impact on turnout.  That would make impossible pre-enforcement Section 2 challenges, which the Supreme Court recently acknowledged.  *See Shelby County*, 133 S. Ct. at 2619 ("[I]njunctive relief is available in appropriate [Section 2] cases to block voting laws from going into effect.").  And as multiple experts testified, given the myriad variables at play, it is extremely difficult to isolate the effect of a new law on voter turnout.[5]  Texas's argument that the plaintiffs were required to prove a direct impact on turnout is unsound.

---

[4] The dissent cites law review articles for the propositions that studies collected therein show no effect from voter ID laws on turnout, or even show increased turnout.  Those collected studies, which mostly date from 2009 and earlier, did not involve SB 14 and do not make the district court's acceptance of expert testimony that Texas's law likely will depress turnout clearly erroneous.  In any event, scholarship on the effects of voter ID laws is far from uniform.  *See, e.g.*, Zoltan Hajnal, et al., *Voter Identification Laws and the Suppression of Minority Votes,* at 15 (February 2016), http://pages.ucsd.edu/~zhajnal/page5/documents/voterIDhajnaletal.pdf ("For Latinos, Blacks, and multi-racial Americans there are strong signs that strict photo identification laws decrease turnout."); Bill Hobby, et al., *The Texas Voter ID Law and the 2014 Election: A Study of Texas's 23rd Congressional District*, at 13 (August 2015), https://bakerinstitute.org/media/files/files/e0029eb8/Politics-VoterID-Jones-080615.pdf (concluding that Hispanic non-voters in one Texas congressional district "were significantly more likely than Anglo non-voters to strongly agree or agree that a lack of photo ID was a reason that they did not cast a ballot in the 2014 general election"); Michael D. Gilbert, *The Problem of Voter Fraud*, 115 COLUM. L. REV. 739, 749 & n.55 (2015) ("Other studies suggest voter ID laws do depress votes." (collecting studies)).

[5] Scholars have made the same point.  *See* Tokaji, *supra*, at 475–76 ("Existing empirical methods are simply not up to the task of establishing the effect of a particular practice on turnout, let alone on turnout by particular subgroups, with any degree of precision."); Samuel Issacharoff, *Ballot Bedlam*, 64 DUKE L.J. 1363, 1383 (2015) ("There has not been enough time to test the observations against normal fluctuations in turnout . . . and other confounding political factors."); Michael J. Pitts, *Empirically Measuring the Impact of Photo ID Over Time and Its Impact on Women*, 48 IND. L. REV. 605, 606 (2015) ("[I]t can be

No. 14-41127

It is also mistaken to suggest that the majority opinion conflicts with the Ninth Circuit's decision in *Gonzalez*, 677 F.3d at 383. That court, after citing the Senate factors with approval and emphasizing the deference owed to a district court's factual Section 2 determinations, affirmed a finding that the plaintiff had failed to establish the disparate impact of a voter ID law where, among other things, the district court rejected as unreliable the plaintiff's expert statistical analysis and the record included no evidence that Hispanics were even less likely to possess qualifying ID. *Id.* at 406–07 & n.33. The law at issue was also much less strict, requiring a voter to present at the polls *either* (A) one of a broader range of photo IDs *or* (B) two non-photo documents showing the voter's name and address, such as a utility bill, bank statement, or voter registration card. *Gonzalez v. Arizona*, No. CV 06-1268-PHX, 2006 WL 3627297, at *1, *6 (D. Ariz. Sept. 11, 2006). Even so, two judges wrote separately to stress that the court's holding was based on "the *current record*," and that "[a] different record in a future case could produce a different outcome." *Gonzalez*, 677 F.3d at 442 (Berzon, J., concurring).[6]

The Ninth Circuit of course said that "proof of 'causal connection between the challenged voting practice and a prohibited discriminatory result' is crucial" to a Section 2 challenge. *Id.* at 405 (majority opinion) (quoting *Smith*, 109 F.3d at 595). But the district court here found that the record established that causal connection. The trial judge found that SB 14 makes voting relatively more difficult for minorities, and without ameliorative measures will

difficult to determine the amount of actual disenfranchisement caused by photo identification laws."); Gilbert, *supra*, at 750 ("Gathering relevant data and designing conclusive tests presents many challenges.").

[6] The district judge, contrastingly to this case, noted that the record did not contain "adequate evidence on any of [the Senate] factors to enable an appropriate evaluation." *Gonzalez*, 2006 WL 3627297, at *8.

No. 14-41127

likely disproportionately suppress minority voting, by conditioning the right to vote on the possession of documents that, because of the effects of past discrimination, are harder for minority voters to obtain. Such interaction between present-day law and the effects of past discrimination is what Congress intended to combat. *See Gingles*, 478 U.S. at 69 ("Congress intended that the Voting Rights Act eradicate inequalities in political opportunities that exist due to the vestigial effects of past purposeful discrimination."); *see also id.* at 44 n.9 ("[T]he purpose of the Voting Rights Act was 'not only to correct an active history of discrimination, . . . but also to deal with the accumulation of discrimination.'" (quoting S. Rep. No. 97-417, at 5)).

For this reason among others, we should not be guided by *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014). In that case, Judge Easterbrook—who did not mention the applicable clear-error standard of review—overlooked many of the district court's factual findings. *See Frank v. Walker*, 773 F.3d 783, 792–93, 796–97 (7th Cir. 2014) (Posner, J., dissenting from denial of rehearing en banc); Tokaji, *supra*, at 460. Questioning other circuits' approaches to vote-denial cases without offering a clear alternative, Judge Easterbrook went on to uphold a different voter ID law on the rationales that the law did not facially "draw any line by race," and that the plaintiffs had not "show[n] a 'denial' of anything by Wisconsin, as § 2(a) requires" because the state had not directly caused minorities to be less likely or able to own qualifying IDs. *Frank*, 768 F.3d at 753. Ultimately, the Seventh Circuit read Section 2 as only "an equal-treatment requirement," and rejected the plaintiffs' challenge "because in Wisconsin everyone has the same opportunity to get a qualifying photo ID." *Id.* at 754, 755.

This reasoning ignores that Section 2 prohibits voting procedures "imposed or applied . . . in a manner which *results* in a denial *or abridgement*

No. 14-41127

of the right . . . to vote." 52 U.S.C. § 10301(a) (emphasis added). Indeed, the opinion does not mention "abridgement" aside from a single quotation of the statute. Judge Easterbrook's "equal-treatment" gloss—which he did not explain aside from saying that is "how [the statute] reads," *Frank*, 768 F.3d at 754—is puzzling because it is undisputed that, in response to a judicial ruling that Section 2 plaintiffs had to prove discriminatory intent, Congress revised the statute "to make clear that a violation could be proved by showing discriminatory effect alone," *Gingles*, 478 U.S. at 35; *cf. Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (explaining that "disparate-treatment" plaintiffs must show a discriminatory intent or motive). And if Section 2 requires only equal treatment, or if a Section 2 burden is cognizable only if it is impossible for some minority voters to comply with the challenged law, Justice Scalia must have mistakenly stated that Section 2 would be violated if "a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites." *Chisom*, 501 U.S. at 408 (Scalia J., dissenting). After all, ignoring disparities due to past discrimination, that law would give everyone the "same opportunity" to register.

Judge Easterbrook further seems to have reasoned that the *only* discrimination relevant to Section 2's totality-of-the-circumstances inquiry is of the state-sponsored variety. *See Frank*, 768 F.3d at 753. The dissent agrees, adding that the official discrimination must be "contemporary" or at least "recent." I have difficulty squaring that with Section 2's directive to address the "totality of circumstances," and with the Supreme Court's admonitions to probe the interaction of the challenged practice "with social and historical conditions" as well as consider "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment,

No. 14-41127

and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 47, 45. As one of this court's notable jurists put it, "under the results standard of section 2, pervasive private discrimination should be considered, because such discrimination can contribute to the inability of [minorities] to assert their political influence and to participate equally in public life." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1567 n.36 (11th Cir. 1984) (Wisdom, J.); *see also Gomez v. City of Watsonville*, 863 F.2d 1407, 1418 (9th Cir. 1988) (rejecting the argument that only discrimination by the defendant is relevant to a Section 2 vote-dilution case); *Solomon v. Liberty County*, 899 F.2d 1012, 1032 (11th Cir. 1990) (en banc) (Tjoflat, J., concurring) ("Congress . . . revised section 2 to prohibit election practices that accommodate or amplify the effect that private discrimination has in the voting process." (ellipsis in original) (quoting David L. Eades, Recent Developments, *Section 2 of the Voting Rights Act: An Approach to the Results Test*, 39 VAND. L. REV. 139, 172 (1986))).[7]

## III.

Two related final points bear mentioning. First, Judge Easterbrook warned that the *Frank* plaintiffs' interpretation of Section 2 could "sweep[] away almost all registration and voting rules." *Frank*, 768 F.3d at 754. For example, he opined, "[m]otor-voter registration, which makes it simple for

---

[7] Because Texas selected the requisite voter qualifications and the manner of implementing them, which the trial court found interact with the effects of discrimination to cause racial disparities in opportunity to vote, considering the effects of private discrimination among other factors does not violate the Supreme Court's warning against imposing disparate-impact liability when "the plaintiff cannot point to a defendant's policy or policies causing [a statistical] disparity." *Inclusive Cmtys.*, 135 S. Ct. at 2523; *cf. id.* at 2524 (opining that a Fair Housing Act plaintiff might not be able to show "a causal connection between the Department's policy and a disparate impact" if, "for instance . . . federal law substantially limits the Department's discretion").

people to register by checking a box when they get drivers' licenses, would be invalid, because black and Latino citizens are less likely to own cars and therefore less likely to get drivers' licenses." *Id.* The dissent advances a similar point, warning that voting regulations ranging from polling locations, early voting details, and registration times "can be challenged successfully under the majority's rationale." I agree that Section 2 challenges can be brought against a variety of election laws—but that is nothing new. *See Holder v. Hall*, 512 U.S. 874, 922 (1994) (Thomas, J., concurring) ("The section thus covers all manner of registration requirements, the practices surrounding registration (including the selection of times and places where registration takes place and the selection of registrars), the locations of polling places, the times polls are open, the use of paper ballots as opposed to voting machines, and other similar aspects of the voting process that might be manipulated to deny any citizen the right to cast a ballot and have it properly counted."); *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 566–67 (1969) ("Indicative of an intention to give the Act the broadest possible scope, Congress expanded the language in the final version of [Section] 2 to include any 'voting qualifications or prerequisite to voting, or standard, practice, or procedure.'" (quoting then-42 U.S.C. § 1973)). Nor does it imperil our electoral system.

There is a difference between making voting *harder* in ways that interact with historical and social conditions to disproportionately burden minorities and making voting *easier* in ways that may not benefit all demographics equally (like motor-voter). The former can be characterized as "abridging" the right to vote; the latter cannot. Laws that neither "eliminate opportunities that racial minorities disproportionately use, [n]or impose a requirement that

No. 14-41127

they disproportionately lack,"[8] in other words, will not fail our test. *Cf.* 52
U.S.C. § 10301(b) (explaining that Section 2 does not "establish[ ] a right to
have members of a protected class elected in numbers equal to their proportion
in population"). And as recent cases show, not all voter ID laws will, either. It
is simplistic to lump all such laws together, overlooking that details—such as
which forms of ID are accepted at the polls,[9] what documentation is needed to
get a free qualifying ID,[10] and how the law is implemented[11]—matter.
Especially significant are the accommodations made for those most affected by
the ID requirement. In North Carolina, for instance, persons without
qualifying ID can vote by swearing that they "subjectively believe a reasonable
impediment prevented them from acquiring ID." *N. Car. State Conference of
the NAACP v. McCrory*, --- F. Supp. 3d ---, 2016 WL 1650774, at *35–36
(M.D.N.C. Apr. 25, 2016). Only the impediment's veracity may be challenged.
*Id.* at *120. South Carolina has a similar provision, which a three-judge court

---

[8] Tokaji, *supra*, at 475.

[9] *See Veasey*, 71 F. Supp. 3d at 642 (chart showing that, in terms of types of ID
accepted, SB 14 is the strictest voter ID law in the country).

[10] *Compare Veasey*, 71 F. Supp. 3d at 668–69 (explaining that SB 14 requires a birth
certificate or similar document to get a free qualifying ID), *with McCrory*, 2016 WL 1650774,
at *26 (explaining that a North Carolinian can secure free voter ID by supplying a Social
Security number and two of approximately twenty supporting documents, including medical
records, prison ID, and paycheck stubs), *and Lee v. Va. State Bd. of Elections*, --- F. Supp. 3d
---, 2016 WL 2946181, at *24 (E.D. Va. May 19, 2016) ("[E]ligible voters do not need to present
any independent documentation to obtain a free voter form of identification under Virginia
Code § 24.2–643 and its implementing regulations. The statute simply requires that a
registrant provide her name, address, birthdate, and social security number and sign the
registration form swearing that the information provided is true and correct.").

[11] North Carolina's ID requirement, for example, had a two-year "soft rollout," and the
state's more extensive educational efforts included mailings offering help to voters whom a
study indicated might not have qualifying ID. *See McCrory*, 2016 WL 1650774, at *19–26;
*see also Common Cause/Ga. v. Billups*, 504 F. Supp. 2d 1333, 1378–79 (N.D. Ga. 2007)
(discussing Georgia's "exceptional" educational efforts), *vacated in part on other grounds*, 554
F.3d 1340 (11th Cir. 2009).

No. 14-41127

stressed in preclearing the state's voter ID law. *See South Carolina v. United States*, 898 F. Supp. 2d 30, 35–43 (D.D.C. 2012).

Second, we should not shy away from inquiring into such details, or from judging laws in their operative contexts, merely because it will require courts to draw fact-specific and even close distinctions. States have reacted to the Supreme Court's decisions in *Crawford* and *Shelby County* by introducing a range of voting regulations that go beyond what had previously been upheld. It is healthy for these initiatives to be assessed against congressional mandates, and courts can and should distinguish between nondiscriminatory ones which safeguard voter integrity and those which, whatever their intentions, interact with the effects of past discrimination to abridge minorities' opportunities to participate in the political process. Such scrutiny should be seen not as heavy-handed judicial rejection of legislative priorities, but as part of a process of harmonizing those priorities with the fundamental right to vote—a topic with which over a quarter of our Constitution's amendments have dealt in one way or another, and an individual right that cannot be compromised because an adverse impact falls on relatively few rather than many. *See Operation Push*, 932 F.2d at 404 (noting that the Mississippi legislature responded to a finding of a Section 2 violation by adopting ameliorative changes suggested by a district court); *South Carolina*, 898 F. Supp. 2d at 35–36 (explaining that state officials adopted a broad interpretation of a voter ID law's reasonable-impediment exception as litigation progressed); *id.* at 53 (Bates, J., concurring) ("An evolutionary process has produced a law that accomplishes South Carolina's important objectives while protecting every individual's right to vote and a law that addresses the significant concerns raised about [the law's] potential impact on a group that all agree is disproportionately African-American."); *see also N.*

No. 14-41127

*Car. State Conference of the NAACP v. McCrory*, --- F. Supp. 3d ---, 2016 WL 204481, at *2, *11 (M.D.N.C. Ja. 15, 2016) (noting that North Carolina adopted a reasonable-impediment exception "materially indistinguishable from South Carolina's" during the course of litigation); *Milwaukee Branch of the NAACP v. Walker*, 851 N.W.2d 262, 278–79 (Wis. 2014) (construing voter ID law so as to avoid constitutional infirmity).[12]

Cognizant that the Supreme Court may itself choose to refine Section 2 law in light of *Gingles*, *Crawford*, and *Shelby County*, or that Congress may revisit the topic as other affected groups, such as young people, the working poor, and the elderly mobilize, I concur in the majority opinion, having offered these respectful responses to arguments made in dissent.

---

[12] I also disagree with the opposite criticism that this interbranch engagement ameliorates too little, though that argument is contributory. *See* Richard L. Hasen, *Softening Voter ID Laws Through Litigation: Is it Enough?*, WISC. L. REV. FORWARD (forthcoming 2016), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2743946 (with apologies to Professor Hasen for my citation of his draft version).

No. 14-41127

EDITH H. JONES, Circuit Judge, joined by E. GRADY JOLLY, JERRY E. SMITH, EDITH BROWN CLEMENT, and PRISCILLA R. OWEN, concurring in part and dissenting in part:

We dissent.[1]  Requiring a voter to verify her identity with a photo ID at the polling place is a reasonable requirement widely supported by Texans of all races and members of the public belonging to both political parties.  The majority, however, today holds not only that Texas's photo voter ID law, SB 14, violates the "results test" declared in Section 2 of the Voting Rights Act,[2]  but concludes that there is "more than a scintilla" of evidence to support a finding that the Texas Legislature passed the photo voter ID law with a racially discriminatory intent.  By keeping this latter claim alive, the majority fans the flames of perniciously irresponsible racial name-calling.[3]

---

[1] We join only Part IV of the majority opinion that renders judgment in favor of the State on the Plaintiffs' poll tax claim.

[2] This holding invalidates the law for that small subgroup of the subgroup of 4.5% of Texas registered voters, those who allegedly lack not only the law's approved ID (drivers licenses, veterans ID, etc.) but also lack the documentation (birth certificates) necessary to obtain a free Election Identity Card ("EIC") and are inconvenienced by obtaining the documentation and the EIC.  As I shall demonstrate, the majority offers a gravely incorrect interpretation of Section 2.

[3] Section 2 was amended to add the results test, footing liability on less than intentional conduct, in part to defuse controversy over charges of purposeful discrimination.  *See Thornburg v. Gingles*, 478 U.S. 30, 44, 106 S. Ct. 2752, 2763 (1986) (explaining that one of the "principal reasons" the intent test was repudiated was that it was "unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities" (internal quotations omitted)).  The Senate Report, from which the Court in *Gingles* heavily draws, elaborates on this point from testimony and examples before Congress:

> As Dr. Arthur S. Flemming, Chairman of the United States Commission on Civil Rights, testified during hearings before the Subcommittee on the Constitution:

No. 14-41127

No one doubts our unwavering duty to enforce antidiscrimination law. But in this media-driven and hyperbolic era, the discharge of that duty requires the courage to distinguish between invidious motivation and shadows. The ill-conceived, misguided, and unsupported majority opinion shuns discernment. Because of definitive Supreme Court authority, no comparable federal court precedent in over forty years has found a state legislative act motivated by purposeful racial discrimination. Even more telling, the multi-thousand page record yields not a trace, much less a legitimate inference, of racial bias by the Texas Legislature. Indeed, why would a racially biased legislature have provided for a cost-free election ID card to assist poor registered voters—of all races—who might not have drivers' licenses? Yet the majority emulates the clever capacity of Area 51 alien enthusiasts who, lacking any real evidence, espied a vast but clandestine government conspiracy to conceal the "truth."[4]

---

> (L)itigators representing excluded minorities will have to explore motivations of individual council members, mayors, and other citizens. The question would be whether their decisions were motivated by invidious racial considerations. Such inquiries can only be divisive, threatening to destroy any existing racial progress in a community. It is the intent test, not the results test, that would make it necessary to brand individuals as racist in order to obtain judicial relief.
>
> The very concern voiced by Dr. Flemming was illustrated by two recent decisions, [*City of Mobile, Ala. v.*] *Bolden*, [446 U.S. 55, 100 S. Ct. 1490 (1980)], on remand, and *Perkins v. City of West Helena, Ark.*[, 675 F.2d 201 (8th Cir. 1982)]. In both cases, the federal courts were compelled to label the motives of recent public officials as "racial" in reaching the conclusion that an electoral system was maintained for a discriminatory purpose.

S. REP. NO. 97-417, at 36 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 207-08 (footnotes omitted).

[4] *See* GREGORY W. PEDLOW & DONALD E. WELZENBACH, CENT. INTELLIGENCE AGENCY, THE CENTRAL INTELLIGENCE AGENCY AND OVERHEAD RECONNAISSANCE: THE U-2 AND OXCART PROGRAMS, 1954–1974 (1992) (declassified June 25, 2013) (report debunking

Because inflammatory and unsupportable charges of racist motivation poison the political atmosphere and tarnish the images of every legislator, and the Texas Lt. Governor and Governor, who supported SB 14, we consider that majority conclusion first. We then critique the majority's Section 2 holding and discuss constitutional tensions the majority opinion fosters.

## I.    Background

Three points must be highlighted at the outset, with further discussion to follow: the true extent of the legislative process leading to passage of a photo voter ID law; the catalytic effect of the Supreme Court's decision approving these IDs; and the impact of the law's requirements on all races.

First, SB 14 was enacted in the 2011 biennial legislative session after similar bills requiring photo voter ID had failed in three previous sessions. For six years, opponents had successfully stalled measures requiring proof of a voter's identity, not just a piece of paper from the County Registrar's office or a mere affidavit of "lost voter certificate." For every shortcut the majority employed to finally pass SB 14, an equal and opposite blocking tactic had succeeded in earlier legislative sessions.

Second, the campaign for stronger voter ID laws was encouraged by *Crawford v. Marion County Election Board*, 553 U.S. 181, 128 S. Ct. 1610 (2008), which upheld Indiana's photo voter ID law and emphasized the importance of protecting the integrity of election processes. Justice Stevens's

---

Area 51 conspiracy theories). Circumstantial evidence—equally probative as that relied on by the majority—is at odds with calling SB 14 intentionally discriminatory. Lamenting the lack of Latino voter turnout in Texas elections, Gilberto Hinojosa, the Texas Democratic Chairman, was recently quoted in a news article: "Voter ID is a problem. It is. But that's fixable. . . . That's not stopping that 1 million from going out to vote . . . ." Peggy Fikac, *Texas Democratic Chair: It's 'Ridiculous' His Party Isn't Winning*, SAN ANTONIO EXPRESS NEWS (June 16, 2016), http://www.mysanantonio.com/news/local/article/Texas-Democratic-chair-It-s-ridiculous-8261873.php.

No. 14-41127

opinion rejected the claim that Indiana had to advance "proof" of actual in-person voter fraud in order to justify the statute. Fourteen states passed photo voter ID laws in the wake of *Crawford.*

Third, the range of qualifying SB 14 IDs, while narrower than that in some similar ID laws, poses no obstacle to voting for at least 95.5% of all Texas voters who have unexpired (or no later than 60 days past expiry) driver's licenses, Texas personal identification cards, military IDs with a photo, United States passports, United States citizenship certificates with a photo, or licenses to carry a handgun. For those who lack such IDs, the law offers a cost-free Election Identification Card ("EIC") obtainable at state DMV offices (like the free card available in Indiana). Photo voter IDs are not required for elderly and disabled voters, as they may vote with mail-in ballots.

At trial, the alleged adverse racial impact of SB 14 was derived from statistical estimates of the relative numbers of Anglo, Black, and Hispanic voters who "do not possess SB14-compliant IDs." That is to say, of the 4.5% who may lack qualifying IDs, a disproportionate number are Black and Hispanic voters. Still, approximately the same number of Anglo registered voters (approx. 296,000) as the total of Black (approx. 128,000) and Hispanic (approx. 175,000) voters lack the requisite IDs. Put otherwise, approximately 2% of Anglo, 5.9% of Hispanic and 8.1% of Black voters comprise the 4.5% who lack SB 14 IDs but could vote with EICs; the law poses no obstacle for over 90% of minority voters.

Despite extraordinary efforts to find voters "disenfranchised" by SB 14, the DOJ could not uncover any, and no representative of the plaintiff organizations found any of their members unable to vote because of SB 14. Three plaintiffs claimed they could not vote in person under SB 14, but two of those qualified for ballots by mail. The plaintiffs' case thus turned on the

104

No. 14-41127

extent to which it could be estimated that those who do not possess SB 14 IDs would find it difficult to acquire EICs. It was assumed that the 4.5% overwhelmingly include the poor (of all races). There was expert testimony, unsupported by any hard data, that "the poor" are less likely to have actual or certified copies of birth certificates, the principal document required for an EIC. Obtaining birth certificates was testified to be challenging for the poor, especially those who had moved from their original birthplaces, but no estimates of this class's mobility were offered. Finally, even if the poor had birth certificates or obtained them, the district court found that travelling to DMV offices to procure EICs could be time-consuming, burdensome and interfere with hourly work schedules.

## II.    The Majority's Erroneous Discussion of Discriminatory Intent

SB 14 is a facially neutral law of general applicability, whose photo ID requirement poses no obstacle to the overwhelming majority of registered Texas voters. The law has a racially disparate impact upon a subset of minority voters. But there is "no smoking gun," not even code words that suggest discriminatory intent in the thousands of pages of legislative documents and deposition transcripts that the district court compelled the state to produce. The majority entirely ignores the total absence of direct evidence and, moreover, has to exclude (by force of precedent) the evidence most heavily relied on by the district court. Still, the majority finds "more than a scintilla of evidence" that could allow the district court on remand to condemn the law as, at least in part, racially motivated. I fully agree with Judge Clement's application of the *Arlington Heights* factors and will not repeat the discussion in her separate dissent. My additional disagreements are two-fold. First, the majority fails to follow the totality of Supreme Court precedents

No. 14-41127

pertaining to the interpretation of legislative intent.[5]   Second, the majority butchers, when it does not ignore, the relevant facts.

## A. Applicable Legal Principles

"[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact . . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65, 97 S. Ct. 555, 563 (1983).  This is shared ground, as it is that *Arlington Heights* sets out certain factors that may be relevant to proving the intent of the legislature.

*Arlington Heights*'s discourse on proving discriminatory legislative intent does not exist in a vacuum.  There, the Court upheld a zoning board decision that prevented the construction of a low-income housing project in a Chicago suburb.  The facially neutral zoning order had a discriminatory impact on minorities who were more likely to inhabit the project.  The Court attempted to catalog how a legislative decision, and the steps leading to it, might display an impermissible motive.  Notably, in each case cited to exemplify its listed factors, discriminatory motive could be easily inferred.  A county closed public (heavily minority) schools while private segregated schools received financial support.[6]   A state constitutional amendment was passed to overturn laws that

---

[5]  The majority also erroneously equates finding legislative intent with finding discrimination in employment cases. The intent of the legislature is a pastiche of each individual representative's views, mixed policies and motives.  An employer, in contrast, is held to have a single motive and policy. A facile equation of these two situations elides the difficulty in legislative cases, which the Supreme Court plumbed in cases described above.

[6]  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267, 97 S. Ct. 555, 564 (1977) (citing *Griffin v. Sch. Bd.*, 377 U.S. 218, 84 S. Ct. 1226 (1964)).

No. 14-41127

had recently banned discrimination in private home sales.[7]   And zoning regulations were immediately changed, or a moratorium on new construction declared, or land rezoned to park use when a public housing project was proposed.[8]   Highly relevant to legislative purpose, the Court held, but "extraordinary" because it could not normally be compelled, would be evidence of legislative history and legislators' contemporaneous statements.  *Id.* at 268. The Court applied its newly listed factors to a very ordinary and neutral zoning process and found no racially discriminatory purpose.  *Id.* at 269–71.

Nothing in *Arlington Heights* suggests that the Court's listing of relevant factors licenses courts to string together bits of circumstantial evidence that wholly lack racial content and then undo any law with an incidental disparate impact.  In *Arlington Heights*, the Court found no basis for doing so.

*Arlington Heights* followed *Washington v. Davis*, in which the Court held that purposeful discrimination is required to establish Equal Protection violations.  Despite evidence that four times more Blacks than Whites failed the District of Columbia's verbal proficiency test for police applicants, 426 U.S. 229, 237, 96 S. Ct. 2040, 2046 (1976), the Court found no purposeful discrimination, *id.* at 246.  "The test is neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue." *Id.*  Other facts recounted how the District was attempting to recruit minority police officers.

Critical for this case is the Court's conclusion in *Washington v. Davis*:

---

[7]  *Id.* (citing *Reitman v. Mulkey*, 387 U.S. 369, 373–76, 87 S. Ct. 1627, 1629–31 (1967)).

[8]  *Id.* at nn.16–17 (citing *Kennedy Park Homes Ass'n v. City of Lackawanna*, 443 F.2d 108 (2d Cir. 1970); *Dailey v. City of Lawton*, 425 F.2d 1037 (10th Cir. 1970); *Progress Dev. Corp. v. Mitchell*, 286 F.2d 222 (7th Cir. 1961)).

No. 14-41127

> A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far-reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white.

*Id.* at 248. For precisely this reason, courts must walk a fine line between acknowledging discriminatory impact in a neutral law and discerning discriminatory purpose from nothing more than creative inferences.

Two years after *Arlington Heights*, the Court rejected inferring discrimination against women in a Massachusetts law that conferred an absolute lifetime state employment preference for veterans. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 99 S. Ct. 2282 (1979).[9] The district court had found no overt sex-discriminatory purpose by the legislature but concluded that the consequences of the absolute-preference formula for women's employment opportunities "were too inevitable to have been 'unintended.'" *Id.* at 261. But the Court focused on the legitimate, noninvidious purpose of the law, which broadly included both male and female veterans, and it noted that significant numbers of male nonveterans were also disadvantaged by the law. *Id.* at 274–75.[10] The adverse impact of the law was gauged according to all the affected citizens, not just the minority group.

---

[9] A finding of discrimination had been remanded for reconsideration in light of *Washington v. Davis*. *Pers. Adm'r of Mass v. Feeney*, 442 U.S. 256, 260, 99 S. Ct. 2282, 2286 (1979).

[10] Justice Stevens's concurrence pointed out that about 2.8 million women were adversely affected by the law, but so were over 1.8 million men, a comparison he found significant "to refute the claim that the rule was intended to benefit males as a class over females as a class." *Id.* at 281.

No. 14-41127

Significantly, the Court rebuffed three arguments reminiscent of contentions advanced in this case to support a finding of discriminatory purpose. First, even though the military may have historically discriminated against women, "the history of discrimination against women in the military is not on trial in this case." *Id.* at 278; *see also Milliken v. Bradley*, 418 U.S. 717, 745, 94 S. Ct. 3112, 3127 (1974) (remedy cannot be imposed on other government bodies not having been shown to violate Constitution). In other words, exogenous effects of past discrimination cannot be used to impute a contemporary discriminatory purpose.

Second, the Court held, discriminatory purpose:

> implies more than intent as volition or intent as awareness of consequences . . . . It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group. Yet nothing in the record demonstrated that this preference for veterans was originally devised or subsequently re-enacted because it would accomplish the collateral goal of keeping women in a stereotypic and predefined place in the Massachusetts Civil Service.

*Id.* at 279. Thus, as in *Arlington Heights,* an absence of direct evidence of discriminatory intent should be compelling.

Third, the Court rejected the plaintiffs' complaint that the law was excessively broad, unfair, and controversial with a firm reminder that "the Fourteenth Amendment 'cannot be made a refuge from ill-advised laws.'" *Id.* at 281 (internal citation omitted). That a law might have been written differently with respect to impact does not condemn it under the Equal Protection Clause.

No. 14-41127

In a footnote, the Court acknowledged the possibility that a strong inference of discrimination could perhaps be drawn from a stark sex-based impact, but the Court cautioned that

> [i]n this inquiry—made as it is under the Constitution—an inference is a working tool, not a synonym for proof. When, as here, the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when, as here, the statutory history and all of the available evidence affirmatively demonstrate the opposite, the inference simply fails to ripen into proof.

*Id.* at 279 n.25. Inferences cannot substitute for proof where the available evidence demonstrates no invidious intent.

The case before us falls comfortably in line with *Arlington Heights, Washington v. Davis,* and *Feeney.*[11] First, the facially neutral laws in each of those cases worked a far more dramatic disparate impact on minorities than does SB 14's specification of qualifying photo voter IDs. SB 14, after all, has no disparate impact on over 90% of all registered Black and Hispanic voters. Second, as in the Supreme Court cases, SB 14 has legitimate noninvidious purposes: ensuring the integrity of in-person balloting and public confidence in election outcomes. Third, as in *Washington v. Davis,* where surrounding circumstances confirmed an absence of discriminatory intent, 426 U.S. at 246–47, 96 S. Ct. at 2051, SB 14 authorized an EIC for all voters without drivers' licenses, presumably the poor, to satisfy the photo ID requirement. Fourth, as in *Feeney,* not only minority voters but an equal number of Anglo voters are

---

[11] It is true that the primary holdings in *Washington v. Davis* and *Feeney* worked out the relationship between disparate impact and the Equal Protection clause, but in each case, to uphold the law in question, the Court necessarily had to find no purposeful discrimination by the legislature. This discussion reflects that aspect of the decisions.

No. 14-41127

within the 4.5% who do not have qualifying IDs.  Fifth, in not one of those cases did the Court require "proof" that the challenged statute was effective or the best choice to achieve the legislative objective.   Instead, the Court in *Feeney* admonished that the Fourteenth Amendment is not a "refuge from ill-advised . . . laws." 442 U.S. at 281, 99 S. Ct. at 2297 (internal citation omitted).

The majority ignores the foregoing similarities between this case and the governing trio of Supreme Court authorities.  In fact, following this trio, no comparable federal court decision in forty years has found that any facially neutral state law was passed with discriminatory purpose.[12]  The majority opinion further defies those authorities by relying excessively on exogenous

---

[12]  *Cf. Hunter v. Underwood*, 471 U.S. 222, 105 S. Ct. 1916 (1985) (overturning an Alabama constitutional provision dating from 1901 with abundant evidence of discriminatory intent to disenfranchise Black felons); *Garza v. Cty. of L.A.*, 918 F.2d 763 (9th Cir. 1990) (holding that action by a county, not a state legislature, to fragment Hispanic voting population to perpetuate incumbencies amounted to intentional discrimination); *Harris v. Siegelman*, 695 F. Supp.  517 (M.D. Ala. 1988) (finding intentional discrimination where policies of: appointing only White poll officials; keeping electoral process closed to Black citizens by law and through use of fraud, force, and intimidation; and retaining provisions from racially inspired law requiring that voter seeking assistance swear oath to inspectors that he or she is unable to write English language and limiting to five minutes time that voter may remain inside voting booth amounted to intentional discrimination); *Baker v. City of Kissimmee, Fla.*, 645 F. Supp. 571 (M.D. Fla. 1986) (holding that the city intentionally discriminated against Black citizens by providing municipal services of street paving, resurfacing, and maintenance to identifiable Black residential neighborhoods in a disparate and unequal manner in violation of Equal Protection Clause, where about 63% of street footage in Black neighborhoods was unpaved compared to about 39% in White neighborhoods, and about 95% of resurfacing programs occurred in White neighborhoods compared to about 5% in Black neighborhoods).

Judge Costa attempts to explain away the absence of any comparable case in over forty years declaring that a state legislature acted with discriminatory intent.  The presence of preclearance under Section 5 in some jurisdictions does not explain why there are no findings of purposeful discrimination by a state legislature either outside the jurisdictions covered by preclearance or beyond the subject of voting regulations. *Washington v. Davis*, *Feeney*, and *Arlington Heights* all rejected discrimination claims not arising from voting rights.  Like the majority, Judge Costa continues to fear de jure discrimination by states fifty years after passage of the major federal civil rights laws in this country.

No. 14-41127

effects of discrimination and "long ago" legislative actions, and by authorizing a string of inferences to become a "synonym for proof" contrary to *Feeney*. *See id.* at 279 n.25.

But even if there were merit in the majority's inadequate reading of the Supreme Court's decisions, the "proof" adduced in support of the majority opinion is nonexistent.[13] We move on to address the errors and omissions committed in the majority's analysis of the record.

## B. Record Analysis

The following section tracks each of the alleged "facts" from which the majority opinion draws inferences of discriminatory intent.

### 1. *"the record does not contain direct evidence . . . ."*

As the majority acknowledges, the record is barren of any "direct evidence that the Texas Legislature passed SB 14 with a racially invidious

---

[13] Judge Costa's separate opinion requires special comment to the extent it admits a "different starting point" for assessing a discriminatory purpose claim. In plain English, he argues a theory never litigated in this case, unsupported by any evidence, at odds with the Supreme Court's decision in *Feeney*, and unsupported by the only cases he relies on. After his lament about the duration of the instant litigation, there is no justification for bringing up points that are unpreserved, not briefed, and therefore not entitled to consideration on remand. Judge Costa's theory is that political partisanship can be tantamount to a proxy for discriminatory intent. That is not what the Court held in *Feeney*: "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences." 442 U.S. at 279, 99 S. Ct. at 2296. The decisionmaker must have acted in part "because of," not merely "in spite of" the adverse effects of the legislation. *Id.* Judge Costa points to no evidence indicating such a discriminatory purpose to "suppress votes", as opposed to ensuring the voters' identity. Further, in the single case he relies on (and only the concurring opinion, at that), the district court found direct evidence of purposeful discrimination as well as partisanship. *Garza v. City of Los Angeles*, 918 F.2d 763, 767 n.1, 771 (9th Cir. 1990). Judge Costa (and the majority in fn.30) cite *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984), for the proposition that in factually egregious circumstances, local council redistricting to protect political incumbents might intentionally discriminate against minority voters. In *Ketchum*, however, the court refused to review the question of intentional discrimination after the district court had resolved the case under Section 2. *Id.* at 1409.

No. 14-41127

purpose." After making this observation, the court quickly pivots to cataloguing various pieces of circumstantial evidence, but the majority fails to mention that the plaintiffs unearthed no direct evidence of discriminatory intent even after they were granted wide-ranging and invasive discovery into potentially privileged[14] internal correspondence of the Legislature. Indeed, legislators, their staff, and even the Lt. Governor produced thousands of documents, including office files, bill books, personal correspondence concerning SB14, access to personal and official email accounts, and e-mail communications between legislators and lawyers at the Texas Legislative Council.[15] Additionally, the plaintiffs took weeks of seven-hour-long

---

[14] In *Arlington Heights*, the Supreme Court cautioned that "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government" and that "[p]lacing a decisionmaker on the stand is therefore 'usually to be avoided.'" 429 U.S. at 268 n.18, 97 S. Ct. at 565 n.18. "In some extraordinary instances . . . members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege." *Id.* at 268.

Since *Arlington Heights*, courts frequently rely on the legislative privilege to repel attempts by plaintiffs to subject legislators to the burdens of civil litigation. *See In re Hubbard*, 803 F.3d 1298, 1307–08 (11th Cir. 2015) (quashing subpoenas for the production of documents served on legislators and a Governor in a First Amendment retaliation case); *Reeder v. Madigan*, 780 F.3d 799, 806 (7th Cir. 2015) (dismissing, based on legislative immunity, plaintiff's claim that the Illinois Senate violated his First Amendment rights by denying him media credentials); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995) (quashing subpoenas for disclosure of subcommittee documents served on members of a Congressional subcommittee by private defendants in an unrelated civil lawsuit); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856 (D.C. Cir. 1988) (same).

In this case, however, the district court disregarded this authority and opted to take a piecemeal, balancing approach to the legislators' legislative privilege.

[15] *See, e.g.*, ROA 83316–17 (requesting from Senator Fraser "[a]ll documents related to communications between, among, or with you, the office of the Governor, the office of the Lt. Governor, the office of the Secretary of State, the Department of Public Safety, the office of the Texas Attorney General, any Legislator or Legislators, their staff or agents, lobbyists, groups, associations, organizations, or members of the public concerning the State of Texas's consideration of a requirement that voters present identification to cast a ballot, from January 1, 2005, through November 30, 2010).

No. 14-41127

depositions from over two dozen witnesses, including: eleven legislators and members of their staff[16] and over a dozen individuals from state agencies such as the Department of Public Safety, the Office of the Secretary of State, the Office of the Attorney General, and the Department of State Health Services. The record also contained twenty-nine depositions of legislators, their staff, and state agency officials that were taken in the SB 14 preclearance litigation; sixteen of these depositions were of the legislators themselves. Yet, this unprecedented and probing inquisition into reams of documents and hours of testimony uncovered not a single slip of the tongue or errant statement indicative of a racially discriminatory motive behind SB 14. Were SB 14 tainted by racially discriminatory intent, one would expect to find at least some hint of such invidious intent in the thousands of files and hours of deposition testimony, which were aggregated from a diverse cross-section of state officials. Instead, the evidence demonstrated just the opposite: that SB 14 was passed to deter voter fraud and promote ballot integrity, thereby increasing voter turnout.[17]

---

[16] Lt. Gov. Dewhurst (ROA 60999); Senator Dan Patrick (ROA 620987); Senator Robert Duncan (ROA 61062); Senator Troy Fraser (ROA 61168); Senator Tommy Williams (ROA 62692); Speaker Joe Straus (ROA 65509); Rep. Debbie Riddle (ROA 62219); Rep. Patricia Harless (ROA 61343); Bryan Hebert, General Counsel to the Lt. Governor (ROA 60999); Janice McCoy, Chief of Staff to Senator Troy Fraser (ROA 64226); and Colby Beuck, Chief of Staff to Rep. Harless (ROA 60918).

[17] *See* Lt. Gov. Dewhurst Dep. at 122 (ROA 61026) ("presenting the ID listed in Senate Bill 14 is a substantial improvement towards the goals that most people have, and that is to fight voter fraud, because all of these four points will show who the person is, divert voter fraud and to provide more confidence in the election process and result in a larger voter turnout."); Senator Patrick Dep. at 106 (ROA 62122) ("To protect the integrity of the ballot box—and pass a bill that the vast majority of people had indicated they wanted passed and believed should pass."); Senator Fraser Dep. at 174, 177 (ROA 61204–05) (agreeing that the purpose of SB 14 was to deter voter fraud and to "protect the integrity of the voting box"); Senator Duncan Dep. at 127–29 (ROA 61091) ("The purpose of the bill was to preserve ballot

No. 14-41127

This is not to say that circumstantial evidence of intent may be not used in proving intentional discrimination, *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 564. However, in this rare case where the plaintiffs engaged in a searching inquiry into the legislative process, the circumstantial evidence would have to be overwhelming to support a theory—not borne out by any direct evidence—that there was a vast but silent conspiracy to pass a racially discriminatory law that permeated both houses of the Legislature, the Lt. Governor's office, the Governor's office, and various state agencies. *Cf. Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1318 (5th Cir. 1991) (upholding a district court's no-discriminatory-intent finding concerning a school board's adoption of a student assignment plan and noting that when decisionmakers testify without invoking the privilege, "the logic of *Arlington Heights* suggests that" such direct evidence is "stronger than the circumstantial evidence proffered by the plaintiffs"); *see also Flemming v. Nestor*, 363 U.S. 603, 617, 80 S. Ct. 1367, 1377 (1960) ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground [of improper legislative motive]. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed.").

---

integrity and to prevent people from just basically harvesting voter ID cards or voter registration cards and using them to influence primary and general elections."); Senator Williams Dep. at 115 (ROA 62709) ("I think the purpose of the bill was to prevent in-person voter fraud. That would include people who weren't citizens of the United States who tried to vote."); Rep. Straus Dep. at 49 (ROA 65521) ("I think just general voter ballot security just to be certain that those who were casting votes were doing so legitimately."); Rep. Harless Dep. at 85 (ROA 61359) ("I can't recall the answer of all the purposes of it, but mainly to provide for the integrity of the in-person voting by showing a photo ID."); Rep. Riddle Dep. at 68 (ROA 62228) ("It is critically important for us to maintain the integrity of the ballot box and for the voters to have 100 percent confidence in the integrity of the ballot box.").

## 2. *Quoting Senator Fraser as "knowing that the law would be subject to preclearance" and Mr. Hebert, Lt. Gov. Dewhurst's General Counsel, on talking points to senators, with implication these could be construed as masks for racist motives*

To the majority, "[t]here is evidence that the proponents of SB 14 were careful about what they said and wrote about the purposes of SB 14, knowing it would be challenged during the preclearance process under the Voting Rights Act."  For this proposition, they highlight a statement by Senator Fraser, one of SB 14's authors, who testified that "the public legislative record would either go to the Department of Justice or a three-judge panel as a part of the [Voting Rights Act] Section 5 review process."  Because Senator Fraser was "aware that everything that [he] was saying was part of a public record," the majority imply, it is unsurprising that no direct evidence of discrimination was found in the unprecedented legislative discovery.

The district court did not rely on Fraser's statements to explain away the lack of a "smoking gun" in the legislative record or discovery.  *See Veasey v. Perry*, 71 F. Supp. 3d 627, 702 (S.D. Tex. 2014).  At most, his testimony reflects simple and uncontroversial facts.

Senator Fraser's deposition excerpts were read into the record by the State during the *Veasey* trial.  The majority opinion quotes from the plaintiff's "cross-examination" portion.  When asked if it was his belief "that the public legislative record would either go to the Department of Justice or a three-judge panel as part of the Section 5 review process," Senator Fraser testified that he "did believe it would go one of those two places."   Senator Fraser was then asked if this made him consider "what sort of statements [he] made on the Senate Floor?"  Senator Fraser did *not* respond that he was especially careful in his floor statements about SB 14 or anything even close to that.  Instead, he

116

No. 14-41127

simply responded that he "was aware that everything [he] was saying was part of the public record."

Senator Fraser's testimony does not support the inference that SB 14 proponents were unusually careful about what they wrote and said. Senator Fraser's awareness that the public legislative record would be scrutinized by the Justice Department or a three-judge court under the preclearance process is a statement of fact. Between 1975 and 2013, any change in Texas voting procedures had to be "approved by federal authorities in Washington, D.C.—either the Attorney General or a court of three judges." *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2620 (2013).

Senator Fraser's statement that he was aware that his Senate Floor statements would be part of the public record is also a fact. The legislative record is a matter of public record under the Texas Constitution. *See* TEX. CONST. art. III, § 12(a). The Texas Senate Staff Services office makes the audio recordings of all Senate Floor proceedings available to the public free of charge.

Most importantly, however, the facts conveyed by Senator Fraser are not probative about why the unprecedented discovery into the private correspondence and documents of SB 14 proponents turned up no evidence of discriminatory intent. Senator Fraser's testimony deals with public records and floor statements. It says nothing about why SB 14 proponents would have censored themselves *privately*. Based on *Arlington Heights*, no one could have predicted a federal court would order such unprecedented discovery from Senator Fraser or the Legislature.

The majority also emphasizes a piece of deposition testimony by Bryan Hebert, the deputy general counsel for the Lt. Governor, that he sent an email reminding senators to emphasize the "detection and deterrence of fraud and protecting public confidence in elections as the goal of SB 14."

117

No. 14-41127

Once again, the district court did not rely on this statement of Mr. Hebert. *See Veasey v. Perry*, 71 F. Supp. 3d at 702. Hebert's statement was made in an email sent to various Senate staffers laying out plans for the floor debate on SB 14. He characterized it as "an attempt to—at best . . . outline . . . how things might go." Stressing the detection and deterrence of fraud and promoting public confidence in elections was listed as a "floor task" because, as Hebert understood it, "that was the goal of the bill."

Hebert's statement is not probative of why there would be no evidence turned up in the private legislative discovery. Hebert's statement merely urges the use of talking points in Senate Floor speeches. Politicians emphasize and reemphasize talking points because they are effective, not because they are seeking to cover up ulterior motives. *See Citizens United v. FEC*, 558 U.S. 310, 364, 130 S. Ct. 876, 912 (2010) ("[S]ound bites, talking points, and scripted messages . . . dominate the 24–hour news cycle."). Hebert's statement offers no support for the proposition that the plaintiffs' failure to uncover evidence of discrimination can be ascribed to a cover-up by SB 14 proponents.

### 3. *Legislators were "aware" of racial disparate impact*

The majority opinion also contends that SB 14 proponents were aware of the disproportionate impact it would have on minority voters. The majority relies on three statements. First, in his deposition, Representative Todd Smith, a proponent of SB 14 in the Texas House of Representatives, was asked if he recalled the conclusions of studies he read about the effect of voter ID laws on minorities. Smith testified that he did not recall the conclusions, but that "there's a study for every conclusion that you want to reach." Smith then more or less volunteered that, in his opinion, it was "common sense" that "the people

118

No. 14-41127

that do not have photo IDs [are] more likely to be minority."[18]   Second, Hebert
testified that it was "possible" that an indigency affidavit provision would have
reduced the burden on poor voters and that he suspected, but did not know,
that poor voters were disproportionately minority.   Contemporaneous with
SB 14's passage, Hebert prepared a memo for other Senate staffers in which
he opined that it was doubtful that SB 14 would be precleared by the Justice
Department without additional IDs.   His memo is entirely an opinion
predicated on a comparison of SB 14 to a Georgia voter ID law that obtained
preclearance.   It provides only some support for the proposition that the
disparate impact of SB 14 was known among legislative staffers.   Unmentioned
by the majority (or the district court) is Hebert's further opinion that though
he was "unclear" how a three-judge court might rule, they "might be more
favorable" to preclearing the law.[19]

    These three statements were the universe relied upon by the district
court for the proposition that it was "clear that the legislature knew that
minorities would be most affected by the voter ID law."   *Veasey v. Perry*,
71 F. Supp. 3d at 657–58.

    The majority opinion uses the "common sense" opinion of a member of
the Texas House of Representatives and the "suspicions" of the Lt. Governor's
deputy general counsel to leap to the conclusion that "the drafters and
proponents of SB 14 were aware of the likely disproportionate effect of the law
on minorities."   Even if these statements were enough to imply knowledge on

---

[18] Representative Smith's "common sense" was only partially accurate because nearly
half of those lacking SB 14 ID are White.

[19]   The majority wisely does not rely—as the district court did—on the fleeting
statement of Senator Rodney Ellis, an SB 14 opponent, who speculated that "[i]n my mind, I
think . . . they knew the bill had a disparate impact."

No. 14-41127

the part of the entire Texas Legislature, however, awareness of the disparate impact of a law does not prove a legislature's intent to discriminate. *Feeney*, 442 U.S. at 279, 279 n.25, 99 S. Ct. at 2296, 2296 n.25; *Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 349 (5th Cir. 2011) (per curiam).

> ### 4. *Senator Fraser believes the Voting Rights Act has outlived its useful life; Senator Fraser "not advised" about possible disparate impact; Proponents have "largely refused to explain the rejection of 'ameliorative' amendments," an attitude that was "out of character for sponsors of major bills"*

Senator Fraser indeed testified at his deposition that he believed the Voting Rights Act had "outlived its useful life"; the district court did not rely on this statement, and with good reason, too, since it has no probative value. Nowhere in his deposition did Senator Fraser state that SB 14 sought to defy the Voting Rights Act because of the law's perceived obsolescence. And it is odd to hold up his personal opinion of the Act's obsolescence for an inference of purposeful discrimination when it is, in part, shared by a majority of the Supreme Court. *See Shelby Cty.*, 133 S. Ct. at 2628.

Evidence that Senator Fraser answered questions about SB 14's disparate impact with "I am not advised" is also not probative of discriminatory intent. Senator Fraser was asked on the Senate floor if the "elimination of government documents as a form of ID [will] disproportionately affect African Americans and Hispanics?" He responded, "I am not advised," but he also testified that such an answer merely indicates that the speaker does "not have sufficient information to answer [the] question."

The district court relied on a statement from the bill's opponent, Senator Ellis, that answering "I am not advised" was "out of character" for the sponsor of a major bill, which indicated to him that Senator Fraser "drew the

No. 14-41127

straw." S*ee Veasey v. Perry*, 71 F. Supp. 3d at 647.  It is frankly difficult to tell what Senator Ellis meant by the comment that Senator Fraser drew the straw. But in no way does Senator Ellis imply that Senator Fraser acted with discriminatory intent.  Just the opposite, in fact.  Senator Ellis refers to Senator Fraser as his "friend."  Senator Ellis acknowledges that Senator Fraser stated on the Senate Floor that he did not intend SB 14 to have a disparate impact, and Senator Ellis himself said on the *Senate Floor that he did not believe Senator Fraser intended SB 14 to have a disparate impact.*

The majority states that "[a]nother senator [then-Senator Dan Patrick] admitted at his deposition that he and other proponents of SB 14 voted to table numerous amendments meant to expand the types of accepted IDs, expand the operating hours of DPS stations issuing voter IDs, delay implementation of SB 14 until an impact study had been completed, and other ameliorative measures."  This is a fact; there is no doubt that a number of amendments were rejected and that the bill's opponents generally felt that these rejections were inadequately explained.  *See id.* at 646–47.  But it is incorrect to connect the rejection of amendments with Senator Ellis's "out of character for major bills" comment.  Senator Ellis's comment referred only to Senator Fraser's "I am not advised" answers.

### 5. *Dr. Vernon Burton ties excuse of preventing voter fraud to "Texas's history of racial voter suppression"*

The majority notes that Dr. Vernon Burton ties the excuse of preventing voter fraud to Texas's history of racial voter suppression.  In both his expert report and testimony, he specifically focused on: (1) all-White primaries; (2) secret ballots; (3) poll taxes; and (4) re-registration and voter purges.  In each instance, the majority notes, Burton testified that the laws' stated

No. 14-41127

rationale was to prevent voter fraud. From this, the majority contends it would be possible to infer the Texas Legislature's alleged discriminatory intent in enacting SB 14 half a century later because the stated rationale was also the prevention of voter fraud.

This recitation stands at odds with the rest of the majority's opinion, which expressly disavows the district court's reliance on "Texas's use of all-[W]hite primaries from 1895–1944, literacy tests and secret ballots from 1905–1970, and poll taxes from 1902–1966" because "the district court relied too heavily on the evidence of State-sponsored discrimination dating back hundreds of years." As for the re-registration and voter purges, Dr. Burton's expert report and testimony indicate these refer to the Texas Legislature's passing a re-registration law in 1966 that was found unconstitutional in 1971[20] and to a voter purge law enacted in 1975 that was denied preclearance and immediately enjoined—41 years ago.[21] It flies in the face of the majority's conclusion that "the district court's disproportionate reliance on long-ago history was error," to now smuggle in the very same "decades-old data and eradicated practices" in support of a finding of intentional discrimination. *Shelby Cty.*, 133 S. Ct. at 2627–29; *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 201–04, 129 S. Ct. 2504, 2511–12 (2009).

---

[20] *See Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

[21] *See Flowers v. Wiley*, S-75-103-CA (E.D. Tex. 1975); *see also Flowers v. Wiley*, 675 F.2d 704, 705–06 (5th Cir. 1982) (discussing history of law in the attorneys' fees portion of the case); Robert Brischetto et al., *Texas*, *in* QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990, 233, 240 (Chandler Davis & Bernard Grofman eds., 1994) (book cited in Burton expert report summarizing this history).

No. 14-41127

6. *"Radical departures from normal legislative process" that were "virtually unprecedented"*

The majority claims that "SB 14 was subject to numerous and radical procedural departures" that were "virtually unprecedented." The majority has no support, except the district court's opinion, for its conclusion. The district court, in turn, relies only on the speculations of opposition legislators, many of whom are plaintiffs in this case, as to the procedural motivations underlying SB 14's passage. *See Veasey v. Perry*, 71 F. Supp. 3d at 647–51. The majority expressly condemns the district court because it "mistakenly relied in part on speculation by the bill's opponents about proponents' motives," yet it condones precisely such speculation here. Sadly, neither the majority nor the district court tells the entire legislative saga as contained in the record.

Most of the district court's pre-2011 legislative history citations are to public websites that show only the results of votes, not to the record or expert reports that chronicle the drama behind those results. *See, e.g., id.* at 645–46 nn.71–77. The entire story appears from expert reports offered for the plaintiffs (Drs. Lichtman and Davidson) and the testimony of Lt. Gov. Dewhurst, which are necessary to understand the 2011 actions taken by the Legislature.

First, a bit of background in how the Texas Senate considers legislation is necessary. At the start of the session, the Senate adopts by majority vote rules that will govern its business during the session. These rules are usually rolled over from the prior session and then tweaked accordingly. One rule that has been consistently adopted since World War II is the "two-thirds rule." Under ordinary rules, the Senate can only consider legislation in the order in which it appears on the calendar. However, two-thirds of senators present and

123

No. 14-41127

voting may vote to suspend the usual order of business and consider other business out of turn.  In practice, there is basically a two-thirds requirement to consider bills in the Texas Senate, analogous to the cloture rule in the U.S. Senate.  This occurs because of "blocker bills."  A blocker bill is a routine or non-controversial bill, such as one dealing with landscaping at the Capitol or the decorations in the Senate Chamber, that is placed first on the agenda.  It is intentionally almost never passed.  To get around the blocker bill and consider legislation following it on the agenda, a two-thirds vote is required to suspend the usual order of business.  After receiving the required two-thirds vote, the legislation can be passed by a majority vote.  In a chamber with 31 senators, 11 can block under the two-thirds rule.  As will be discussed, there are various ways around the two-thirds rule, many of which are commonly employed.

Beginning before the 2005 session of the Texas Legislature, opinion polls showed that a large majority of Texans supported photo voter ID laws. Further, Texas officials believed that some Texans simply did not vote because they did not have confidence in the system or that their votes would matter. To address these related concerns, proponents of a voter ID law began to negotiate with opponents—almost uniformly Democrats—about a compromise bill that could pass both houses and become law in accordance with the overwhelming public opinion of the citizenry in Texas.  Despite voicing private support for a bill, adding language they believed would address some of their concerns, and general efforts on the part of proponents to compromise, opponents remained intransigent.  They even voiced private concerns that they were "upside down" in their opposition despite strong public support for a bill, but held out because they feared primary opponents if they voted in favor of a voter ID bill.

124

No. 14-41127

Against this backdrop, the Legislature proposed the first iteration of a voter ID bill in 2005. The majority ignores it, and the district court says only that "[t]he bill, after being reported out of the Elections Committee, passed the House but died in the Senate Committee on State Affairs." *Id.* at 645. What actually happened is that after the bill passed the Texas House, proponents in the Senate attached it to another elections bill in order to avoid the two-thirds rule in the Senate, which is a common legislative maneuver on related bills. Senator Rodney Ellis vowed to filibuster the combined bill, and even came to the Senate Chamber wearing tennis shoes and a catheter to comply with Senate prohibitions against sitting and restroom breaks during floor speeches. Before his filibuster could begin, however, opposition Senator Leticia Van de Putte invoked a germaneness rule and the combined bill was withdrawn. The voter ID bill was then sent to a House-Senate conference committee, but it was delayed behind several other important measures and could not be considered before the end of the session.

Voter ID was reintroduced in the 2007 legislative session and passed the Texas House. Regarding the Senate, the majority says nothing and the district court says only that it was reported out of committee and "[w]hile the rules were initially suspended to take it up out of order for second reading, the vote was reconsidered and the measure failed. The rules were not suspended, at which point the bill died." *Id.* at 646.[22] The true story is far more enthralling than the district court's sterile recitation.

Eleven opponents of the bill—all Democrats—had pledged going into the session, as was their legislative prerogative, to block any voter ID bill under

---

[22] The "rules . . . initially suspended" that the district court refers to is the two-thirds rule; thus, "suspending the rules" refers to getting two-thirds to move a bill past a blocker bill, which would be considered first under ordinary rules.

No. 14-41127

the two-thirds rule even though Lt. Governor Dewhurst had attempted to reach a compromise with them before the session on the substance of the bill. However, opposition Senator Mario Gallegos was having complications from a liver transplant, which meant that Democrat opponents lacked the votes to block the bill in his absence. Against the advice of his doctors, Gallegos returned to Austin for the session specifically so he could vote against the voter ID bill. Senator Bob Deuell, a Republican and proponent of the bill, paid to have a medical supply company put a hospital bed in a room adjacent to the Senate chamber for Gallegos. Lt. Gov. David Dewhurst, also a Republican, agreed to give Gallegos 24-hour notice before any vote on the voter ID bill would occur.

Meanwhile, Democrat Senator Carlos Uresti became bedridden with the flu during the session. He was absent from the floor on May 15, 2007, when Senator Fraser, the voter ID bill's sponsor, moved to suspend the regular order of business to consider the bill, which required the two-thirds vote. Dewhurst testified that it is a "fairly common legislative practice" to "try and move your bill when you have the votes on the floor" and that it happens at least monthly in every legislative session. The opponents could not block the bill and it passed, with Senator Gallegos voting against it, 19-9 (just one more than two-thirds). Democrat Senator Whitmire was also not on the floor, and Lt. Governor Dewhurst called on him numerous times before skipping him in the vote. Meanwhile, Senator Uresti, alerted about the vote by another senator, hastily returned to the Senate chambers as the vote was occurring, but initially missed it.

After the vote had been held and the gavel fell, Democrat Senator Shapleigh moved to verify the vote on the grounds that Senator Whitmire had actually been present for the vote and was improperly skipped. Lt. Governor

No. 14-41127

Dewhurst testified that he accommodated the request because he knew "that this [was] an important bill to the Democrats and to the Republicans," and he "didn't want controversy."    He "bent over backwards to respect [Senator Whitmire] and his statement" that he was actually on the floor, so a verification (i.e. second) vote was held.  This allowed all 11 opposition senators to vote against it, with Senator Uresti sprinting up the Capitol steps to reach the floor just in time for the vote and Senator Whitmire also returning to the floor.  The final vote was 20-11 (just short of two-thirds).  No further action was taken on voter ID in the 2007 session after the verification vote failed under the two-thirds rule.

Before the 2009 session, where voter ID would again be on the agenda, Lt. Governor Dewhurst again reached out to Democrats in the Senate who had opposed legislation in 2005 and 2007.  This was to no avail, as opponents remained entrenched.  At the beginning of the session, to avoid the two-thirds rule that had thwarted legislation in 2007, the Senate adopted a rules change that allowed voter ID legislation to proceed under a simple majority vote instead.  The rules change was made by majority vote.  Senator Shapleigh raised two points of order objecting to the rules change, but Lt. Governor Dewhurst overruled them "[b]ecause the rules of the Senate permitted a majority of the Senators to change the Senate rules, so . . . [this change] was entirely within the tradition and rules of the Senate."   According to Karina Davis, the Senate Parliamentarian, the Senate has only designated two categories of bills for such special treatment since 1981:  redistricting and voter ID.  Notably, both of these categories have to do with elections.  This makes sense, as such matters cut to the very heart of how a representative democracy will function and concern the "highly political judgments," *Bartlett v. Strickland*, 556 U.S. 1, 17, 129 S. Ct. 1231, 1245 (2009) (citation omitted),

127

No. 14-41127

for which two-thirds agreement is unlikely.  Further, even though the two-thirds rule has been suspended by special treatment in only these two categories, the legislative history of the Senate is replete with examples since World War II of Lt. Governors who got the Senate to pass the blocker bill, thereby enabling majority votes on later legislation under the Senate's normal rules.[23]

Beginning on March 10, 2009, the Senate held a 23-hour hearing on the proposed bill that lasted until 6 AM the next morning, at which members of the public could testify.  At the hearing's conclusion, the bill passed the Senate.  This time, however, the House would be the source of voter ID's demise.  House leaders expressed a willingness to compromise, and included many so-called ameliorative measures and a provision to delay implementation until 2013 of whatever passed.  Thwarted by opposition in both parties, House leaders instead moved the bill the Senate passed.  House opponents decided on a strategy called "chubbing" to kill the bill.[24]  This was successful, as House opponents chubbed for 26 hours[25] over five days and prevented over 200 bills,

---

[23] The 2009 rules change also provided that voter ID legislation would be referred to the Senate Committee of the Whole (i.e. the entire Senate) rather than traditional committee structures.  More on that to come.

[24] Chubbing in the Texas House is analogous to filibustering in the Texas Senate.  With a filibuster, a single senator speaks on a topic for a long amount of time in order to prevent further consideration.  House rules prevent filibustering, but allow any representative the ability to speak for 10 minutes on any bill he favors.  To chub, representatives use their allotted 10 minutes to speak in favor of any and all legislation, routine or not, that is considered before the target bill.  When multiple representatives combine their speaking privileges across multiple bills, they are able to run the clock out on target legislation slated to be considered later in the session.

[25] There are apparently no records kept on the historical number or length of chubs in the Texas House, but information is kept on the number and length of analogous filibusters in the Texas Senate.  To put the 26 hour chub into context, witness in this case and former State Senator Wendy Davis's 2013 filibuster against abortion legislation lasted just 11 hours.

No. 14-41127

including voter ID, from being passed. Governor Perry considered, but ultimately decided against, placing voter ID on the agenda for the special legislative session he later called.

After the 2009 session again ended without a bill's being passed, voter ID proponents decided that the 2011 session would be different. After repeatedly reaching out to opponents, incorporating some of their amendments/suggestions, and repeatedly being rebuffed by extraordinary legislative maneuvering, proponents decided to pass whatever law they could that was modeled after Indiana's law that had been upheld by the Supreme Court in *Crawford*[26] and Georgia's law that had received preclearance from the Department of Justice. The majority and the district court indict Texas for supposedly being unresponsive to opposition needs and for introducing increasingly strict bills. At least equally plausible is that proponents perceived a legislative necessity in the face of intransigence on this "wedge issue that the Democrats were not going to agree to regardless of the fact . . . [that] a super majority of Texas voters [of all races] were in favor of Voter ID." As the district court put it, "the political lives of some legislators depended upon" voter ID's success. *Veasey v. Perry*, 71 F. Supp. 3d at 658.

To that end, Governor Perry designated voter ID legislation as an emergency. He said in February 2010: "I might as well put [the Legislature]

---

A 26 hour chub, were it a filibuster, would be good for the sixth longest filibuster in the history of the Texas Senate and longest since the record (43 hours) was set in 1977. *See Filibusters and Chubbing*, LEGISLATIVE REFERENCE LIBRARY OF TEXAS, http://www.lrl.state.tx.us/whatsNew/client/index.cfm/2011/5/23/Filibusters-and-Chubbing (last visited June 27, 2016).

[26] As demonstrated by the Attorney General of Indiana as amicus in this case, the Indiana and Texas laws are not meaningfully different. *See* Brief of the States of Indiana, et al. as Amici Curiae at 12–16, *Veasey v. Abbott*, No. 14-41127 (5th Cir. Apr. 29, 2016).

No. 14-41127

on notice today: We're going to do voter ID in 2011. We can either do it early, or we can do it late. [The Legislature's] call." The emergency designation permitted, but did not require, voter ID legislation to be considered during the first 60 days of the 2011 session.[27] It also meant that the Legislature could reasonably believe it would be called back into a special session if voter ID legislation was not passed during the regular session. Considering the legislation early in the session, however, had a tactical advantage because it would prevent opponents from chubbing as they had done in 2009. Both Democrats and Republicans also thought that passing the legislation early in the session would "get this issue behind them" so that there "wouldn't [be] spill-over on other issues" for which there was a chance of bipartisan cooperation.[28] Proponents also noted that opposition protestations to early consideration were likely stall tactics similar to those employed in the prior three sessions. The bill[29] was designated a priority of the Lt. Governor and accordingly assigned a low bill number, but this does not "expedite consideration of the bill in any way except for putting members on notice that it's one of [the Lt. Governor's] priorities." The majority takes issue with the Senate's consideration of SB 14 by the Committee of the Whole (i.e. the entire Senate) rather than through its traditional committee structure. However, this was done because the legislation was going to be considered on an expedited basis,

---

[27] Eminent domain legislation, along with perhaps a couple of other topics, were also designated emergencies for the 2011 session.

[28] Further, all of the emergency legislation was considered early in the 2011 session.

[29] Actually, nine photo voter ID bills were filed in the Senate, but Lt. Governor Dewhurst selected Senator Fraser's and asked him to refile it as priority legislation. Senator Fraser had been the Senate sponsor of previous bills that failed. That there were so many bills filed demonstrates just how politically important voter ID legislation was.

No. 14-41127

and this is a commonly used and effective way to disseminate information about such legislation to the entire Senate.[30]  Far from being "unusual," as the district court described it, *Veasey v. Perry*, 71 F. Supp. 3d at 648, it had been used for issues such as school finance and redistricting within the past decade before 2011.

To avoid what happened in 2007, the Senate rolled forward the rule from the 2009 session that allowed voter ID bills to be considered by simple majority rather than two-thirds vote.  The majority faults the Legislature for this, but the decision is easily explainable on political grounds—the majority party wanted to avoid the two-thirds rule that had blocked similar legislation in a prior session.[31]  Further, as just discussed, the Legislature could reasonably believe that Governor Perry would call an emergency session to consider voter ID legislation if not passed during the regular session.  The two-thirds rule does not apply during special sessions because blocker bills cannot be filed, as

---

[30] Additionally, legislation considered in the Committee of the Whole can be referred to the entire Senate after just 24 hours, so it is important to ensure the entire Senate has all important information it needs.

[31] As if further evidence is necessary to show that the suspension of the two-thirds rule was for political motivations, and not racially discriminatory ones, it is notable that the Texas Senate (by majority vote) completely did away with the two-thirds rule in the 2015 session.  It is now the three-fifths rule, which has the effect of reducing from 21 to 19 the number of Senators necessary to move legislation past a blocker bill.  Under the new threshold in the 2015 session, the Texas Senate was able to pass Republican political priorities such as open carry, campus carry, moving the public integrity unit from the Travis County District Attorney's Office to the Texas Rangers, and an A-F grading system for public schools.  All of these bills had been designated, as SB 14 was in 2011, priority legislation by the Lt. Governor and assigned correspondingly low bill numbers.  Ironically, Democrats also passed a few bills out of the Senate under the new three-fifths rule that would have been blocked under the old two-thirds rule, including one that would make it easier for some state employees to work from home and have more flexible work hours.  *See* Aman Batheja, *Without Two-Thirds Rule, Senate Moving Patrick's Priorities*, TEX. TRIB. (May 19, 2015), https://www.texastribune.org/2015/05/19/loss-two-thirds-rule-senate/.

No. 14-41127

was the case in the 2011 special session that considered redistricting legislation. Voter ID was going to be considered without the two-thirds rule one way or the other.[32]

This history thoroughly explains why voter ID legislation as eventually contained in SB 14—which the majority dismisses as not "a problem of great magnitude"—was considered before what the majority believes are other "pressing matters of great importance to Texas." In addition, the 2011 bill that eventually turned into SB 14 contained several notable provisions. First, in an effort to combat multiple types of voter fraud, a provision was included that would have addressed voter registration fraud, in addition to just in-person fraud that voter ID laws combat. This provision was removed because the Senate has a one-subject rule that prohibited it from addressing this other type of fraud in SB 14. Next, several provisions in SB 14 were inserted into prior voter ID legislation at the behest of members of the Democrat minority. For example, Senators Gallegos and Shapleigh were concerned about voter ID's impact on the elderly, so proponents inserted age exemptions into the version of SB 14 that passed the Senate. Additionally, opponents' concern for the law's impact on the poor during prior iterations of the bill led soon afterwards to the elimination of charges for ID and underlying documents. Thus, contrary to what the majority asserts, SB 14 was neither unresponsive to the concerns of legislative minorities nor was there a lack of motivation to address other types of fraud besides in-person fraud.

---

[32] Additionally, in order to pass a budget, the two-thirds rule was suspended in *the 2011 session* by a procedural move different from that used to suspend it for SB 14. *See* Ross Ramsey, *Failed Budget Vote Threatens Texas Senate Tradition*, Tex. Trib. (May 3, 2011), https://www.texastribune.org/2011/05/03/failed-budget-vote-threatens-senate-tradition/. The majority reads way too much into the suspension of the two-thirds rule.

No. 14-41127

7. *Second guessing legislative priorities and why Texas Legislature prioritized remedy for voter fraud without compelling evidence*

Ignoring the legislative history of voter ID during three previous legislative sessions, the majority chides the 2011 Legislature for prioritizing SB 14 in a busy session without—in the majority's view—sufficient evidence that there is a problem of in-person voter fraud in Texas to justify SB 14. The court critiques that SB 14 did not single out mail-in ballots for a special degree of scrutiny. Of course, as the majority itself rightly notes, "[t]he Legislature is entitled to set whatever priorities it wishes." These gratuitous observations about legislative prioritization are therefore beside the point as the federal courts lack the expertise or authority to question a legislature's prioritization of various issues. Recall too, that the Legislature also wanted to address other types of fraud, such as registration fraud, but was prevented from doing so because of one voter ID opponent's objection based on one-subject rules for legislation.

More significant, however, in *Crawford,* the Supreme Court flatly rejected the majority's intimation that record evidence of voter fraud is required to justify the State's interest in preventing voter fraud. 553 U.S. at 195–97, 128 S. Ct. at 1619–20. Indeed, the Court upheld Indiana's voter ID law in *Crawford* although the record there contained "no evidence of any such fraud actually occurring in Indiana at any time in its history." *Id.* at 194. The Court instead noted that "flagrant examples of such fraud in other parts of the country," occasional examples of more recent voter fraud, and Indiana's example of voter fraud in the 2003 Democratic primary perpetrated by absentee ballots "demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election." *Id.* at 195–96. *Crawford*

No. 14-41127

teaches that the prevention of in-person voter fraud is a valid legislative purpose irrespective of the number of instances of voter fraud in the record. Accordingly, neither the Legislature's prioritization of SB 14 nor the majority's concern that there are few instances of proven in-person voter fraud in Texas supports any reasonable inference that SB 14 was passed with racially discriminatory intent.

8. _"While cloaking themselves in the mantle of following Indiana's voter ID law . . . the proponents of SB 14 took out all the ameliorative provisions of the Indiana law"_

The majority seeks to resist the import of _Crawford_ by arguing that Texas's voter ID law is different because it lacks some ameliorative provisions for indigents that were present in Indiana's law. The majority takes issue, generally, with the Legislature's rejection of various amendments that would have permitted additional forms of ID to be used and allowed the use of IDs with irregularities. The majority also takes issue, specifically, with the House of Representatives' removal of Senator Duncan's amendment, which would have required a provisional ballot to be accepted if the person simultaneously executes an affidavit stating that he or she is indigent and cannot obtain proof of identification without paying the fee. _See_ S.J. of Tex., 82nd Leg., R.S. 137–38 (2011).

Setting aside the fact that the majority's criticism amounts to second-guessing the policy choices of the state legislature, the fact that the Legislature did not adopt certain ameliorative amendments tells us nothing about _why_ the Legislature so acted. And it certainly provides no basis to infer that the Legislature rejected these various amendments _because_ it, collectively, was motivated by racial animus; this remains true even if legislators knew that

134

No. 14-41127

some of the proposed amendments would make it easier for indigents to obtain ID.[33]

Even if, notwithstanding *Crawford*, the presence or absence of an indigency exception is a matter of constitutional significance, SB 14 *does* contain ameliorative provisions for indigent persons.[34]  Election identification certificates, which may be properly used as a form of ID, TEX. ELEC. CODE § 63.0101 (West Supp. 2014), are available free of charge and have been since the bill was signed into law, TEX. TRANSP. CODE § 521A.001(b) (West 2013). The Legislature also passed SB 983, which eliminates the fee associated with obtaining a certified copy of a birth certificate in order to obtain an EIC.  TEX. HEALTH & SAFETY CODE § 191.0046(e) (West 2015).  These provisions eliminate fees associated with obtaining the underlying documents necessary to obtain the EIC.  There is no showing whatsoever that the Legislature tried to authorize EICs that in practice would not facilitate indigent voters.[35]

---

[33] *See Feeney*, 442 U.S. at 279, 99 S. Ct. at 2296 (awareness of potential disparate impact is not enough to prove intent).  *Feeney* also held that the legislature's failure to pass a bill with less discriminatory impact cannot evidence invidious purpose:  the courts are not empowered to disapprove laws under the Equal Protection clause for this reason.  *Id.* at 280–81.

[34] To reiterate, the Indiana law and the Texas law really aren't that different; and many of the "ameliorative" provisions that were rejected were in fact contained in earlier iterations of the bills introduced in 2005, 2007, and 2009, at the behest of Democrats, but the Democrats opposed those bills anyway.

[35] Furthermore, while Texas may have a comparatively strict law in terms of what ID may be presented, its election laws are quite permissive regarding encouraging voter turnout.
  These provisions include: an approximately two week early voting period with no restrictions, TEX. ELEC. CODE § 85.001(a), wide availability of voter registration applications, see *Request for Voter Registration Applications*, TEX. SEC'Y OF ST., http://www.sos.state.tx.us/ elections/voter/reqvr.shtml (last visited June 28, 2016) (providing online voter registration applications), and the flexibility of mail-in ballots without photo ID requirements for the elderly and disabled, TEX. ELEC. CODE §§ 82.002–003.  Taken in "context," it is as easy, if not easier, to register and vote in Texas than it is in many other states.

No. 14-41127

9. *"Contemporary examples of state-sponsored discrimination"*

The majority asserts that "[t]he circumstantial evidence of discriminatory intent is augmented by contemporary examples of State-sponsored discrimination in the record."  It then goes on to cite several examples, taken from the district court's opinion, of alleged recent discrimination by Texas against minorities.  This recitation is riddled with errors and on examination, disintegrates into forty-plus year old actions.

The majority first claims that "as late as 1975, Texas attempted to suppress minority voting through purging the voter rolls, after its former poll tax and re-registration requirements were ruled unconstitutional." (citing *Veasey v. Perry*, 71 F. Supp. 3d at 635).  Thus, the most "contemporary" example that the majority or district court can cite was in 1975.

In its next attempt to find recent examples of intentional discrimination on the part of Texas, the majority credits the district court's statement that "[i]n every redistricting cycle since 1970, Texas has been found to have violated the VRA with racially gerrymandered districts."  (quoting *Veasey v. Perry*, 71 F. Supp. 3d at 636 & n.23).  This assertion is just plain wrong.  The district court cites five cases as support: *LULAC v. Perry*, 548 U.S. 399, 126 S. Ct. 2594 (2006) (2000 census redistricting); *Bush v. Vera*, 517 U.S. 952, 116 S. Ct. 1941 (1996) (1990 census redistricting); *Upham v. Seamon*, 456 U.S. 37, 102 S. Ct. 1518 (1982) (1980 census redistricting); *White v. Weiser*, 412 U.S. 783, 93 S. Ct. 2348 (1973) (1970 census federal redistricting); *White v. Regester*, 412 U.S. 755, 93 S. Ct. 2332 (1973) (1970 census state redistricting).  In *LULAC v. Perry*, the Supreme Court applied Section 2 and *upheld* a majority-Black district but struck down another district as dilutive against Latinos even though the Texas

136

No. 14-41127

Legislature had drawn *another* majority-Latino district to remedy the dilution. In *Bush v. Vera*, the Legislature's plan received preclearance, yet the Court found racial gerrymandering because the Legislature *increased* racial minority voting power when it drew three new majority-minority districts and reconfigured an existing one to make it a majority-Black district.  In *Upham v. Seamon*, the issues related to preclearance for two districts and a district court's power sua sponte to reject legislative choices.  In *White v. Weiser*, congressional districts drawn after the 1970 census were challenged on the basis of the Constitution's one-person-one-vote doctrine, *see Reynolds v. Sims*, 377 U.S. 533, 84 S. Ct. 1362 (1964), and the suit had nothing to do with race or the Voting Rights Act.  Only in *White v. Regester*, did the Court find that two multi-member state legislative districts drawn in 1971 invidiously discriminated against minorities.  Thus, in its attempt to find that Texas is a repeat violator of the Voting Rights Act in its decennial redistricting, the majority and district court misstate cases.

The majority next faults Texas for the Department of Justice's objection under preclearance to at least one district in each of Texas's redistricting plans between 1980 and the present.  To the extent this unattributed statement is accurate, this is not probative of the legislature's intent to discriminate against minorities in 2011.  Preclearance involved a "nonretrogression" standard, *see Beer v. United States*, 425 U.S. 130, 96 S. Ct. 1357 (1976), that is far less stringent than proving an intentional discrimination claim.

In short, the majority's "contemporary examples" about Texas's State-sponsored discrimination are neither contemporary nor probative.[36]

---

[36] Both the majority and the district court, *Veasey v. Perry*, 71 F. Supp. 3d at 636 n.23, cite *United States v. Texas*, 887 F. Supp.2d 133 (D.D.C. 2012) to say that two of the 2011 Texas redistricting plans (for the U.S. House and the Texas Senate) violated the Voting

No. 14-41127

### 10. *Many, "shifting" rationales for SB 14*

The majority also criticizes the Texas Legislature because legislators allegedly proffered various, "shifting" rationales for the law. Citing to the district court's opinion, the majority states that the reasons for the law "shifted as they were challenged or disproven by opponents." Of course, "legislators and administrators are properly concerned with balancing numerous competing considerations," *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 563, so it would be unsurprising to hear legislators advancing different rationales for supporting a particular bill. In this case, however, the depositions of various legislators who voted in favor of SB 14 revealed a consistent purpose behind this voter ID law: to prevent voter fraud and thereby promote the integrity of the voting process; in the minds of some legislators this would improve public confidence and possibly increase voter turnout.[37] Preventing voter fraud and increasing public confidence are closely interrelated, *Crawford*, 553 U.S. at 197, 128 S. Ct. at 1620; to view the iteration of multiple

---

Rights Act. Both note, however, that the D.C. District's opinion in that case was vacated by the Supreme Court. *Texas v. United States*, 133 S. Ct. 2885 (2013). Vacated opinions have no precedential or persuasive value. *See Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012). In any case, the Texas Senate redistricting plan was enjoined by a three-judge panel of the Western District of Texas and a substitute plan issued by the court in its place that fully corrected any legal infirmities in it. The 2013 Texas Legislature subsequently repealed its original plan and adopted the court's interim plan in full. *See generally Davis v. Abbott*, 781 F.3d 207, 209-13 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 534 (2015). The remediation undertaken by the Texas Legislature undermines any inference of an intent to discriminate, especially when its original plan could have been kept in place after the Supreme Court vacated the D.C. District's opinion.

[37] *See supra* note 17 (collecting statements of purpose from the deposition testimony of legislators who were proponents of SB 14).

No. 14-41127

related purposes as a cover for hiding a racially discriminatory intent, as the majority asserts is a plausible inference, makes no sense.

The majority's contention that the legislators shifted between these purposes when the rationales were "challenged or disproven by opponents," similarly proves too much. By this statement, the majority, like the district court, presumably means that the Legislature did not, in its view, provide enough evidence to support its proffered interests in the face of opponents' criticism. *See Veasey v. Perry*, 71 F. Supp. 3d at 653 ("Although these rationales are important legislative purposes, there is a significant factual disconnect between these goals and the new voter restrictions."). This insistence upon concrete evidence of the effectiveness of legislation is, as previously noted, clearly contrary to *Crawford*. 553 U.S. at 204, 128 S. Ct. at 1624; *cf. F.C.C. v. Beach Commc'n, Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 2102 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data . . . . Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function."). The "shifting rationales" theory, then, offers no support for an inference that the Texas Legislature intentionally discriminated against minorities in passing SB 14.

   11. *All legislative measures have conspired to work against African-American voters*

Dr. Burton opined that, no matter the party in power, political interests have always worked to deny African-Americans the right to vote: "*every time that African-Americans have, in fact, been perceived to be increasing their ability to vote and participate in the process there has been State legislation*

No. 14-41127

to either deny them the vote or at least dilute the vote or make it much more difficult for them to participate on an equal basis as Whites in the State of Texas."

This conclusion is belied, however, by materials that Dr. Burton himself cites. For instance, the Supreme Court found that Democratic-led redistricting in the 1990s led to racial gerrymanders *favoring* African-American and Hispanic Congressional candidates. *See Bush v. Vera*, 517 U.S. at 956–57, 116 S. Ct. at 1950–51. The Supreme Court rejected a claim that early 2000s Congressional redistricting around the Dallas area diluted the African-American vote. *See LULAC v. Perry*, 548 U.S. at 443–47, 126 S. Ct. at 2624–26. In addition, an expert report credited by the district court showed African-American and Hispanic representation among state legislators to generally align with their proportion in the total population. *See Veasey v. Perry*, 71 F. Supp. 3d at 638.

> ### 12. *"Seismic demographic shift" spurred action by Republicans "currently in power"*

The legislative history recited above shows that the struggle over SB 14 centered on partisanship, not race. Partisanship, however, is not racism, nor is it a proxy for racism on this record. The majority, however, connects "extraordinary procedural measures accompanying the passage of SB 14 to a 'seismic demographic shift,'" and suggests that the Republicans in power could gain a partisan advantage through a voter ID law. But to repeat: even the district court acknowledged that a photo voter ID requirement had wide multiracial, bipartisan public support.

Indeed, the Supreme Court in *Crawford* specifically held that partisanship in Indiana's voter ID law, also passed on a straight party-line

No. 14-41127

basis, could not defeat the law's purposes in deterring fraud.  553 U.S. at 204, 128 S. Ct. at 1624.  And although the Supreme Court in *LULAC v. Perry* found that the Texas Legislature violated Section 2 in one Congressional district it drew after the 2000 census, the Court did not accuse the Legislature of racism, but at most of partisanship.  The "seismic demographic shift" has been underway for at least twenty years—as Republicans took over every major statewide office in Texas.  The inference that SB 14 implies a sudden efflorescence of racial bias is contradicted by *LULAC v. Perry* and is a non-sequitur.

\* \* \* \*

For all these reasons, the weak, or unsupported inferences claimed by the majority are contradicted by the overwhelming evidence from the complete record that negated any racially discriminatory purpose behind SB 14.  SB 14 may or may not be the best approach to protecting the integrity of in-person voting, but it is the approach that succeeded after more than six years of intransigent and uncompromising partisan opposition.   The law reflects party politics, not racism, and the majority of this court—in their hearts—know this.  *See generally* Samuel Issacharoff, *Ballot Bedlam*, 64 DUKE L.J. 1363, 1363 (2015) ("[A]lthough issues of the franchise correlate with race, as does the partisan divide between Democrats and Republicans, the new battles over ballot access do not readily lend themselves to a narrative that focuses primarily on racial exclusion.").

## III.    Section 2 of the Voting Rights Act

The majority's conclusion that SB 14 violates the "results test" defined in Section 2 of the Voting Rights Act misconstrues the law, misapplies the facts, and raises serious constitutional questions.  This decision stands alone among circuit court decisions to date:  two circuits have upheld photo voter ID

No. 14-41127

laws against Section 2 challenges,[38] others have upheld them as a constitutional matter,[39] but no circuit court has yet invalidated a photo voter ID law under Section 2. The majority's errors lead it to depart from the statute's text, resulting in the adoption of non-textual and irrelevant "factors" that, in practice, amount to little more than a naked disparate impact test. *But cf. Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."). We analyze the majority's reasoning, then demonstrate why it is incompatible with a proper interpretation of Section 2, and conclude by highlighting the constitutional tension created by the majority's approach.

### A. Background and the Majority's Erroneous Approach

Section 2 of the Voting Rights Act, as amended in 1982, prohibits the imposition or application of any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . *which results in* a denial or abridgement of the right . . . to vote on account of race or color. . . ." 52 U.S.C. § 10301(a) (emphasis added). What kind of prerequisite "results in" abridgement? The statute continues:

> *A violation of subsection (a) is established if, based on the totality of circumstances*, it is shown that *the political processes* leading to nomination or election . . . are *not equally open to participation by*

---

[38] *Frank v. Walker*, 768 F.3d 744, 751-55 (7th Cir. 2014), *reh'g denied by an equally divided court*, 773 F.3d 738, *cert. denied*, 135 S. Ct. 1551 (2014); *Gonzalez v. Arizona*, 677 F.3d 383, 405-07 (9th Cir. 2012) (en banc), *aff'd. on other grounds sub nom. Arizona v. Inter Tribal Council of Ariz. Inc.*, 133 S. Ct. 2247 (2013).

[39] *Frank*, 768 F.3d at 745-51; *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352-55 (11th Cir. 2009), *cert. denied*, 556 U.S. 1281, 129 S. Ct. 1282; *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1321-23 (10th Cir. 2008).

No. 14-41127

members of a class of citizens protected by subsection (a) *in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.* The extent to which members of a protected class have been elected to office . . . is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(b) (emphasis added).

Congress fashioned this language to overturn a then-recent Supreme Court decision limiting voting rights violations to cases of intentional state-sponsored discrimination, *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 60-61, 100 S. Ct. 1490, 1496 (1980). In so doing, Congress was focused largely, though not exclusively, on legislative districting practices whose effects often undermined minority representation. Clearly, the formula for a Section 2 violation requires less than intent, but far more than a mere racially disparate impact.

Contrary to the statute and the Supreme Court, the majority's discussion begins by misquoting the Supreme Court to say that a Section 2 voting rights violation can be "proved by showing discriminatory effect alone." The Supreme Court, however, was not misguided; quoted accurately, the Court stated that Section 2 was revised "to make clear that a violation could be proved by showing discriminatory effect alone *and to establish as the relevant legal standard the 'results test,' applied by this Court in White v. Regester . . . .*" *Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S. Ct. 2752, 2758 (1986) (hereafter, *"Gingles")* (emphasis added).[40]

---

[40] The majority next compounds its confusion in averring that mere discriminatory effect can afford a basis for a Fifteenth Amendment violation; the true test is that of

143

No. 14-41127

The majority acknowledges that in transitioning from redistricting cases, epitomized by *Gingles*, to the new generation of "vote abridgement" claims, courts have found it hard to apply the Section 2 results test.[41] Nevertheless, the majority adopts a two-part *Gingles*-heavy framework for analysis of SB 14 and other vote abridgement cases. The framework was

——————————

intentional discrimination. *Bolden*, 446 U.S. at 61-65, 100 S. Ct. at 1496-98. The current Section 2 amended the Voting Rights Act, but it could not overrule *Bolden*. Yet the majority, in another error, contends that the constitutionality of Section 2 has never been questioned. This is wrong. *See Bush v. Vera*, 517 U.S. 952, 990, 116 S. Ct. 1941, 1968, 135 L. Ed. 2d 248 (1996) (O'Connor, J., concurring) ("In the 14 years since the enactment of [Section 2], we have interpreted and enforced the obligations that it places on States in a succession of cases, assuming but never directly addressing its constitutionality."); *Johnson v. De Grandy*, 512 U.S. 997, 1028-29, 114 S. Ct. 2647, 2666 (1994) (Kennedy, J., concurring) ("It is important to emphasize that the precedents to which I refer, like today's decision, only construe the statute, and do not purport to assess its constitutional implications."); *Georgia v. Ashcroft*, 539 U.S. 461, 491, 123 S. Ct. 2498, 2517 (2003) (Kennedy, J., concurring) (noting "[t]here is a fundamental flaw . . . in any scheme in which the Department of Justice is permitted or directed to encourage or ratify a course of unconstitutional conduct in order to find compliance with a statutory directive" under the Voting Rights Act, but that the issue had not been raised in this case); *Chisom v. Roemer*, 501 U.S. 380, 418, 111 S. Ct. 2354, 2376 (1991) (Kennedy, J., dissenting) ("Nothing in today's decision addresses the question whether [Section] 2 of the Voting Rights Act of 1965, as interpreted in [*Gingles*], is consistent with the requirements of the United States Constitution."). The majority also claims that our opinion in *Jones v. City of Lubbock*, 727 F.2d 364, 374-75 (5th Cir. 1984), supports Section 2 as "appropriate legislation" as applied in this case to enforce the Fourteenth and Fifteenth Amendments. But *Jones* predates *City of Boerne* and applied a "lawful and rational means" test that is inconsistent with the congruence and proportionality test applied today.

[41] The Seventh Circuit found the *Gingles* factors "unhelpful in voter-qualification cases." *Frank v. Walker*, 768 F.3d 744, 754 (7th Cir. 2014). Other courts and prominent election law commentators have also been unsettled by the question whether the *Gingles* factors should apply beyond vote dilution claims. *See, e.g.*, *Ohio State Conference of NAACP v. Husted*, 768 F.3d at 554 ("A clear test for Section 2 vote denial claims has yet to emerge."); *Simmons v. Galvin*, 575 F.3d 24, 42 n.24 (1st Cir. 2009) ("While *Gingles* and its progeny have generated a well-established standard for vote dilution, a satisfactory test for vote denial cases under Section 2 has yet to emerge . . . . [and] the Supreme Court's seminal opinion in *Gingles* . . . is of little use in vote denial cases." (quoting Daniel P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights Act*, 57 S.C. L. REV. 689, 709 (2006))).

144

No. 14-41127

initially articulated in a vacated Sixth Circuit decision and followed by the Fourth Circuit.  The test is as follows:

> [1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and

> [2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014), *mandate stayed*, 135 S. Ct. 6, *cert. denied*, 135 S. Ct. 1735 (2015); *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated as moot*, 2014 WL 10384647 (6th Cir. 2014).

The first part of the test recapitulates Section 2, requiring a racially discriminatory burden on voting, which "mean[s] . . . less opportunity" for minority citizens "to participate in the political process."  The second part draws from the "*Gingles* factors"[42] to prove causality between "the burden on

---

[42] The nine *Gingles* factors are:

1. the extent of any history of official discrimination in the State or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the State or political subdivision is racially polarized;

3. the extent to which the State or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

No. 14-41127

voting rights and the fact that this burden affects minorities disparately because it interacts with social and historical conditions that have prevented discrimination against minorities currently, in the past, or both." (citing *Gingles*, 478 U.S. at 47, 106 S. Ct. at 2764 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.")).

Using the *Gingles* factors is error on several levels.   First, as will be elaborated on later, the statute alone sufficiently describes how violations of Section 2 vote abridgement claims are to be proved.  The Senate Report cannot claim the same legal status, if any, as that of the enacted law. For present purposes, it suffices to point out that the second step of the two-part test, linking social and historical conditions to the discriminatory burden, derives

---

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the State or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction[;]

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[;]

9. whether the policy underlying the State or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 44–45, 106 S. Ct. at 2763–64.

146

No. 14-41127

from *Gingles'* descriptive language, quoted immediately above, which did not purport to be a freestanding rule of law.  The second step is also flawed "because it does not distinguish discrimination by the defendants from other persons' discrimination." *Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014), *reh'g denied by an equally divided court*, 773 F.3d 738, *cert. denied*, 135 S. Ct. 1551 (2014).  Section 2 "does not require States to overcome societal effects of private discrimination," only their own discrimination.  *Id.* at 753; *see also LULAC, Council No. 4434 v. Clements,* 999 F.2d 831, 867 (5th Cir. 1992) (en banc) ("[S]ocioeconomic disparities and a history of discrimination, without more," do not satisfy Section 2's legal standard).

Second, *Gingles* did *not* ascribe talismanic significance to the Senate Factors; the Court prescribed a three-part test to gauge the disparate impact of multimember legislative districts—*before* reaching the Section 2 analysis— with the Senate Factors used to confirm liability. *Gingles*, 478 U.S. at 48–51, 106 S. Ct. at 2765–67.

Third, the extra-statutory *Gingles* factors originated in the Senate Report accompanying amended Section 2 principally to guide redistricting cases.[43]  Reflective of this reality, the Supreme Court, in adopting the Senate factors as an add-on to its test for vote dilution, specifically noted they are non-comprehensive and non-mandatory. *Gingles*, 478 U.S. at 45, 106 S. Ct at 2763. The majority barely alludes to these shortcomings but describes the factors as "salient guidance."

---

[43] As one commentator explains, the legislative history of the 1982 Section 2 amendments "focused so intently on representation rather than participation," Daniel P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights Act,* 57 S.C. L.REV. 689, 709 (2006), that it is a mistake to use that history, embodied in the *Gingles* factors, beyond vote dilution.

147

No. 14-41127

Applying this inherently flawed two-part test, the majority approves the district court's finding that SB 14 "disparately impacts" racial minority voters because they are "more likely than their Anglo peers to lack" qualifying ID. The underlying findings were that 2% of Anglos, 5.9% of Hispanics, and 8.1% of Blacks comprise the 4.5% of Texas voters who lack SB 14 IDs.[44] The majority cites exactly three individuals—Floyd Carrier, Sammie Louise Bates, and Gordon Benjamin—who were unable to cast ballots because they lacked SB 14 ID when they went to vote. The majority agrees with the district court that the law's ameliorative provisions, including the free EIC available at DMV offices (which Sammie Louise Bates eventually obtained), a "strict disability exemption" from the SB 14 requirement and the alternative of mail-in ballots, are "burdensome" and thus ineffective alternatives.[45] Moreover, evidence showed that nine of the fourteen plaintiffs (including Floyd Carrier and Gordon Benjamin) were qualified to vote by mail, but they did not want to. *Veasey v. Perry*, 71 F. Supp.3d at 677. It is a mystery why the majority goes out of its way to criticize the use of mail-in ballots for hundreds of thousands of senior citizens. No court has ever held that a voter has a right to cast a ballot by the method of his choice.[46]

---

[44] Largely from experts and statistically-based proof arises the finding that SB 14 "disproportionately impacted the poor" who are less likely to have an ID, less likely to avail themselves of services requiring one, and for whom "[e]ven obtaining an EIC poses an obstacle" given the difficulties for some in obtaining birth certificates and travelling to DMV offices.

[45] The majority neglects to mention other exemptions to the photo ID requirements for religious accommodation and disaster loss.

[46] *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 89 S. Ct. 1404 (1969) (upholding a statute allowing some, but not other, citizens to vote absentee). Laws that require voters to cast different kinds of ballots are valid so long as there is "some rational relationship to a legitimate state end." *Id*. at 809, 1408; *see also Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004). The State of Oregon requires all ballots be cast by mail. Moreover, the

No. 14-41127

The majority moves on to the *Gingles* factors for proof that the disparate impact of SB 14 on ID possession "interacts with social and historical conditions" to cause unequal electoral opportunities for Blacks and Hispanics.[47] Although there are nine *Gingles* factors, from which the majority culls seven, only two really make a difference:  the "effects of past discrimination" and the "tenuousness of policies underlying the law."  Even if all of the other five *Gingles* factors favored the plaintiffs—which they do not[48]—no case could be made to invalidate SB 14 without twin conclusions that the "effects of past discrimination" led to a disparity of ID possession and that the purposes of the law are "tenuous."  Thus, these two factors form the slender core of the majority's "causal link."  And they are slender indeed.

*Gingles* Factor 5, the "effects of past discrimination," comprised on this record comparative socioeconomic data on employment rates, income, educational attainment, and health outcomes.  That these (unfortunately) reflect differences among Whites, Blacks and Hispanics is a sociological fact in Texas as elsewhere.  The majority attempts to, but does not successfully

---

greatest fraud risk exists when unauthorized persons direct an elderly, immobile voter's choices on a mail-in ballot.  That the ballots could get lost or stolen from the mail is no more of a risk than the loss of a Social Security check.

[47] Space does not permit elaboration, but the majority defends its application of the *Gingles* factors in part by repeatedly mischaracterizing and distorting the State's arguments.

[48] Two *Gingles* factors, the existence of racially polarized voting and the lack of racial campaign appeals, are plainly irrelevant here.  Another factor, the history of state-sponsored discrimination recounted by the majority has already been shown to be legally unsupported, see discussion *supra*, and "long-ago."  The Legislature that passed SB 14 had virtually proportional minority representation, rendering another *Gingles* factor, the extent of elected minority officials throughout the state, beside the point.  Finally, showing the Legislature as "unresponsive" to minorities solely with reference to the 2011 events preceding passage of SB 14 fundamentally misunderstands this *Gingles* factor, which relates to the overall conduct of representative government as it applies to legislative districting; moreover, as has been shown, the majority and district court did not read the legislative record over the past four sessions and six years.

No. 14-41127

connect these findings to contemporary discrimination by the state of Texas.[49] The majority goes out of its way, however, to assert that it "does not decide" whether this factor can only be satisfied by a legacy of official state discrimination. The majority is wrong yet again. The Supreme Court recently reaffirmed that state entities should not bear legal responsibility "for racial disparities they did not create." *Inclusive Communities*, 135 S. Ct. at 2523; *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 278, 99 S. Ct. 2282, 2295 (1979) (refusing to hold state liable for sex discrimination in U.S. military); *Milliken v. Bradley*, 418 U.S. 717, 745, 94 S. Ct. 3112, 3127 (1974) (remedy cannot be imposed on other government bodies not having been shown to violate Constitution).

The majority also adopts the finding that minorities' disproportionately lower socioeconomic status "hinders their participation in the electoral process." But while on one hand, the majority credits an expert opinion that minority voters are probably inhibited by the voter ID requirement from casting ballots, the majority forcefully disclaims, on the other hand, that *Gingles* factor 5 embodies any actual requirement for evidence of the law's effect on voter turnout. Indeed, no evidence in the record supports a link between requiring SB 14 IDs for voting and diminished turnout. Despite testimony from a handful of voters, not one of the plaintiff organizations in this

---

[49] The majority references the district court's opinion, *Veasey v. Perry,* 71 F. Supp.3d at 666, which adverts to general socioeconomic data and specifically recites employment discrimination cases settled in the past twelve years by two state and two municipal entities, and disparate school discipline procedures (which can't be attributed to the State). The court references desegregation of Texas schools, which occurred over forty years ago. In sum, the majority has no evidence of current discriminatory practices by the state in housing, education, or employment.

No. 14-41127

case offered testimony that a single one of their members had been prevented from voting by SB 14. The DOJ thoroughly canvassed the state of Texas in search of voters "disenfranchised" by SB 14 and found none. The State's witness—Keith Ingram, the director of the Elections Division of the Texas Secretary of State—stated that the number of voters who have been unable to present a qualifying ID were "vanishingly small," even after three statewide elections, six special elections, and numerous local elections that have taken place under the law.[50]

Regarding *Gingles* factor 9, the "tenuousness of policies underlying the law," the majority approves of the district court's empirical analysis of SB 14 and finds "a total disconnect between the State's announced interests and the statute enacted." *But cf. Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 488, 75 S. Ct. 461, 464 (1955) ("The day is gone when [courts] . . . strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.").[51] The majority pays lip service to *Crawford*, which ruled evidence of actual in-person Indiana voter fraud irrelevant to upholding a voter ID law under the Fourteenth Amendment, but pivots and concludes that this *Gingles* extra-statutory factor permits intrusive judicial second-guessing of the

---

[50] The majority disclaims the necessity of a proven turnout effect because it is allegedly too difficult to prove. The reality, however, is that such effects simply have not been found by researchers who have investigated voter ID law. *See, e.g.*, Samuel Issacharoff, *Ballot Bedlam*, 64 DUKE L.J. 1363, 1377-86 (2015); Michael D. Gilbert, *The Problem of Voter Fraud*, 115 COLUM. L. REV. 739, 746-50, 749 n.53 (2015); Michael J. Pitts, *Empirically Measuring the Impact of Photo Id over Time and Its Impact on Women*, 48 IND. L. REV. 605, 605-07 (2015).

[51] The majority's citation to *St. Joseph Abbey v. Castille*, 712 F.3d 215, 225–26 (5th Cir. 2013), is inapt because it is a one-of-a-kind ruling to the contrary, and it concerns economic regulation.

No. 14-41127

legislation. The majority avers that there is hardly any evidence of in-person voter fraud in Texas—the Senatorial election of "Landslide Lyndon" Johnson in 1948 seems to have been forgotten—and there is no proof that voter confidence in the integrity of the ballot is enhanced by requiring voters to prove their ID at the polls—despite the opinion polls showing the overwhelming popularity of photo ID requirements.[52]   Even if the district court's findings are taken at face value, however, this conclusion proves too much.   If requiring a photo voter ID has no rational basis, as the majority concludes, the entire law, not simply its application to minority voters, would be indicted.

The sum of the majority's reasoning, despite its emphasis on "an intensely local appraisal" and its incantation of seven *Gingles* factors, boils down to these propositions:

> (1) SB 14 specifically burdens Texans living in poverty, who are less likely to possess qualified photo ID, are less able to get it, and may not otherwise need it; (2) a disproportionate number of Texans living in poverty are African–Americans and Hispanics; and (3) African–Americans and Hispanics are more likely than Anglos to be living in poverty because they continue to bear the socioeconomic effects caused by decades of racial discrimination.

(citing *Veasey v. Perry*, 71 F. Supp. 3d at 664).   As a result of finding a racial disparity among those who possess or have access to SB 14 IDs and using the *Gingles* factors, the majority affirms a Section 2 violation.   Liability therefore turns, under the majority's approach, on essentially three conclusions.   First, a particular regulation has a "disparate impact" because it creates an additional voting burden upon poor, disproportionately minority voters. Second, Texas has a history of official discrimination whose effects persist to

---

[52] Moreover, some studies actually show that voter ID laws increase voter turnout. *See* Gilbert, *supra* note 50, at 749 n.56 and accompanying text (collecting studies and discussing rationales).

No. 14-41127

the present day. Third, the law in question could have been written more narrowly.[53]

These conclusions are incredibly open-ended. The first conclusion can be met even though, as here, the law in question disadvantages only a small percentage of voters and contains ameliorative provisions and exemptions. The second conclusion is basically a condition of American society, although contrary to the majority opinion, current socioeconomic conditions cannot be explained in terms of any recent state-sponsored discrimination. The third conclusion is at war with the Supreme Court's acknowledgement of the State's and public's interest in ballot integrity as well as the Texas public's approval of photo voter IDs.

Virtually any voter regulation that disproportionately affects minority voters can be challenged successfully under the majority's rationale: polling locations; days allowed and reasons for early voting; mail-in ballots; time limits for voter registration; language on absentee ballots; the number of vote-counting machines a county must have; registering voters at a DMV (required by the federal Motor Voter law); holding elections on Tuesday. Such challenges are occurring at the present time.[54]

---

[53] Judge Higginson's special opinion embraces and embroiders the majority's position adopting the *Gingles* factors to interpret Section 2. Judge Higginson focuses principally on racial socioeconomic disparities as the touchstone for Section 2 liability, thus overlooking the Supreme Court's warning that states cannot be held responsible to fix disparities they did not create. He disparages requiring plaintiffs to prove that SB 14 itself caused ("resulted in") the abridgement of voting rights—while apparently accepting the majority's legally upside-down view that the state must prove the statute's efficacy in preventing voter fraud. Finally, Judge Higginson's disparate impact focus would create constitutional tension, to say the least, by forcing states to become race-conscious in avoiding disparate impact whenever they enact voting regulations. This result is not a benign "evolutionary" process to "harmonize" legislative priorities with the right to vote; it is judicial micromanagement of race-neutral voting regulations consigned to the states.

[54] *See, e.g., Ne. Ohio Coal. for the Homeless v. Husted*, 2016 WL 3166251 (S.D. Ohio June 7, 2016) (enjoining under Section 2 and Equal Protection Clause a law that: requires

No. 14-41127

The majority's rationale, however, is flawed not only as already explained, but simply because it does not correlate with the statute itself. Section 2, as the Seventh Circuit recognized, *Frank*, 768 F.3d at 752, is "the salient guidance" for enunciating violations.

## B. The Proper Analysis

The correct answer is simple and consistent. Showing a disparate impact on poor and minority voters is a necessary but not sufficient condition to

---

full and accurate completion of absentee ballot identification envelopes before vote is counted; reduces period for correction of absentee ballot envelopes from 10 days to 7 days; requires that provisional ballot affirmation forms are completed fully and accurately; reduces period for correction of provisional ballot affirmation forms from 10 days to 7 days; and prohibits poll workers assisting in completing provisional or absentee ballot forms; challenges to other election laws part of case as well), *appeal docketed*, Nos. 16-3603, 16-3691 (4th Cir. June 8, 2016 and June 23, 2016); *Ohio Org. Collaborative v. Husted*, ---F. Supp.3d---, 2016 WL 3248030 (S.D. Ohio May 24, 2016) (Section 2 challenges to: reduction of number of days in early-in-person voting period from 35 to 28; elimination of same-day registration; limitation of early-in-person location per county; number of vote counting machines counties are required to maintain; reductions in ability to collect, pay for, and mail absentee ballots on behalf of others; addition of required information to absentee ballot envelopes and provisional ballot affirmation forms; reduction in cure period on provisional ballots and prohibition on election officials completing provisional ballot affirmation form on voter's behalf; failure to require county boards of elections to consolidate multi-precinct poll books); *Lee v. Va. State Bd. of Elections*, ---F. Supp.3d---, 2016 WL 2946181 (E.D. Va. May 19, 2016) (Section 2 challenge to voter ID), *appeal docketed*, No. 16-1605 (4th Cir. May 27, 2016); *N.C. State Conference of the NAACP v. McCrory*, ---F. Supp.3d---, 2016 WL 1650774 (M.D.N.C. Apr. 25, 2016) (Section 2 challenges to: voter ID; early voting reductions; elimination of same-day voter registration and voting; elimination of counting ballots cast in the wrong precinct; and pre-registration for those under age 18), *appeal docketed*, No. 16-1529 (4th Cir. May 9, 2016); First Amended Complaint at 70-74, *Greater Birmingham Ministries v. Alabama*, No. 2:15-cv-02193 (N.D. Ala. May 3, 2016), ECF No. 43 (Section 2 challenge to voter ID and positive ID provisions along with a request to "bail-in" the State into preclearance under the Voting Rights Act); Amended Complaint at 41-44, *Feldman v. Ariz. Sec'y of State*, No. 2:16-cv-01065-DLR (D. Ariz. Apr. 19, 2016), ECF No. 12 (Section 2 challenge to: allocation of polling places within a county; prohibition on counting ballots cast out of precinct; and criminalization of collecting of signed and sealed absentee ballots); Complaint for Declaratory and Injunctive Relief at 38-40, *Brakebill v. Jaeger*, No. 1:16-cv-08 (D.N.D. Jan. 20, 2016), ECF No. 1 (Section 2 challenge to voter ID and elimination of ameliorative provisions); *see also* Complaint at 14-17, *Stringer v. Cascos*, No. 5:16-cv-00257 (W.D. Tex. Mar. 14, 2016), ECF No. 1 (challenge under Equal Protection Clause and Motor Voter law to Texas's voter registration system).

No. 14-41127

substantiate a Section 2 vote denial or abridgement claim.  Abridgement is less than outright denial of the vote.  It is the challenged regulation, here SB 14, rather than "socioeconomic conditions" or a "history of discrimination," that must cause the disparate impact.  Moreover, Section 2(b), the "results" provision, "tells us that [Section] 2(a) does not condemn a voting practice just because it has a disparate effect on minorities. (If things were that simple, there wouldn't have been a need for *Gingles* to list nine non-exclusive factors in vote-dilution cases.)." *Frank*, 768 F.3d at 753.  After all, nearly every voting regulation poses some kind of obstacle or prerequisite to casting a ballot, and nearly every one of these may be potentially more disabling for poor and minority voters.[55]  The totality of circumstances inquiry, leading to a determination whether minority voters have an equal opportunity to participate, also bears  the important caveat that perfection, in the form of proportional representation, is not mandated.  It logically follows that Section 2 is not designed to abolish every incidental impact of facially neutral voting regulations.  Finally, as the Supreme Court has made clear, no citizen may complain of "the usual burdens of voting." *Crawford*, 553 U.S. at 198, 128 S. Ct. at 1621.

Using the textualist approach to Section 2, a vote abridgement claim should be analyzed (absent proof of intentional discrimination) as follows: First, consider the total impact of the challenged regulation on the voting public.  If the regulation disparately affects minority voters, proceed to determine whether the particular burden imposed by the regulation, examined

---

[55] The majority opinion admits this in stating that, "[a]ccording to a well-established formula . . . to assess individuals' likelihood of voting in an election, increasing the cost of voting decreases voter turnout—particularly among low-income individuals, as they are most cost sensitive." (citing *Veasey v. Perry*, 71 F. Supp. 3d at 656).

No. 14-41127

under the totality of circumstances, deprives them of an equal opportunity to participate in the electoral process. This analytical process, synthesized from *Frank*, fundamentally differs from that of the majority in three ways. First, it dispenses with the *Gingles* factors. Second, it requires a causal connection between the challenged regulation and the disparate impact. Third, Section 2(b) is better read as an "equal-treatment requirement (which is how it reads)" rather than "an equal-outcome command." *Frank*, 768 F.3d at 754.[56]

Contrary to the majority opinion, applying the statute itself in this way does not neuter or minimize minority citizens' voting rights. The question under Section 2 is whether a regulation "needlessly" burdens those rights. *Id.* at 753. Justice Scalia's dissent in *Chisom v. Roemer* posed an inarguable Section 2 violation, in which a hypothetical jurisdiction limited voter registration to one hour a day three days a week, to the stark disadvantage of the minority working class. 501 U.S. 380, 408, 111 S. Ct. 2354, 2371 (1991) (Scalia, J., dissenting). Likewise, Mississippi actually violated Section 2 with a dual voter registration law and limited registration offices, which "resulted

---

[56] How the majority can claim its interpretation is "consistent" with *Frank* is incomprehensible. *Frank* found the *Gingles* factors "unhelpful" in vote abridgment cases, 768 F.3d at 754, and applied the two-part test only "for the sake of argument," *id.* at 755. On rehearing, the court never mentions Section 2 liability but appears instead to foot its discussion on the *Anderson/Burdick* claim. *See Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) (*Frank II*).

Moreover, *Frank* finds no Section 2 violation where the Wisconsin voter ID law arguably had a higher disparate impact on voter ID possession than SB 14. *Compare Frank*, 768 F.3d at 752 (92.7% of Whites, 86.8% of Blacks, and 85.1% of Hispanics possessed photo IDs), *with Veasey v. Abbott*, 796 F.3d at 509 (panel opinion discussing that plaintiffs' expert found that 98% of Whites, 91.9% of Blacks, and 94.1% of Hispanics possessed photo IDs). In other words, far more Texas voters of each race possess the requisite photo IDs; hence one might infer that the scope of diminished opportunity to participate is far smaller across the board in Texas than in Wisconsin. Moreover, the racial spread between Texas and Wisconsin in terms of ID possession is about the same in the case of Whites to Blacks and narrower in the case of Whites to Hispanics. On a comparative statistical basis, then, there should be no difference in the outcome of this case and *Frank*.

No. 14-41127

in" a 25% diminution in Black voter registration. *Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991).

According to the correct, textualist frame of reference, SB 14 does not violate Section 2. The majority's finding that a racial disparity "in ID possession" exists between Anglos and Blacks and Hispanics is not clearly wrong. The majority does not, however, establish that SB 14 "resulted in" or caused a diminution of the right to vote, nor does the "totality of circumstances" demonstrate that minority voters' opportunity to participate has been reduced.

A tailored causation analysis is imperative under Section 2 case law. Not only does *Gingles* offer ample support for a requirement that the challenged law causes the prohibited voting results, but six circuit courts, including this court, have clearly so held. *See Gingles*, 478 U.S. at 48 n.15, 106 S. Ct. at 2766 n.15 ("It is obvious that unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect'" in violation of Section 2). The Ninth Circuit, rejecting a challenge to Arizona's voter ID law, held that "proof of 'causal connection between the challenged voting practice and a prohibited discriminatory result' is crucial" to Section 2 analysis. *Gonzalez*, 677 F.3d at 405 (quoting *Smith v. Salt River Project Agric. Imp. & Power Dist.*, 109 F.3d 586, 589 (9th Cir. 1997)); *see also Frank*, 768 F.3d at 753–54 (voter ID law did not cause minorities to have less opportunity and were treated equally); *LULAC v. Clements*, 999 F.2d at 867 (5th Cir. 1993) (en banc) (emphasizing need for proof of depressed minority voter turnout); *Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) (rejecting challenge to at-large districts where Hispanic lack of electoral success was caused by lower turnout, not dilution); *Ortiz v. City of Phila.*, 28 F.3d 306, 310 (3d Cir. 1994) (Philadelphia voter list purge law did not cause minorities to be deprived

No. 14-41127

of equal access to the political system); *Irby v. Va. State Bd. of Elections*, 889 F.2d 1358–59 (4th Cir. 1989) (upholding appointive system for school board members where evidence "cast doubt on . . . a causal link between the appointive system and Black underrepresentation"); *Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986) (upholding felon disenfranchisement law because the disproportionate racial impact does not "result" from the State's qualification of the right to vote).

SB 14 had no impact on voter registration, the major prerequisite to casting a ballot. SB 14 does not adversely impact over 90% of minority voters who already possess SB 14 IDs or thousands of others eligible to vote by mail or any voter who can readily obtain a free EIC. Moreover, the plaintiffs here did not show that SB 14 had any effect on voter turnout or that any disparity in voter-quality ID possession was caused by SB 14. The rate of preexisting ID possession does not prove "that participation in the political process is in fact depressed among minority citizens." *LULAC*, 999 F.2d at 867. To understand the totality of circumstances, at least three subsidiary questions had to be answered: *how many* of those without SB 14 ID already have the documents to get one? Of those without the underlying documents, *how many* would have significant trouble obtaining them? And within that much smaller group, *how many* have actually voted in the past or intend to vote in the future? The actual adverse racial impact of SB 14 is not demonstrated by gross no-match list percentages, but by the impact on these subsets of the 4.5% of Texas voters currently without SB 14 ID. The record is bereft of such information.

As the Ninth Circuit held, "a [Section] 2 challenge 'based purely on a showing of some relevant statistical disparity between minorities and whites,' without any evidence that the challenged voting qualification causes that disparity, will be rejected." *Gonzalez*, 677 F.3d at 405 (citation omitted); *see*

158

No. 14-41127

*also Frank*, 768 F.3d at 753 (Section 2 "does not condemn a voting practice just because it has a disparate effect on minorities").   The majority's opinion fundamentally turns on a statistical disparity in ID possession among different races, but instead of showing that this disparity was *caused* by SB 14, the majority relies on socioeconomic and historical conditions as the causes of this disparity.  This finding conflicts with the Supreme Court's recent instruction that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Communities*, 135 S. Ct. at 2523.  Without a showing that SB 14 caused the disparity in ID possession, the majority holds Texas "liable for racial disparities [it] did not create."  *Id.* (citation omitted).

Moreover, past examples of State-sponsored discrimination are not indicative that *SB 14*, the "challenged voting qualification," caused the disparity in ID possession.  After all, the majority itself discredited "long ago" evidence of State-sponsored discrimination when it reversed many parts of the district court's finding that SB 14 was enacted with discriminatory intent.  The majority's attempt to shore up a finding of state-action-related discrimination with no more than socioeconomic disparities (and even alleged local differences in high school discipline, which can't be the fault of the State of Texas), fails the test of *LULAC*, *Gonzalez*, and *Inclusive Communities*.

Misplacing its reliance on the *Gingles* factors, the majority also fatally errs in discounting the State's and the public's interest in enforcing SB 14.  The State's interests are weighty, they are to be treated as a matter of law, not fact as the majority does, and they outweigh the insubstantial proof of diminished minority opportunity to participate caused by SB 14.

In *Crawford*, the Supreme Court held that the State's legitimate interest in preventing voter fraud is "sufficiently strong" to justify a voter ID law even

No. 14-41127

without any evidence of voter fraud in the record. 553 U.S. at 204, 128 S. Ct. at 1623; *see also Voting for Am. v. Steen*, 732 F.3d 382, 394 (5th Cir. 2013). *Crawford* also approved, without requiring independent proof, Indiana's argument that voter ID laws serve the State's legitimate interest of increasing voter turnout by safeguarding voter confidence in the election process. *Crawford*, 553 U.S. at 197, 128 S. Ct. at 1620. Nonetheless, the majority finds that these recognized State interests are only tenuously related to SB 14's provisions.

The majority inaptly attempts to distinguish *Crawford* because that case reviewed a summary judgment record and involved constitutional challenges to the right to vote, while this case is brought under Section 2 after a full trial. *Crawford*, however, carefully balanced the voters' difficulties in obtaining voter ID under the Indiana law against the State's interests, and concluded: "For most voters who need them, the inconvenience of making a trip to the [DMV], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198, 128 S. Ct. at 1621. Although *Crawford* does not control the instant case, its general conclusion stands at odds with the majority's implicit determination that "significant" and "substantial" burdens exist in obtaining voter ID for that small percentage of Texas's Black and Hispanic voters who do not presently possess SB 14 ID.

Further, the majority mischaracterizes the State's interests as a matter of adjudicative fact. This court previously held en banc that the substantiality of the State's interest is a legal question to be determined as a matter of law. *LULAC*, 999 F.2d at 871. In *Crawford*, the Supreme Court confirmed the State's strong interests as a matter of law, as it sustained Indiana's voter ID

160

No. 14-41127

law without record evidence "of any such fraud actually occurring in Indiana at any time in its history." 553 U.S. at 194, 128 S. Ct. at 1619. *Crawford* thus elevated the State's interest to a status of legislative fact, which lower courts are bound to respect. *See Frank*, 768 F.3d at 750 ("After a majority of the Supreme Court has concluded that photo ID requirements promote confidence, a single district judge cannot say as a 'fact' that they do not, even if 20 political scientists disagree with the Supreme Court."). The majority wrongly second-guesses and subjects the State's interest in preventing in-person voter fraud to routine factual examination. *But see Crawford*, 553 U.S. at 196, 128 S. Ct. at 1619 ("While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."). The majority was wrong to require record evidence of lack of confidence in elections without voter ID. *See id.* at 194, 1618 ("'The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.'" (quoting Building Confidence in U.S. Elections § 2.5 (Sept. 2005) (a report prepared by a committee co-chaired by former President Jimmy Carter and former Secretary of the Treasury and White House Chief of Staff James A. Baker III)).

Finally, even weighing the State's interests as a matter of fact, the majority errs. The majority credits the district court's finding that SB 14 would *theoretically* decrease voter turnout, yet overlooked that the minimal evidence in the record that anybody was *actually* prevented from voting. There is not even evidence that any voter was actually unable to obtain the proper voter ID. *LULAC* held that "plaintiffs cannot overcome a substantial State interest by proving insubstantial dilution." 999 F.2d at 876. It follows that the majority should not reject strong State interests without *any* showing of an "abridgement of the right . . . to vote on account of race or color." 52 U.S.C.

No. 14-41127

§ 10301(a). The majority errs in its treatment of the State's strong interests at stake here.

### C. Constitutional Considerations

The majority claims to exercise "constitutional avoidance" by electing not to rule on the plaintiffs' assertion that SB 14 burdened their right to vote contrary to the Fourteenth Amendment. But the majority has no qualms about keeping alive the preposterous and divisive claim that SB 14 was passed with unconstitutional discriminatory intent.[57] And the majority's extra-textual interpretation of Section 2 runs a severe risk of unconstitutionality. So much for judicial restraint.

As applied here, the majority's two-part Section 2 test authorizes judicial mischief in micromanaging a facially neutral state law implementing a Supreme Court-approved purpose in order to eliminate disparate impact (in types of qualified IDs) not caused by the law itself. This result interferes with the Constitution's assignment of the conduct of elections to the States and is not congruent and proportional as a remedy for violation of voting rights protected by the Fourteenth and Fifteenth Amendments.

The Constitution's "Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."

---

[57] The Supreme Court itself declined to rule on Equal Protection issues raised in a redistricting case where the lower court decision might rest on the alternative ground of the Voting Rights Act. *Escambia Cty. v. McMillan,* 466 U.S. 49, 104 S. Ct. 1577 (1984). No such forbearance by today's majority! The majority cites with approval *Ketchum v. By*rne for that opinion's broad (but fact-bound) language concerning discriminatory intent and partisanship. *Ketchum,* however, refused to rule on the constitutionality of a local council redistricting plan after the district court had found it wanting under a then recently-amended Section 2. The court noted "[t]his change in the law appears to reflect congressional impatience with the inherently speculative process of ascribing purposes to government actions involving the complex interaction of numerous individuals and conflicting interests. We think it undesirable to undertake this difficult [legislative intent] analysis when Congress has rendered it superfluous by amending the Voting Rights Act." *Ketchum,* 740 F.2d at 1409.

No. 14-41127

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2257 (2013) (emphasis in original); *see* U.S. CONST. art. I, § 4, cl. 1. "Prescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government' by the Elections Clause, which is 'expressly restricted to the regulation of the *times,* the *places,* and the *manner* of elections.'" *Arizona*, 133 S. Ct. at 2258 (emphasis in original) (quoting THE FEDERALIST No. 60, at 371 (A. Hamilton); THE FEDERALIST No. 52, at 326 (J. Madison)). This design was for good reason. The Court explained, "[t]his allocation of authority sprang from the Framers' aversion to concentrated power," because, as James Madison presciently observed, "[a] Congress empowered to regulate the qualifications of its own electorate . . . could 'by degrees subvert the Constitution.'" *Id.* (quoting 2 Records of the Federal Convention of 1787, p. 250 (M. Farrand rev. 1966)). It is thus "obvious that the whole Constitution reserves to the States the power to set voter qualifications in state and local elections. . . ." *Oregon v. Mitchell*, 400 U.S. 112, 125, 91 S. Ct. 260, 265 (1970) (Black, J. for a five member majority on this point); *see also Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50, 79 S. Ct. 985, 989 (1959) ("The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised. . . .").

The States' primacy in regulating elections is limited, however, by the Fourteenth and Fifteenth Amendments, which protect different rights. The Fifteenth Amendment secures the right to vote from denial or abridgment by intentional discrimination on account of race or color. *City of Mobile v. Bolden*, 446 U.S. 55, 61–66, 100 S. Ct. 1490, 1496–98 (1980); *see Rice v. Cayetano*, 528 U.S. 495, 120 S. Ct. 1044 (2000) (striking down law that denied vote to those without Native Hawaiian ancestry); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S. Ct. 125 (1960) (striking down law that denied vote via racial redistricting

No. 14-41127

of city boundaries).  The Fourteenth Amendment has been interpreted to protect voters generally from laws that excessively burden the right to vote and the conduct of the political process.  *See Crawford*, 553 U.S. at 189–91, 128 S. Ct. at 1615–16; *Burdick v. Takushi*, 504 U.S. 428, 432–34, 112 S. Ct. 2059, 2062–64 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 786–90, 103 S. Ct. 1564, 1568–70 (1983).  Understanding the difference between these protections is important.  Where every aspect of a state's election code "inevitably affects— at least to some degree—the individual's right to vote and his right to associate with others for political ends," *Anderson*, 460 U.S. at 788, 103 S. Ct. at 1570, invalidating ballot-access rules as overly burdensome (absent intentional discrimination) without a compelling showing would make it impossible to run fair and efficient elections.  *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S. Ct. 1364, 1369 (1997) ("States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.").  Accordingly, no citizen has a Fourteenth or Fifteenth Amendment right to be free from "the usual burdens of voting." *Crawford*, 553 U.S. at 198, 128 S. Ct. at 1621.

Because Section 2 was enacted to protect voting rights under these amendments, it must be "appropriate legislation," for the purpose.  *See City of Boerne v. Flores*, 521 U.S. 507, 516–20, 117 S. Ct. 2157, 2162–64 (1997).  "'[A]s broad as the congressional enforcement power is, it is not unlimited.'" *Id.* at 518, 2163 (quoting *Mitchell*, 400 U.S. at 128, 91 S. Ct. at 266 (Black, J.)). Clearly, "Congress can enact legislation . . . enforcing" these constitutional rights.  *Id.* at 519, 2163.  And prophylactic measures to deter or remedy unconstitutional conduct are "within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional. . . ." *Id.*; *see also Bd. of Trs. of Univ. of Ala. v. Garrett*,

164

No. 14-41127

531 U.S. 356, 365, 121 S. Ct. 955, 963 (2001); *South Carolina v. Katzenbach*, 383 U.S. 301, 327, 86 S. Ct. 803, 818 (1966). However, Congress's ability to enact such prophylactic legislation is cabined by an important limitation: "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 520, 117 S. Ct. at 2164; *see also Garrett*, 531 U.S. at 365, 121 S. Ct. at 963. While Congress can employ "strong remedial and preventive measures to respond to the widespread and persisting deprivation of constitutional rights," *City of Boerne*, 521 U.S. at 526, 117 S. Ct. at 2167, it cannot enact "a substantive change in constitutional protections," *id.* at 532, 2170, under the guise of enforcement. *See also Coleman v. Court of Appeals of Md.*, 132 S. Ct. 1327 (2012); *Garrett*, 531 U.S. at 364–65, 121 S. Ct. at 962–63; *Mitchell*, 400 U.S. at 128–29, 91 S. Ct. at 266–67.

Section 2 is a prophylactic measure under the Fifteenth Amendment to the extent it prohibits any voting practice that "results in . . . abridgement of the right . . . to vote . . . on account of race" as further elaborated by the totality of the circumstances test. 52 U.S.C. § 10301(a). The results test is less demanding than that of intentional discrimination. The majority's two-part test, however, predicates liability not on any proven impact on voting but on disparate voter possession of qualifying IDs, a disparity caused not by this law but by exogenous circumstances. The disparity, moreover, relates to a small fraction even of minority voters and is found fatal to SB 14 notwithstanding the law's offer of free EICs to poor voters and accommodations for voters who are disabled, elderly, or have religious objections to photographic ID. This result amounts to "prophylaxis-upon-prophylaxis." *In re Cao*, 619 F.3d 410, 446 (5th Cir. 2010) (en banc) (quoting *Fed. Election Comm'n v. Wisc. Right To Life, Inc.*, 551 U.S. 449, 479, 127 S. Ct. 2652, 2672 (2007)). The majority has

165

No. 14-41127

transformed Section 2 from a provision protecting the equal right of minority voters to exercise the franchise to a right of more convenient exercise.

Consequently, not only does this expanded right exceed the Fifteenth Amendment, but it also threatens the balance struck by the Fourteenth Amendment between individual rights and the public's need for fair and efficient elections. Under the majority's reasoning, a wide swath of racially neutral election measures will be subject to challenge, a previously unthinkable result under the Fourteenth Amendment and the Constitution's federalist design. Moreover, using Section 2 to rewrite racially neutral election laws will force considerations of race on state lawmakers who will endeavor to avoid litigation by eliminating any perceived racial disparity in voting regulations. But it is established that "subordinat[ing] traditional race-neutral . . . principles" to "racial considerations" violates the Equal Protection Clause. *Miller v. Johnson*, 515 U.S. 900, 916, 115 S. Ct. 2475, 2488 (1995); *see also Inclusive Cmtys.*, 135 S. Ct. 2507, 2524 ("Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into" government decision-making.); *Ricci v. DeStefano*, 557 U.S. 557, 594–95, 129 S. Ct. 2658, 2681–82 (Scalia, J., concurring) (avoiding disparate impact liability forces third parties such as states to evaluate the racial outcome of their policies in a way that considers race, and government compulsion of this result violates equal protection principles). This was already a problem with the nonretrogression doctrine in Section 5 of the Voting Rights Act, and it is a mistake to import it to Section 2. *See Georgia v. Ashcroft*, 539 U.S. 461, 491, 123 S. Ct. 2498, 2517 (2003) (Kennedy, J. concurring) ("Race cannot be the predominant factor in redistricting . . . . Yet considerations of race that would doom a redistricting plan under the Fourteenth Amendment or [Section] 2 seem to be what save it under [Section] 5.").

166

No. 14-41127

In fact, the Supreme Court has been careful to read Section 2 narrowly to avoid constitutional doubts. For example, in *LULAC v. Perry*, the Court rejected an interpretation of Section 2 that would have "unnecessarily infuse[d] race into virtually every redistricting. . . ." 548 U.S. 399, 446, 126 S. Ct. 2594, 2625 (2006); *see also Bartlett v. Strickland*, 556 U.S. 1, 21, 129 S. Ct. 1231, 1247 (2009) (reading Section 2 so as to "avoid[] serious constitutional concerns under the Equal Protection Clause."); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205, 129 S. Ct. 2504, 2513 (2009) (deciding case under Voting Rights Act Section 4(b) instead of reaching the constitutionality of Section 5). A faithful adherence to the statutory text of Section 2 would have avoided constitutional difficulties.

## IV. Conclusion

Today's result moves us another step down the road of judicial supremacy by potentially subjecting virtually every voter regulation to litigation in federal court. According to the twists and turns of the majority opinions, purposeful racial discrimination can be "inferred" even without a shred of discriminatory utterance—not even one document of thousands of internal communications betrayed such purposes. Equally perversely, such a discrimination claim can be bolstered by legislative actions from forty to sixty years ago, when Texas was a Democrat-controlled state, whose legacy has been repudiated by current Republican dominance. (Not that party designation matters, but that any legislature's actions can be probative of decades-later actions when the legislature is controlled by the opposing party is bizarre.) Similarly, a Section 2 claim can rest on a marginal racially disparate impact estimated from sadly intransigent socioeconomic disparities coupled with a state's "long-ago history" of discrimination. Voting rights litigation is thus decoupled from any "results" caused by the state.

No. 14-41127

No doubt the majority believes that federal judges are well suited to regulate the electoral process.  As with many judge-made "solutions," however, today's results will backfire.  Judicial decisions will spawn inconsistent results and uncertainty, leading the public to question judges' impartiality.  This decision will thus foster cynicism about the courts and more rather than less racial tension.  Lawmakers at every level will be forced to be race-conscious, not race-neutral, in protecting the sanctity of the ballot and the integrity of political processes.  Finally, these unauthorized and extra-legislative transfers of power to the judiciary disable the working of the democratic process, which for all its imperfections, best represents "we the people."

For these reasons, we dissent.

No. 14-41127

JERRY E. SMITH, Circuit Judge, joined by EDITH H. JONES and EDITH BROWN CLEMENT, Circuit Judges, dissenting:

We respectfully dissent for the reasons ably explained by Judges Jones, Clement, and Elrod.

The en banc court is gravely fractured and without a consensus. There is no majority opinion, but only a plurality opinion that draws six separate dissenting opinions and a special concurrence.[1]

Despite deep divisions on key questions, however, the en banc court is unanimous in roundly repudiating the district court for legal error on some issues. Most significantly, the district judge attempted to wipe the Texas voter ID law entirely off the books—a remedy that the majority rightly observes "is potentially broader than the one to which Plaintiffs would be entitled . . . ." (Page 77.) The en banc court instead leaves the voter ID requirement essentially intact. In reversing, all fifteen judges agree that, in the words of the plurality opinion, "the vast majority of eligible voters possess SB 14 ID, and we do not disturb SB 14's effect on those voters—those who have SB 14 ID must show it to vote." (Page 82.) That is a global change from what the district court ruled.

The en banc court is likewise unanimous in reversing the district judge's bizarre declaration that SB 14 is a poll tax. (Part IV.) That is a frivolous claim that never should have seen the light of day. Her holding reveals this judge's

_____

[1] This case is an apt candidate for the well-worn saying, "You can't tell the players without a scorecard." Harry Stevens is credited with coming up with these words. Sometimes thought to be the inventor of the hot dog, he sold refreshments at Major League Baseball games in the early 1900s. "He also began to sell scorecards to fans with the phrase [']*You can't tell the players without a scorecard.*[']" *Harry M. Stevens*, WIKIPEDIA, https://en.wikipedia.org/wiki/Harry_M._Stevens (last modified July 5, 2016).

No. 14-41127

apparent opinion that Texas legislators and state officials are hayseed bigots determined to return minority voters to the back of the bus.

The unanimous court likewise clips the district judge's wings by vacating her gratuitous holding—in violation of the rule of constitutional avoidance—that SB 14 burdens the right to vote in violation of the First and Fourteenth Amendments. (Part III.) The plurality opinion properly dismisses those claims, criticizing the district court for ignoring the "well established principle governing the prudent exercise of . . . jurisdiction that [federal courts] will not decide a constitutional question if there is some other ground . . . ." (Page 71.)

The plurality opinion, although charitably allowing the district judge a second chance to review existing evidence, also roundly and repeatedly scolds her for mishandling that evidence and making erroneous findings therefrom. For example, the plurality aptly declares that "some [of the] findings are infirm." (Page 10.) Some "findings are infirm because of an erroneous view of the law." (Page 10.) "[W]e hold that much of the evidence upon which the district court relied was infirm." (Page 13.) "Because the district court relied upon evidence we conclude is infirm, the district court's opinion cannot stand as written." (Page 18.) "[T]he district court's analysis contained some legal infirmities." (Page 19.) "[S]ome of the evidence on which the district court relied was infirm." (Page 30.) The plurality gives the district court "instructions . . . about the legal infirmities in its initial findings." (Page 32.) The judge is told "to reevaluate the evidence" (Page 32) in accordance with "the appropriate legal standards" (Page 31). The plurality sternly rejects the judge's use of suspect evidence: "[W]e do not agree that such anecdotal evidence of racial campaign appeals shows that SB 14 denies or abridges the right

No. 14-41127

to vote." (Page 64.)

In sum, the vast majority of the judges on the en banc court have declared the district judge to have substantially erred in myriad legal conclusions and use of evidence, and the court is unanimous in several of those reversals. The district court is well-advised to avoid such regrettable misadventure on remand.

No. 14-41127

JAMES L. DENNIS, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

I concur in all but part II.A.1 of the majority's opinion. I respectfully dissent from the majority's reversal of the district court's finding that SB 14 was enacted with a racially discriminatory purpose because, in my view, we are bound to affirm that factual finding. The majority opinion erroneously assigns legal errors to the district court and, in disturbing the district court's finding of discriminatory purpose, fails to adhere to the proper standard of review and engages in improper reweighing of the evidence.

The district court's determination that SB 14 was enacted with a racially discriminatory purpose or intent is a finding of fact. *See Rogers v. Lodge*, 458 U.S. 613, 623 (1982). In reviewing the factual findings of the district court, this court is bound by the "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a). *Id.* at 622-23 (citing *Pullman-Standard v. Swint*, 456 U.S. 273 (1982)). "That Rule recognizes and rests upon the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856 (1982). "Because of the deference due the trial judge, unless an appellate court is left with the 'definite and firm conviction that a mistake has been committed,' it must accept the trial court's findings." *Id.* at 855 (quoting *United States v. United States Gypsum*, 333 U.S. 364, 395 (1948)). Thus, if the trial court's account of the evidence is "plausible in light of the record viewed in its entirety," the appellate court must accept its findings. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985).

The majority does not contend that the district court's finding of discriminatory purpose is implausible in light of the record as a whole. Indeed, the majority opinion itself appears to acknowledge that there is a considerable

No. 14-41127

amount of evidence to support this finding. *See, e.g.*, Maj. Op. at 20-30 (discussing part of the voluminous evidence that tends to show that SB 14 was enacted with a discriminatory purpose). Nevertheless, the majority reverses the district court because of purported legal errors, specifically, the district court's reliance on evidence that, in the majority's view, is "infirm."

Of course, Rule 52(a) does not apply to conclusions of law, and the district court's findings may be set aside if they rest on an erroneous view of the law. *Pullman-Standard*, 456 U.S. at 287. In my view, however, examination of the district court's opinion reveals no legal error and no reliance on infirm evidence. Instead of correcting legal errors, the majority opinion mistakenly lapses into an independent reweighing of the evidence and encroaches upon the district court's domain, in violation of Rule 52(a)'s clear instruction. *See Inwood Labs.*, 456 U.S. at 856; *Rogers*, 458 U.S. at 622-23.

First, the majority faults the district court for relying "too heavily" on evidence of Texas's less recent history of enacting discriminatory voting measures, citing *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612 (2013) and *McCleskey v. Kemp*, 481 U.S. 279 (1987). Maj. Op. at 13-14. The historical background of an official decision is "one evidentiary source for proof of intentional discrimination, particularly if it reveals a series of official actions taken for invidious purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). Following the Supreme Court's guidance in *Arlington Heights*, the district court considered, *inter alia*, evidence of Texas's persistent history of discriminatory practices in the realm of voting rights, beginning with the inception of all-white primaries in 1895 and progressing with the continual invention of new methods designed to curb minority voting each time a prior method was blocked by the courts, including poll taxes, literacy and secret ballot restrictions, voter re-registration and purging, and

173

No. 14-41127

racial gerrymandering of electoral districts. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 633-36 (S.D. Tex. 2014). The district court found that "[i]n each instance, the Texas Legislature relied on the justification that its discriminatory measures were necessary to combat voter fraud." *Id.* at 636. Contrary to the majority opinion's suggestion, neither *Shelby County* nor *McClesky* limits courts' consideration of such historical evidence in assessing discriminatory-purpose claims or proscribes the analysis employed by the district court here.

*Shelby County* concerned only the coverage formula for the preclearance requirement under section 5 of the Voting Rights Act, and the Supreme Court explicitly stated that its decision "in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2." 133 S. Ct. at 2629; *accord League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 242-43 (4th Cir. 2014) (holding in a section 2 case that the district court abused its discretion where it "failed to adequately consider North Carolina's history of voting discrimination" and instead "parroted the Supreme Court's proclamation [in *Shelby County*] that 'history did not end in 1965'") (citation and some internal quotation marks omitted).

In *McClesky*, the petitioner argued that Georgia's modern death sentencing process was unconstitutional. 481 U.S. at 291. Determining that McClesky had failed to establish that the state had acted with a discriminatory purpose, the Supreme Court concluded, *inter alia*, that state laws "in force during and just after the Civil War" were not probative of the legislature's intent a century later. *Id.* at 298 n.20. In the instant case, however, the district court did not rely solely on the more distant discriminatory practices by the state as evidence of the Texas Legislature's discriminatory purpose in passing SB 14. Rather, the district court considered the various and recurring

174

No. 14-41127

historical examples of state discrimination in Texas as evidence of the unceasing effort and desire to enact discriminatory procedures that would suppress the minority vote. As the district court explained, this history "exhibits a recalcitrance that has persisted over generations despite the repeated intervention of the federal government and its courts on behalf of minority citizens." *Veasey*, 71 F. Supp. 3d at 636. And, because of the Legislature's repeated invocation of ballot integrity concerns to justify discriminatory practices, the district court concluded that "[t]here has been a clear and disturbing pattern of discrimination in the name of combatting voter fraud in Texas." *Id.* Unlike the kind of isolated and remote evidence the Supreme Court rejected in *McClesky*, evidence of a pervasive pattern of operation is relevant to determining whether the legislature's current intent was discriminatory. While "history did not end in 1965," *Shelby Cty.*, 133 S. Ct. at 2628, neither legal precedent nor logic requires that we act as if it started in 1965 and close our eyes to the historical context surrounding challenged state action.[1] *See* W. FAULKNER, REQUIEM FOR A NUN 80 (Vintage Books 1975) (1951) ("The past is never dead. It's not even past.").

Next, the majority opinion faults the district court for its reliance on evidence that, in the majority's view, is "limited in [its] probative value," including the relatively recent history of official discriminatory actions in a

---

[1] The majority opinion itself recognizes that this evidence is relevant and probative. In surveying the evidence that tends to support the district court's discriminatory purpose finding, the majority opinion discusses evidence of Texas' history of "justifying voter suppression efforts," including the all-white primary, literacy and secret ballot requirements, poll tax, and re-registration and purging, "with the race-neutral reason of promoting ballot integrity." Maj. Op. at 23. Thus, the majority opinion suggests that this evidence tends to show that the Legislature's justification of SB 14 as a measure to ensure ballot integrity was pretext. *See id.* at 23. But the majority opinion does not explain why this historical evidence, which may be used to prove pretext, cannot be used to support a more direct inference of discriminatory intent.

No. 14-41127

particular Texas county and post-enactment testimony by proponents of the bill. Maj. Op. at 14-15, 18. In that respect, the majority opinion explicitly engages in reweighing of the evidence. *See, e.g.*, *id.* at 18 ("While probative in theory, even those (after-the-fact) stray statements made by a few individual legislators voting for SB 14 may not be the best indicia of the Texas Legislature's intent."). But determining the weight of the evidence "is the special province of the trier of fact," and this court may not reject the district court's finding simply because it would have assigned different weight to certain evidence than did the district court. *Inwood Labs.,* 456 U.S. at 856.

Finally, the majority opinion criticizes the district court for relying on conjecture and conclusory accusations by the bill's opponents in the Texas Legislature about the proponents' motives. Maj. Op. at 16-18. However, in its analysis of the discriminatory purpose claim, the district court did not rely on conjecture or conclusory assertions; instead, the court relied in part on testimony by SB 14's opponents as to particular facts and drew independent conclusions from those facts. *See, e.g.*, *Veasey*, 71 F. Supp. 3d at 702 (relying on proposed anti-immigration laws and concerns by Texas legislators about Hispanic immigrants carrying leprosy following census results showing gains in minority populations to conclude that "the 2011 legislative session was a racially charged environment"). The majority may not simply discard the district court's findings by substituting its own assessment of the evidence for that of the district court. *See Inwood Labs.,* 456 U.S. at 856.

In sum, the majority opinion identifies legal error where there is none, disturbs valid factual findings by the proper fact-finder, and thereby exceeds this court's authority under Rule 52(a). Because I believe we must affirm the district court's finding that SB 14 was enacted with a discriminatory purpose, I respectfully dissent in part. However, given that that our court has resolved

No. 14-41127

to reverse the discriminatory purpose finding and because of the significant evidence tending to show that SB 14 was enacted with a discriminatory purpose, I agree that this claim must be remanded to the district court for further proceedings in accordance with the judgment of the court.

No. 14-41127

EDITH BROWN CLEMENT, Circuit Judge, joined by E. GRADY JOLLY, EDITH H. JONES, JERRY E. SMITH, PRISCILLA R. OWEN, and JENNIFER WALKER ELROD, Circuit Judges, dissenting as to Part II.A.:

The Supreme Court has instructed that when a district court's findings as to discriminatory purpose are "infirm" and "the record permits only one resolution of the factual issue," we must reverse and render. *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982). The plurality discredits "much of the evidence" relied upon by the district court, Op. at 13, yet still manages to determine that remand is the proper course. After accounting for the full extent of errors in the district court's analysis, the record permits only one resolution of the factual issue: Plaintiffs failed to prove that the Texas Legislature passed SB 14 with a discriminatory purpose. Such a resolution mandates that we reverse and render. Accordingly, I dissent.

## I.

The district court made infirm findings that rested on legal error in concluding that the Legislature passed SB 14 with a discriminatory purpose. The plurality addresses only some of these errors in a selective and disorderly fashion, failing to conduct the appropriate analysis under the *Arlington Heights* framework. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977).

In conducting the proper analysis, it is important to bear in mind plaintiffs' heavy burden in imputing discriminatory intent to an entire legislative body. "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*,

No. 14-41127

442 U.S. 256, 279 (1979) (citation and footnote omitted); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (explaining that racial discrimination must be a "'substantial' or 'motivating' factor behind enactment of the law").

First, the district court disproportionately relied on long-ago historical background evidence unrelated to SB 14 to discern a discriminatory purpose by the Legislature. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 632-39, 700 (S.D. Tex. 2014). The most pernicious of the measures cited by the district court predate the passage of the Voting Rights Act in 1965. In fact, despite some bygone history of official discrimination, Texas's voting practices had so improved by 1965 that it was not included in the original preclearance requirements of the Voting Rights Act. As the plurality must admit, the district court's heavy reliance on such outdated historical evidence was error. Op. at 13-15; *see McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (noting that historical evidence not "reasonably contemporaneous with the challenged decision" has "little probative value"). Once stripped of error, the remaining historical background evidence on which the district court relied falls woefully short of "demonstrat[ing] a clear and consistent pattern of discriminatory action by the Texas Legislature." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). There is no substantial contemporary evidence of discrimination, and far from enough evidence to impugn the intentions of the entire Legislature in passing SB 14.

Second, the plurality fails to address the "specific sequence of events leading up [to] the challenged decision," *Arlington Heights*, 429 U.S. at 267, but an analysis of this factor makes clear that the district court erred. In *Arlington Heights*, the Supreme Court explained that courts should look to whether, for example, a legislative decision was precipitated by a sudden change in circumstances. *See id.* at 267 & n.16 (collecting cases and providing

No. 14-41127

example of sudden change in zoning laws after learning of plans to erect integrated housing). Here, the district court relied on evidence that SB 14 became "increasingly harsh" in each successive draft. *Veasey*, 71 F. Supp. 3d at 700. That is not the type of specific-sequence evidence, however, envisioned by the Court in *Arlington Heights*. The events leading up to the enactment of SB 14 demonstrate that lawmakers were concerned about protecting the integrity of elections, a concern backed by surveys showing that Texas voters of all races agreed with this goal and supported requiring photo IDs to vote. There is no evidence of sudden changed circumstances; in fact, the district court noted that SB 14 was debated over a lengthy six-year period. *Id.*

Third, the plurality claims that certain procedural departures by the Legislature provide a "potential link" in the "circumstantial totality of evidence" of possible discriminatory purpose. Op. at 24. But, as the plurality concedes, "context matters." *Id.* Viewed in the appropriate context, the procedural maneuvers employed by the Legislature occurred precisely because opponents of the legislation—several of whom are the very parties who brought this lawsuit—blocked three earlier iterations of voter ID legislation over the course of several years. While the Legislature made some departures from its normal procedural sequence in passing SB 14, these departures are easily explained as a way to avoid the obstructive tactics that had repeatedly defeated voter ID bills in past sessions. In other words, the political effectiveness of SB 14's opponents precipitated the Legislature's procedural departures.

The plurality makes much of the Legislature's passage of SB 14 in the midst of other "pressing matters of great importance to Texas." Op. at 26. In doing so, the plurality only feigns deference to the legislative process by claiming that the Legislature "is entitled to set whatever priorities it wishes." *Id.* at 25. We are not entitled to supplement our policy preferences for that of

180

the Legislature, and speculation such as what "one might expect" a legislature to do, *id.*, is not evidence of discriminatory purpose. It would be improper for the district court to infer discriminatory intent on behalf of the Legislature by second guessing legislative priorities. *See Arlington Heights*, 429 U.S. at 265 ("[I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality.").

Fourth, the State's purposes in passing SB 14 were protecting the sanctity of voting, avoiding voter fraud, and promoting public confidence in the voting process—motives that are unquestionably legitimate. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. . . . While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."). The fit between the law's goals and provisions does not show it was enacted with discriminatory intent.

Fifth, the district court identified no reliable legislative history or contemporary statements that reveal discriminatory purpose. "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268. "In some extraordinary instances the members might be called . . . to testify concerning the purpose of the official action . . . ." *Id.* As the Supreme Court has long recognized, however, "[p]lacing a decisionmaker on the stand is . . . 'usually to be avoided'" because "judicial inquiries into legislative or executive motivation

No. 14-41127

represent a substantial intrusion into the workings of other branches of government." *Id.* at 268 n.18.

The district court relied in large part on accusations by the bill's opponents about proponents' motives. *See Veasey*, 71 F. Supp. 3d at 655-57. Such biased conjecture cannot form the basis of a finding of discriminatory intent by the entire Legislature. *See United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.").

Despite discrediting this unreliable evidence, the plurality still determines that "circumstantial evidence . . . could support a finding of discriminatory purpose." Op. at 21. The primary evidence cited by the plurality is that "[t]he record shows that drafters and proponents of SB 14 were aware of the likely disproportionate effect of the law on minorities . . . ." *Id.* at 22. The plurality further cites a "backdrop of warnings that SB 14 would have a disparate impact on minorities." *Id.* at 26. The plurality misunderstands the law: the Supreme Court has made clear that mere *awareness* of a disparate impact (even assuming *arguendo* it existed here) is not enough to prove discriminatory *intent*. *Feeney*, 442 U.S. at 279 (holding discriminatory purpose requires more than "awareness of consequences"; legislature must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); *Price v. Austin Indep. School Dist.*, 945 F.2d 1307, 1319 (5th Cir. 1991) ("*Feeney* stands directly for the proposition that foreseeability of discriminatory impact, without more, does *not* constitute the forbidden discriminatory purpose."). The plurality's mistaken understanding of the law only encourages further "infirm" findings based on "an erroneous view of the law" by the district court, whose

No. 14-41127

reasoning and findings even the plurality now roundly discredits. *Pullman-Standard*, 456 U.S. at 292.

The plurality also overlooks the total absence of direct evidence of a discriminatory purpose and the effect of plaintiffs' failure to unearth such evidence—despite repeated assertions that such evidence exists. The district court allowed plaintiffs to develop an extensive discovery record that included thousands of documents, numerous and lengthy depositions, and confidential email communications, all on plaintiffs' assertion that such discovery would offer critical evidence of discriminatory motive. In the end, this intrusive search—typically reserved only for "extraordinary" cases—yielded no such evidence. *See Arlington Heights*, 429 U.S. at 268. Despite no smoking gun that would show discriminatory intent in the voluminous evidence, the plurality asserts that we should instead look to circumstantial evidence to infer intent, as an "invidious purpose" may be "hiding." Op. at 30. The Court in *Arlington Heights* noted the need to consider circumstantial evidence in cases where testimony by the actual decisionmakers was "barred by privilege." 429 U.S. at 268. But, as we found in *Price v. Austin Independent School District*, where decisionmakers are called to testify about their actions and "the justifications advanced in their testimony do not demonstrate a pretext for intentionally discriminatory actions, the logic of *Arlington Heights* suggests that the [direct] evidence . . . is actually stronger than the circumstantial evidence proffered by the plaintiffs." 945 F.2d at 1318. Here too, the direct evidence, and plaintiffs' failure to demonstrate discriminatory purpose from it, overwhelmingly favor a finding of no discriminatory intent. As the panel correctly noted, it is rather unlikely that a discriminatory motive "would permeate a legislative body and not yield any private memos or emails." *Veasey v. Abbott*, 796 F.3d 487, 503 n.16 (5th Cir. 2015), *reh'g en banc granted*, 815 F.3d 958.

No. 14-41127

The Supreme Court has recognized the gravity of judicial inquiries into alleged improper motives by a legislative body. *O'Brien*, 391 U.S. at 383-84 (stating that judicial "[i]nquiries into congressional motives or purposes are a hazardous matter" and the "stakes are . . . high"). The plurality takes lightly the aspersions it casts on the Legislature by allowing such a weak evidentiary record to potentially support a finding of racial animus. When there is no "proof that a discriminatory purpose has been a motivating factor in the decision," as is the case here, we owe "judicial deference." *Arlington Heights*, 429 U.S. at 265-66. The plurality abjures such deference and encourages witch hunts for racism.

## II.

The record permits only one conclusion in this inquiry after applying the appropriate legal standards and discounting the infirm findings by the district court: Plaintiffs have not proven that the Texas Legislature acted with a discriminatory intent in enacting SB 14. *See Pullman-Standard*, 456 U.S. at 292. Despite extensive discovery of legislators' private materials, plaintiffs have brought forth no direct evidence of discriminatory intent. What evidence remains, after accounting for the district court's errors, does not suffice to conclude that SB 14 was enacted "'because of,' not merely 'in spite of,'" a disparate impact on minorities. *Feeney*, 442 U.S. at 279.

The record below was fully developed. Because plaintiffs "simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the [Legislature's] decision," the district court should not be allowed to conduct any re-weighing of the evidence. *Arlington Heights*, 429 U.S. at 270-71. There is no reason to permit plaintiffs—who have not carried their burden—another opportunity to prove their case. *See id.* at 271 ("This conclusion ends the constitutional inquiry."). Unfortunately, the plurality

No. 14-41127

chooses to provide plaintiffs another chance and leaves the district court with a disorganized, piecemeal analysis of the *Arlington Heights* factors that confuses the law and offers no clear direction on remand.

For these reasons, I would reverse the district court's holding as to discriminatory purpose and render judgment for the State on this claim.

No. 14-41127

JENNIFER WALKER ELROD, Circuit Judge, joined by SMITH, Circuit Judge, concurring in part and dissenting in part:

I dissent from all but Part IV of Judge Haynes's opinion.[1]  I agree with Judge Jones's opinion that, despite wide-reaching and invasive discovery into legislators' internal correspondence, there is no record evidence that any legislator—much less the Texas Legislature as a whole—had a racially discriminatory purpose in enacting SB 14.  The extensive history of obstruction by opponents of voter ID legislation accounts for the procedures employed to ensure passage of SB 14, and none of the circumstantial evidence relied on by Judge Haynes's opinion suggests that the Legislature acted on the basis of racism.[2]  Judgment therefore should be rendered in favor of the State on Plaintiffs' discriminatory purpose claim.

---

[1] Part IV of Judge Haynes's opinion correctly vacates the district court's opinion and renders judgment in the State's favor on Plaintiffs' claim that SB 14 imposes an unconstitutional poll tax.  Part III of Judge Haynes's opinion vacates the district court's ruling on Plaintiffs First and Fourteenth Amendment claims.  I agree that those claims should be vacated.  Because I do not agree with the treatment of the Voting Rights Act claims in Judge Haynes's opinion, I would reach the First and Fourteenth Amendment claims and reverse.  The First and Fourteenth Amendment claims fail because Plaintiffs have not shown SB 14 "imposes 'excessively burdensome requirements' on any class of voters . . . ." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 202 (2008) (quoting *Storer v. Brown*, 415 U.S. 724, 738 (1974)) (upholding Indiana's voter ID requirements against Fourteenth Amendment challenge); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992) ("[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992))).

[2] Judge Costa's opinion blurs the line between discriminatory intent and discriminatory effect.  Even when a legislature acts to disadvantage an opposition party, the mere correlation between party membership and race does not create a Voting Rights Act or Equal Protection claim.  "Because of" means because of.  *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) ("[Discriminatory purpose] implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.").

No. 14-41127

Plaintiffs' claim that SB 14 violates the "results test" of Section 2 of the Voting Rights Act also fails. SB 14 does not "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

> [A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create.

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) (internal alterations, quotation marks, and citation omitted). I agree with Judge Jones's opinion and Judge Easterbrook's opinion for the Seventh Circuit that the *Gingles*[3] factors—an unranked list of nonexclusive considerations that lend themselves to manipulation—are unhelpful in this context.[4] *See Frank v. Walker*, 768 F.3d 744, 755 (7th Cir. 2014) (expressing skepticism about application of *Gingles* factors to voter ID provision, because *Gingles* "does not distinguish discrimination by the defendants from other persons' discrimination. In vote-dilution cases, the

---

[3] *Thornburg v. Gingles*, 478 U.S. 30 (1986).

[4] The malleability of the *Gingles* test is visible in its implementation: different courts purporting to apply the *Gingles* factors seem to conduct very different analyses. *Compare Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 556–60 (6th Cir. 2014) (relying on *Gingles* as second step of a two-part test dependent on socioeconomic factors and historic voting practices), *vacated as moot by* 2014 WL 10384647 (6th Cir. Oct. 1, 2014), *and League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 241–44 (4th Cir. 2014) (relying on *Gingles* as second step of a two-part test dependent on sweeping contextual analysis of pre-VRA history and details of challenged bill's passage), *mandate stayed*, 135 S. Ct. 6, *cert. denied*, 135 S. Ct. 1735 (2015), *with Gonzalez v. Arizona*, 677 F.3d 383, 405–07 (9th Cir. 2012) (en banc) (citing some but not all of the *Gingles* factors without reference to a two-part test); *see also N.C. State Conference of NAACP v. McCrory*, ___ F. Supp.3d ___, No. 1:13-cv-658, 2016 WL 1650774, at *76–*80 (M.D.N.C. Apr. 25, 2016) (collecting cases). The validity of a state's voting laws ought not to rely on the outcome of a judicial Rorschach test.

No. 14-41127

domain of *Gingles*, the government itself draws the district lines; no one else bears responsibility."), *cert. denied*, 135 S. Ct. 1551 (2015).

Moreover, Plaintiffs' § 2 claim fails even if we consider the *Gingles* factors. SB 14 has been tested many times and there is no evidence in this record that any voter has been denied the right to vote on the basis of his or her race because of its voter ID requirements.[5] Plaintiffs' claim rests principally on the unfortunate socioeconomic disparities that exist among various racial groups in Texas as elsewhere, but Judge Haynes's opinion fails to establish any link between these disparities and any contemporary discrimination by the State of Texas.

The Voting Rights Act rests on Congress's authority to enact "appropriate legislation" to enforce the guarantees of the Fifteenth Amendment. *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2619 (2013); *South Carolina v. Katzenbach*, 383 U.S. 301, 325–26 (1966); U.S. Const. amend. 15 §§ 1–2. The use of that power "must be justified by current needs." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009). The examples of decades-old state discrimination relied on by Plaintiffs are unavailing. *See Shelby Cty.*, 133 S. Ct. at 2622, 2627 (explaining that the Voting Rights Act "imposes current burdens and must be justified by current needs" and rejecting reliance on "decades-old data and eradicated practices"). Nor does the existence of societal economic disparities render SB 14 unlawful. *See Frank*,

---

[5] To establish a § 2 claim, Plaintiffs must first show that SB 14 abridges or denies an individual's ability to vote. After an exhaustive statewide search, Plaintiffs identified three individuals who could not vote at one time because they lacked qualifying ID. None is now prevented from voting. Two of the three individuals are eligible to vote by mail and the third has subsequently obtained a free election ID card. Out of the entire state of Texas, Plaintiffs have not produced anyone who cannot vote today because of SB 14's requirements. The burden to prove discriminatory effect lies with Plaintiffs. Without a denial or abridgement, no § 2 claim can stand.

768 F.3d at 753 ("Section 2(a) forbids discrimination by 'race or color' but does not require states to overcome societal effects of private discrimination that affect the income or wealth of potential voters.").

The contrary approach taken by Judge Haynes's opinion improperly would permit challenges to virtually all aspects of the voting process simply because poverty adds to the burdens of everyday activities and wealth distribution is unequal across racial groups. This distorts the § 2 analysis and raises serious constitutional questions. *Cf. Inclusive Cmtys.*, 135 S. Ct. at 2524 ("Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations" into government decision-making.).

The Supreme Court has explained that for most voters, the burdens associated with obtaining photo ID in order to vote "surely do[] not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198 (upholding Indiana's voter ID law). The requirements imposed by SB 14 are not outside the usual inconveniences expected of citizens exercising their right to vote, and, as in *Crawford*, they provide no basis for overturning a race-neutral law by which the State seeks to prevent in-person voter fraud. *See id.* at 196 ("[T]he interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process.").

Simply put, Plaintiffs have not shown that SB 14 had any effect on voter turnout, that any disparity in ID possession among racial groups was caused by SB 14, or that a single Texan is prevented from voting by SB 14. Accordingly, I would vacate the district court's opinion and render judgment for the State.

No. 14-41127

GREGG COSTA, Circuit Judge, dissenting from Part II(A)(1):

The six years of debate in the Texas Legislature before voter ID passed demonstrates that it is a controversial political question. The opinions issued today demonstrate it also raises contentious legal questions. And with respect to how to assess vote denial (as opposed to vote dilution) claims under the "effects" test of the Voting Rights Act, it is a difficult one. Although I join the majority opinion affirming the district court's holding that the Texas law has discriminatory effects in violation of the Act, the *Gingles* factors are not a perfect fit for the vote denial claims that have blossomed in the post-*Shelby County* world. But for the reasons set forth in the majority opinion and Judge Higginson's concurring opinion, it is the best guidance we have for evaluating such cases.

In contrast to the uncertain legal terrain for the discriminatory effects claim, the discriminatory purpose claim can be resolved through application of two entrenched legal principles: the deference that appellate courts owe to factfinders and the *Arlington Heights* framework for evaluating circumstantial evidence of discriminatory purpose.[1] *See Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982); *Village of Arlington Heights v. Metropolitan Housing Develop. Corp.*, 429 U.S. 252, 266–68 (1977). That deference requires that we overturn a district court's factual findings only if they are clearly erroneous, which means substantial evidence did not support the finding, the court misinterpreted the effect of the evidence, or the findings are against the preponderance of credible evidence. *See* Fed. R. Civ. P. 52(a)(6); *Water Craft*

---

[1] Even with our affirmance of the discriminatory effects finding, the purpose claim must still be resolved. Not only would a finding of discriminatory purpose lead to a different remedy with respect to the voter ID law, but it could also subject Texas to preclearance for future voting changes. 52 U.S.C. § 10302(c).

No. 14-41127

*Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 488 (5th Cir. 2006).  To reverse under the clear error standard, we must have "a definite and firm conviction that a mistake has been committed."  *Id.* (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir.2000)).

That deference is the reason it is hard to find appeals of bench trials involving private law causes of action in which we have concluded that the factual findings were clearly erroneous.  This year alone, we have affirmed such findings in bankruptcy,[2] maritime,[3] Fair Labor Standards Act,[4] ERISA,[5] insurance,[6] and oil and gas[7] cases.  In none of those cases did we subject the evidence to exacting scrutiny or reweigh it.  That is not a dereliction of appellate duty.  It is as it should be.  So long as the "district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  *U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 431 (5th Cir. 2014) (affirming district court's valuation finding in fraudulent transfer case) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)).

---

[2] *In re Monge*, -- F.3d --, 2016 WL 3269032 (5th Cir. June 14, 2016).

[3] *Grogan v. W & T Offshore, Inc.*, 812 F.3d 376 (5th Cir. 2016); *Alebamon Marine Servs., L.L.C. v. Ocean Marine Contractors Scrap Div., L.L.C.*, 2016 WL 1358948 (5th Cir. Apr. 5, 2016); *Osprey Underwriting Agency, Ltd. v. Nature's Way Marine, L.L.C.*, -- Fed. Appx. --, 2016 WL 1178110 (5th Cir. Mar. 25, 2016).

[4] *Steele v. Leasing Enter., Ltd.*, -- F.3d --, 2016 WL 3268996 (5th Cir. June 14, 2016); *Fairchild v. All American Check Cashing, Inc.*, 815 F.3d 959 (5th Cir. 2016).

[5] *Perez v. Bruister*, -- F.3d --, 2016 WL 2343009 (5th Cir. May 3, 2016).

[6] *Seahawk Liquidating Trust v. Certain Underwriters at Lloyds London*, 810 F.3d 986 (5th Cir. 2016).

[7] *Akuna Matata Invs. Ltd. v. Texas Nom Ltd. P'ship*, 814 F.3d 277 (5th Cir. 2016).

No. 14-41127

But it is easier to find recent public law cases in which we have not upheld factual findings, despite the deferential standard of review.[8] *See Aransas Project v. Shaw*, 774 F.3d 324, 326 (5th Cir. 2014) (Prado, J., dissenting from denial of rehearing en banc) (citing *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 769 F.3d 330, 335 (5th Cir. 2014) (Dennis, J., dissenting from denial of rehearing en banc)). This case adds to the list. That is so despite the rule that "[l]egislative motivation or intent is a paradigmatic fact question."[9] *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)).

So what are the reasons why the majority opinion, despite noting significant evidence "that could support a finding of discriminatory intent," Maj. Op. at 18, does not defer to that finding? There are two: the district court relied "too heavily on the evidence of State-sponsored discrimination dating back hundreds of years" and "on post-enactment speculation by opponents of SB 14." Maj. Op. at 13, 16. As discussed below, however, virtually none of this evidence that the majority opinion critiques appears in the district court's

---

[8] Because these cases often have such a significant impact (the instant case involves a law setting voting requirements for a state of more than 25 million people), it may be natural to be hesitant about giving a single district judge so much discretion in deciding the fate of a law. Indeed, it used to be the case that lawsuits challenging the constitutionality of a state or federal law had to be heard by three-judge panels. 28 U.S.C. §§ 2281, 2282 (repealed 1976). For better or worse, Congress did away with that system in 1976. Act of Aug. 12, 1976, Pub. L. No. 94-381, 90 Stat. 1119; *see also* 17A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4235 (3d ed.) (discussing history, purpose, and current status of Congressionally required three-judge panels). With these cases now being decided by a single judge as most others are, there is no basis for altering the level of deference based on the subject matter of the case.

[9] In the context of private Title VII suits, discriminatory intent was the disputed issue in two of the leading Supreme Court cases emphasizing the deference that district courts are owed on questions of fact. *Anderson*, 470 U.S. at 574–75 (intent to discriminate on basis of sex); *Pullman-Standard*, 456 U.S. at 290 (rejecting in race discrimination case "the Fifth Circuit rule that a trial court's finding on discriminatory intent is not subject to the clearly-erroneous standard of Rule 52(a)").

No. 14-41127

analysis of the discriminatory purpose claim. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 698–703 (S.D. Tex. 2014).

With respect to the use of history, I read not only the district court's opinion but also the case law differently. As legal support for the view that the district court gave too much weight to "long-ago history," the majority opinion relies principally on *Shelby County v. Holder*, 133 S. Ct. 2612 (2013). Maj. Op at 13–14 & n.14. *Shelby County* held that Congress exceeded its power under the Fifteenth Amendment in subjecting nine states to the "extraordinary measure[]" of having to preclear every change in voting laws. *Id.* at 2619. It found Congress's formula for selecting these states unconstitutional because it relied on "decades-old data and eradicated practices," in particular the use of literacy tests which had long been abolished and voter registration and turnout numbers that had "risen dramatically" since 1965 when the Voting Rights Act was first enacted. *Id.* at 2627.

*Shelby County* was not a case about purposeful discrimination under the Fourteenth Amendment or Section 2 of the Voting Rights Act. It makes no mention of *Arlington Heights*. For those reasons alone, *Shelby County* should not be used to curtail the use of an *Arlington Heights* factor. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overturning its own decisions.").

But even if we did have the freedom to engage in a law review-like debate about what *Shelby County* foretells for the use of history as circumstantial evidence under *Arlington Heights*, history is being used very differently in the two contexts. *Shelby County* rejected the use of 50-year-old history alone to

No. 14-41127

impose the "stringent" requirement of preclearance. That preclearance requirement, which applied to new laws carrying no hint of unconstitutionality (even ones that increased access to voting), was an exception to the normal practice of using "case-by-case litigation" to enforce constitutional rights. 133 S. Ct. at 2624. In the example of case-by-case litigation here that seeks to establish a current constitutional violation, *Arlington Heights* just says that history is one of many factors that may be considered. And it's not just any history that courts should consider, but a historical background that "reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267.

That type of pattern-or-practice evidence exists here. As the majority opinion recognizes, most of the discriminatory laws the district court recounted—all-white Democratic primaries; literacy tests; poll taxes; and the annual re-registration requirement that Texas imposed after the poll tax was abolished—were justified with the same interest cited for voter ID: prevention of voter fraud. Maj. Op. at 22–23. Another thread, again recognized by the majority opinion, running from prior restrictive voting laws to SB 14 is that they have typically been enacted (by both political parties) in response to a perception of increased voting power by emerging demographic groups.[10] Maj. Op. 29–30 & n.30; 71 F. Supp. 3d at 700. The district court thus did not just say "there was discrimination in the past, so there must be discrimination today;" it tied historical patterns to features of the law being challenged, as *Arlington Heights* contemplates.

---

[10] This historical practice is not limited to Texas or other southern states. In response to the growth of Irish immigrants who tended to favor Democrats, the Know-Nothing movement led to the passage of more restrictive voting laws in Connecticut, Massachusetts, and New York during the 1850s. *See* ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 68 (rev. ed. 2009).

No. 14-41127

Despite recognizing that this connection was made with respect to both the voter fraud rationale and historical practice of enacting voting restrictions in response to potential increases in minority voting strength, the majority opinion nonetheless holds that the district court relied too much on "evidence of State-sponsored discrimination dating back hundreds of years." Maj. Op. at 13. To be sure, historical evidence limited to the nineteenth century is of "little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (discounting, under *Arlington Heights*, historical evidence focused only on "Georgia laws in force during and just after the Civil War" because it was not reasonably contemporaneous with enactment of the challenged law). But I just don't see that the district court's finding of discriminatory purpose relied on such history at all, let alone to a significant degree.

The majority opinion's contrary view seems to flow from its scrutiny of the entire district court opinion for any references to evidence that may not be probative of discriminatory intent. But the district court had before it not just the purpose question, but claims involving discriminatory effects, impact on First Amendment interests under the *Anderson/Burdick* balancing test, and whether the voter ID imposed a poll tax. As is customary with bench trial rulings, the district court first summarized the testimony and facts from the entire trial. Only after that discussion, which was lengthy given the vast record, did it proceed to analyze the particular claims and identify the evidence that supported its legal conclusions for each. In reviewing the factual sufficiency of the finding of discriminatory purpose, our review should focus on the district court's analysis of that particular claim.

One looking at that section of the district court's decision after reading today's opinions with their focus on history would be surprised that this is the only mention of it:

> Historical Background. As amply demonstrated, the Texas Legislature has a long history of discriminatory voting practices. To put the current events into perspective, Texas was going through a seismic demographic shift at the time the legislature began considering voter ID laws. Hispanics and African–Americans accounted for 78.7% of Texas's total population growth between 2000 and 2010. In addition, it was during this time that Texas first became a majority-minority state, with Anglos no longer comprising a majority of the state's population. As previously discussed, this Court gives great weight to the findings of Dr. Lichtman that '[t]he combination of these demographic trends and polarized voting patterns . . . demonstrate that Republicans in Texas are inevitably facing a declining voter base and can gain partisan advantage by suppressing the overwhelmingly Democratic votes of African–Americans and Latinos.'

71 F. Supp. 3d at 700 (alterations in original) (footnotes omitted). The natural reading of this single paragraph is that the general first sentence is providing background, and it is only the demographic changes that the court is citing as the *Arlington Heights* context for "the current events." The majority opinion not only finds no error with this latter conclusion, but endorses its relevance. Maj. Op. at 29–30.

Even if one reads the footnote at the end of the first sentence as fully incorporating the opening section of the opinion that chronicles "Texas's history with respect to racial disparity in voting rights,"[11] *id.* at 700 n.535 (citing *id.* at 633–39), I don't see that historical overview as error.[12] Not so long ago, the Supreme Court recited the same history of voting rights in Texas:

---

[11] Because the opening sentence of the paragraph just refers to the Texas Legislature's history of enacting discriminatory voting laws, there is no plausible reading that would allow it to incorporate prior summaries of testimony in the opinion that involve the discriminatory voting acts of a single county (Waller County), another item the majority opinion criticizes.

[12] The only parts of that section that refer to events "dating back hundreds of years" are a benign introductory statement that "On the heels of Reconstruction, freed slaves and other minority men were just gaining access to the right to vote," and headings for topics like the poll tax and literacy tests that, owing to the duty of historical accuracy, list the entire period they were in existence ("1905–1970: Literacy and 'Secret Ballot' Restrictions"; "1902–1966: Poll Taxes"). 71 F. Supp. 3d at 634.

No. 14-41127

> Texas has a long, well-documented history of discrimination that has touched upon the rights of African–Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the State as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act. Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions.

*LULAC v. Perry*, 548 U.S. 399, 439–40 (2006) (quoting *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994)). Deeming a similar discussion here to be legal error risks making rhetoric a basis for reversal. The natural starting point of any historical discussion is the beginning. Maj. Op. at 14 n.14 (recognizing that "history (even 'long-ago history') provides context to modern-day events"). And the bigger problem of locating error in sections of the district court's opinion that do not even analyze the claim at issue is that it results in the fact finding of judges being much more susceptible to reversal than those of juries, which do not have to summarize the evidence or provide reasons for their decisions.

This improper focus on the district court's summary of the evidence rather than its later analysis of the discriminatory purpose claim is just as pronounced when it comes to the statements of bill opponents with which the majority opinion also finds fault. Maj. Op. at 16–17. Those comments appear nowhere in the one-paragraph discussion of "Contemporaneous Statements," 71 F. Supp. 3d at 702, or anywhere else in the discriminatory purpose analysis. Instead, they appear in a section recounting testimony (from both sides) about the "Method and Result of Passing SB 14." *Id.* at 655–57. The discussion of "Contemporaneous Statements" that does appear in the purpose analysis is

No. 14-41127

balanced, noting that "there are no 'smoking guns' in the form of an SB 14 sponsor making an anti-African-American or anti-Hispanic statement." *Id.* at 702. The only legislator quoted is not an opponent, but bill supporter Todd Smith who admitted it was "common sense" that voter ID would have disproportionate effects on racial minorities. *Id.* The majority opinion cites that testimony as relevant evidence for the purpose claim. Maj. Op. at 22. That leaves only the district court's conclusion that the 2011 legislative session was racially charged in light of other pending legislation, *id.* at 702, which seems like an inference a factfinder should be entitled to draw.

But even if not, with that factual finding being the only one specifically mentioned in the district court's discussion of discriminatory purpose with which the majority opinion finds fault, it does not seem like a sufficient basis for reaching "a definite and firm conviction that a mistake has been committed" as to the ultimate finding. *Canal Barge Co. Inc.*, 220 F.3d at 375. That is especially so when the majority opinion endorses the district court's reliance on just about all the other evidence it actually did cite in assessing the *Arlington Heights* factors. *See* Maj. Op. at 21–30. In light of that discussion and the district court opinion, there is no value in repeating that evidence here. The only thing to add is that the district court correctly recognized that the discriminatory impact of the law (for which the majority opinion finds sufficient evidentiary support on the "effects" claim and which even Judge Jones's dissent does not dispute, *see* Jones Dissent at 5) can also be considered in evaluating discriminatory purpose. *See Arlington Heights*, 429 U.S. at 266 (noting that "[t]he impact of the official action whether it 'bears more heavily on one race than another,' may provide an important starting point" in the "sensitive inquiry into [ ] circumstantial and direct evidence of intent") (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)); *Jim Sowell Const. Co. v. City*

No. 14-41127

*of Coppell*, 61 F. Supp. 2d 542, 547 (N.D. Tex. 1999) (citing *Arlington Heights* for the proposition that "circumstantial evidence regarding the impact of its official actions" can be evidence of discriminatory purpose). Yet the majority opinion does not list discriminatory impact as a consideration in the purpose inquiry, Maj. Op. at 11–12, despite recognizing that those likely effects were known prior to enactment, which would seem to make the discriminatory impact an even more probative consideration in determining purpose. I would therefore conclude that there was sufficient evidence from which the district court could have reasonably concluded that the law was enacted with a discriminatory purpose, even if, as is usually the case in hotly contested trials, there is also evidence to support the opposite view.

Vacating the finding of discriminatory purpose not only is at odds with the deference owed the factfinder, but also causes delay in the ultimate resolution of this case that could impose significant costs. Voter ID was passed five years ago. Litigation concerning its lawfulness has been ongoing for more than four years.[13] Even more concerning than mere delay, however, is the possibility of Texas elections being conducted under ever-changing rules. Since SB 14's enactment, elections have been conducted under its terms. The upcoming November 2016 is now likely to be conducted under a remedy for the effects violation that limits the discriminatory impact of the law but that leaves some of it in place. Depending on how the discriminatory purpose claim is decided on remand, the next cycle of elections might be conducted with a voided SB 14 playing no role. Such frequent changes in the voting rules carry a

---

[13] The preclearance regime was still in effect when the law was enacted. DOJ denied preclearance, but in 2012 Texas sought a judicial determination of that question by a three-judge panel. *See Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012), *vacated*, 133 S. Ct. 2886 (2013). After *Shelby County*, the lawsuits we are considering were filed in 2013.

No. 14-41127

substantial risk of increased confusion. It is that uncertainty over voting requirements that some studies—including a recent joint study from Rice University's Baker Institute for Public Policy and the University of Houston's Hobby Center for Public Policy—have found to be one of the more significant ways in which voter ID laws depress turnout. *See* MARK JONES, ET. AL., THE TEXAS VOTER ID LAW AND THE 2014 ELECTION: A STUDY OF TEXAS'S 23RD CONGRESSIONAL DISTRICT 13 (2015) (noting that its study of voter turnout under SB 14 "suggest[s] that the most significant impact of the current Texas voter ID law is confusion and subsequently depressed voter turnout").

\* \* \*

Reluctance to hold that a legislature passed a law with a discriminatory purpose is understandable. Maj. Op. 12 ("We acknowledge the charged nature of accusations of racism, particularly against a legislative body . . . ."). Yet courts are called upon all the time to decide difficult questions about whether state legislatures or Congress have violated other important constitutional values like, taking the First Amendment as just one example, the right to free speech or free exercise of religion. When we find that they have done so, it doesn't exactly cast those lawmakers in the best of light.

It is also important to note that affirming the finding of discriminatory purpose[14] would not be the inflammatory "racial name-calling" that Judge Jones's dissent suggests. Jones Dissent at 1. Such a finding, although one of grave importance, is not tantamount to a finding that the law had a "racist

---

[14] It's also worth again emphasizing that unlike the findings of constitutional violations we usually make in cases that present purely legal questions, affirming the district court here would not be a direct ruling from this court that the law was passed with a discriminatory purpose, only that there was evidence from which a factfinder could draw that conclusion.

No. 14-41127

motivation." *Id.* at 3; Elrod Dissent at 1 (characterizing question as whether "the Legislature acted on the basis of racism"); *see also* Maj. Op. at 12–13 (also indicating that such a finding requires a showing of "racism"). As Judge Kozinski explained in a decision upholding a district court determination that a discriminatory purpose motivated a Los Angeles county reapportionment plan, nothing in an opinion finding discriminatory purpose needs to even "suggest[]" that lawmakers "harbored any ethnic or racial animus." *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring) (explaining that "there is no indication that what the district court found to be intentional discrimination was based on any dislike, mistrust, hatred or bigotry against Hispanics or any other minority group").[15]   The

---

[15] Judge Jones's dissent states that *Garza* is one of only a handful of cases in recent decades finding that a law was enacted with a discriminatory purpose. Jones Dissent at 10 n.11. Notably, it was a voting rights case from a jurisdiction not covered by the Voting Rights Act's preclearance requirements. *See also Stabler v. Cnty. of Thurston, Neb.*, 129 F.3d 1015, 1022 (8th Cir. 1997) (finding intentional discrimination in redistricting plan of non-covered Nebraska county). For the nine covered states (a number of counties from other states were also subject to preclearance), there was little incentive for a challenger to bring a claim of purposeful discrimination prior to *Shelby County*. One of the requirements for preclearance was for the public entity enacting the change to *disprove* that the voting change had a discriminatory purpose or effects. *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 477–78 (1997) (citing 42 U.S.C. § 1973c). The impact that making the typically easier-to-prove effects test an equally powerful avenue of relief has on purpose claims can be seen from the drop in the number of discriminatory purpose claims brought in voting cases after the 1982 amendments to the Voting Rights Act made effects a basis for section 2 liability in response to *City of Mobile v. Bolden*, 446 U.S. 55 (1980) (interpreting prior version of section 2 to require finding of discriminatory purpose). In cases litigated on the eve of the 1982 amendments, three courts of appeals (including ours) had found discriminatory purpose in the enactment or maintenance of local electoral systems. *See Lodge v. Buxton*, 639 F.2d 1358, 1380 (5th Cir. Unit B 1981), *aff'd sub nom. Rogers v. Lodge*, 458 U.S. 613 (1982); *N.A.A.C.P. by Campbell v. Gadsden Cnty. Sch. Bd.*, 691 F.2d 978, 982 (11th Cir. 1982); *Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 216 (8th Cir. 1982), *aff'd sub nom. City of W. Helena, Ark. v. Perkins*, 459 U.S. 801 (1982) (all finding that at-large electoral system was created or maintained for discriminatory purpose).

Outside the voting context where effects became challengers' preferred claim, there are more examples of courts finding discriminatory purpose, mostly in the area of school desegregation and housing. *See, e.g.*, *United States v. City of Yonkers*, 96 F.3d 600, 618–19

No. 14-41127

discriminatory purpose can instead be the product of "elected officials engag[ing] in the single-minded pursuit of incumbency." *Id*.; *Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) (observing that "many devices employed to preserve incumbencies are necessarily racially discriminatory"). That most basic of human instincts—self-preservation—can thus provide an explanation for enacting a law at least in part because it will have a disparate impact on protected groups that favor the out-of-power party. 71 F. Supp. 3d at 700; *see also Frank v. Walker*, 773 F.3d 783, 790–93 (7th Cir. 2014) (Posner, J., dissenting from denial of rehearing en banc) (discussing studies and other evidence supporting the view that voter ID laws, although not resulting in "huge" decreases in turnout, have an effect primarily on "low-income and minority groups" that favor Democrats). Indeed, the highly polarized nature of voting in Texas along racial lines (according to exit polls from the last gubernatorial election, 72% of whites, 44% percent of Latinos, and 7% of African-Americans voted for the Republican winner[16]) makes depressing minority turnout a strong proxy for suppressing Democratic turnout.

A judge who agrees with Judge Jones's dissent that "partisanship, not race," is a likely reason why the Texas Legislature enacted SB 14 can thus still conclude that the law was enacted with a discriminatory purpose. Jones Dissent at 39 ("No doubt Republicans would not have pressed for voter ID if they felt it would largely enhance Democrat voting."); *id*. at 40 ("The law

---

(2d Cir. 1996) (school); *Diaz v. San Jose Unified Sch. Dist.*, 733 F.2d 660, 675 (9th Cir. 1984) (school); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1066–67 (4th Cir. 1982) (housing); *United States v. Texas Ed. Agency*, 600 F.2d 518, 527 (5th Cir. 1979) (school); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 144–45 (3d Cir. 1977) (housing).

[16] *Governor: Texas (Abbott vs. Davis)—Exit Polls (2014)*, CNN: 2014 ELECTION CENTER, http://www.cnn.com/election/2014/results/state/TX/governor/.

No. 14-41127

reflects party politics, not racism . . ."). If that desire for partisan advantage (or any other underlying motivation) leads a legislature to select a "course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group,"[17] that is enough. *See Garza*, 918 F.2d at 778 (Kozinski, J., concurring). This different starting point for assessing the discriminatory purpose claim—that is, a mistaken premise that the record has to support a finding of outright racism—perhaps explains why today's opinions take such widely divergent views of the evidence.

---

[17] *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).